Judy DAVIS and The First National Bank
of Boston, as Trustee of the Albert A.
Davis Trust f/b/o Judy Davis, Plaintiffs,

v.

DAWSON, INC. and Dawson Holdings
PLC, Defendants.

Civil Action No. 95–12255–PBS.

United States District Court,
D. Massachusetts.

June 9, 1998.

John P. Dennis, Dale C. Kerester, Lynch, Brewer, Hoffman & Sands, Boston, MA, for Plaintiffs.

Richard D. Belin, Michael A. Albert, Sayoko Blodgett–Ford Foley, Hoag & Eliot, Boston, MA, for Defendants.

## ORDER

SARIS, District Judge.

After hearing, I adopt the well-reasoned report and recommendation dated February 12, 1998. I make only three brief comments.

First, Dawson objects to the magistrate judge's recommendation that the sellers be granted summary judgment on Counterclaim V, which asserts that the sellers breached Section 2.11 of the Stock Purchase Agreement relating to tax claims by the Japanese, Canadian, and Massachusetts authorities. The heart of this breach of contract claim is laid out in the October 11, 1996 set-off letter (Appendix 608–621) in which Dawson demands indemnification as a result of damages arising from the breaches of representations and warranties made in the Stock Purchase Agreement and Schedules. Specifically, Dawson sought indemnification for all unpaid taxes, stated it would set off $29,185 for the settlement of unpaid taxes owed to the Japanese tax authority, and reserved the right to set-off those amounts of unpaid taxes due to Massachusetts and Canada when they become more "precisely determinable."

In my review of the defendants' brief (Docket No. 357) and the pleadings, Dawson never expressly raised before the magistrate judge the present claim that a breach of warranty as to potential future tax liability at the time of the Stock Purchase Agreement had an adverse impact on the value of Faxon, as measured by the difference between the purchase price and the actual value of Faxon. Her voluminous opinion which discusses in meticulous detail each and every claim doesn't discuss this theory of breach of contract, and correctly in my opinion, analyzes the set-off claim articulated in the October 11, 1996 letter. At the hearing, I asked Dawson to point to any place in the extensive pleadings where this issue of diminution of the value of Faxon resulting from a breach of warranty on unpaid taxes at the time of the agreement had been expressly raised. The letter from counsel, dated March 26, 1998, does not do so, but concedes the summary judgment record was incomplete on this point. Accordingly, with respect to Counterclaim V, the issue of diminution of value has not been fairly presented or preserved.

Second, with respect to Plaintiff's objection 16, I agree that the relevant time for assessing the accuracy of the warranty in Section 2.4 is July 29, 1994. However, I wait until trial to determine whether any possible Ni-

hon Faxon intercompany account loss could be "probable of occurrence" or "reasonably estimated" in light of the pending EBSCO offer on July 29, 1994.

Third, as stated at the hearing, plaintiffs may press a claim for a breach of the duty of good faith and fair dealing.

### REPORT AND RECOMMENDATION RE: PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (DOCKET ENTRYè313 & 315);[1] DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (DOCKET ENTRY # 257)

Feb. 12, 1998.

BOWLER, United States Magistrate Judge.

Pending before this court are: (1) a motion for partial summary judgment (Docket Entryè313 & 315) filed by plaintiffs Judy Davis ("Davis") and BankBoston, N.A., formerly known as The First National Bank of Boston ("FNB") (collectively: "plaintiffs" or "the sellers"); and (2) a motion for partial summary judgment (Docket Entry # 257) filed by defendants Dawson, Inc. ("Dawson, Inc.") and Dawson Holdings PLC ("Dawson PLC") (collectively: "Dawson" or "the buyer"). The latter motion references four, separate supporting memorandum.[2] Each memorandum addresses a particular subject matter and includes a separate statement of undisputed facts.

Where, as here, there are cross motions for summary judgment, this court treats each motion separately and assesses the factual record differently depending on which party is the nonmovant and which party bears the underlying burden of proof at trial. Disputes as well as mere allegations set forth in the factual background are readily apparent.[3] It is in the discussion section wherein this court resolves the factual disputes in favor of the nonmoving party to the extent necessary to resolve a summary judgment motion.[4] The standard of review of a summary judgment motion is well established.

"Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Barbour v. Dynamics Research Corporation,* 63 F.3d 32, 36–37 (1st Cir.1995), *cert. denied,* 516 U.S. 1113, 116 S.Ct. 914, 133 L.Ed.2d 845 (1996) (quoting Rule 56, Fed.R.Civ.P.). " '[E]vidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his [or her] favor.'" *Rogers v. Fair,* 902 F.2d 140, 143 (1st Cir.1990) (citation omitted). Furthermore, it is particularly apropos to the case at bar, to acknowledge that credibility issues are not the proper subject of a sum-

---

1. Plaintiffs' motion for partial summary judgment appears twice on the docket.

2. These four areas are: the purchase price adjustment, the accounts receivable set off, the breach of representations and warranty set off and plaintiffs' fraud/chapter 93A claims.

3. The factual background also contains a summary of the parol evidence, such as the parties' understanding of the contract terms and the wording of initial drafts of the contract. It is in the discussion section wherein this court will determine whether the contract terms are ambiguous. If unambiguous, this court enforces the contract according to its terms without considering the parol evidence.

4. If a party failed to correctly cite to a deposition, document or affidavit, a recurring problem, this court attempted to locate the cited testimony and, if successful, reviewed the cited testimony. The factual background does not necessarily re-

cite such testimony. Nor does the factual background include a recital of all of the summary judgment record. Nevertheless, this court has thoroughly reviewed the record and the supporting briefs. Citations to the record are provided for convenience *only* and are *not* intended to be all inclusive.

Plaintiffs submit the entire transcripts of the depositions but "do not adopt deposition testimony other than as specifically cited." (Docket Entry # 318, n. 4). This court, in its discretion, did not limit itself to the page citations of the depositions noted by the parties. *See Stepanischen v. Merchants Despatch Transportation Corporation,* 722 F.2d 922, 930 (1st Cir.1983). Indeed, it was often necessary to review deposition testimony which was not cited in order to determine what exhibit the deponent was discussing in the text of the deposition which was referenced by the party.

mary judgment motion. In general, the role of a summary judgment motion "is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Coyne v. Taber Partners I,* 53 F.3d 454, 457 (1st Cir.1995).

"As to issues on which the summary judgment target bears the ultimate burden of proof, she [or he] cannot rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." *McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir.1995). Once the moving party makes a proper showing as to the " 'absence of evidence to support the nonmoving party's case,' the burden of production shifts to the nonmovant," *Dow v. United Brotherhood of Carpenters,* 1 F.3d 56, 58 (1st Cir.1993) (citation omitted), who may not rest on allegations in his briefs, *Borschow Hospital & Medical v. Cesar Castillo,* 96 F.3d 10, 14 (1st Cir.1996), or, as in the present case, allegations in a brief with inaccurate and, thus, irrelevant citations to the deposition testimony. *See also* LR. 56.1.[5]

### FACTUAL BACKGROUND

On October 4, 1994, Davis and FNB, Trustee of the Albert Davis Trust, as the sellers, and Dawson, Inc., as buyer, executed a Stock Purchase Agreement ("the agreement" or "the stock purchase agreement") for the sale of The Faxon Company, Inc. ("Faxon"). Under the agreement, the sellers agreed to sell all of Faxon's outstanding shares of stock to Dawson, Inc. for the purchase price of $14,000,000. The method of payment was for Dawson, Inc. to pay the sellers $3,000,000 in cash at the October 20,

1994 closing and the remaining $11,000,000 in seven annual installments as reflected in certain promissory notes ("the notes" or "the promissory notes").

Faxon, which began as a family owned business in 1918, is in the subscription service business. Based in Westwood, Massachusetts, the company manages subscriptions for libraries, universities and other institutions with large periodical subscription needs. More specifically, Faxon accepts orders for periodicals from its customers and then forwards the orders, oftentimes with payment, to various publisher[s]. Faxon bills its customers for the subscriptions as well as service charges. Faxon's customers often prepay Faxon for their subscriptions which will then arrive in the following calendar year.

In early 1994 Faxon's business consisted of its operations in Westwood ("Faxon domestic" or "Faxon Westwood"), two North American subsidiaries (The Turner Subscription Agency, Inc. ("Turner") and Faxon Canada Limited ("Faxon Canada")), seven European subsidiaries ("the European subsidiaries") and a number of foreign operations and subsidiaries in Latin America, the Middle East and the Asia Pacific region ("the nonEuropean subsidiaries").

In the early 1990s Faxon's business began to decline and the company began experiencing significant losses. (A.232–233).[6] In or around Faxon's 1993 fiscal year,[7] Chemical Bank declined to renew Faxon's line of credit which covered the company's high seasonal demands for cash during certain periods of the year.[8] (A. 231; S.A. 76; P. 25). According to Jonathan S. Altman ("Altman"), the

5. Local Rule 56.1 requires page references to affidavits, depositions and other summary judgment evidence.

6. The letters "A." and "S.A." refer to Dawson's appendix and supplemental appendix. The numbers following the letters refer to the particular page number in the appendix or the supplemental appendix. The letter "P" followed by a number refers to one of plaintiffs' 255 exhibits.

7. Faxon's calendar year ends in March.

8. In describing the industry, Gerard V. Connolly ("Connolly") of Dawson explained that it is the norm to pay publishers when customers place

orders, primarily in the months of November and December. At that time, however, not all of the libraries would have paid for their ordered subscriptions. Thus, it would be "necessary to obtain bank funding to bridge that gap between what's paid to the publishers and what money has been collected from the libraries." According to Connolly, Faxon therefore required funding for approximately three to four months during the year, oftentimes from the middle of December to the end of March. (P. 16, pp. 157–158, vol.III).

owner of Altman & Company and a financial turnaround consultant for businesses, Faxon unsuccessfully contacted a number of other banks for loans in early 1994.[9] (P. 28).

In or around this time period, a series of investments had also proven unproductive and Faxon became unable to pay certain publishers in a manner consistent with its past payment history. (A. 231–232; P. 28). Discussions noted in the minutes of Faxon's March 14, 1994 Board of Directors meeting cite to "traumatic losses" and the depletion of equity resulting from payments to Judy Davis's former husband, Richard Rowe. As a result, at the March 14, 1994 meeting, the Board of Directors ("the board") of Faxon voted to authorize Altman to explore selling Faxon, in whole or in part. (P. 251). Davis supported this decision. (S.A.146).

Similarly, the draft consolidated financial statements for Faxon and its subsidiaries for the years ending March 31, 1994 and 1993, prepared by Deloitte & Touche, L.P. ("De-loitte"), Faxon's auditors, showed respective net losses of $8,330,692 and $7,893,917. (P. 25 & 104). These financials additionally reference Faxon's default on principal payments to various publishers and question Faxon's ability to continue operating as a "going concern." (P. 104).

In sum, by the spring of 1994 Faxon's financial condition had deteriorated to the point where it was seriously exploring and considering the option of selling all or part of the company.[10] Indeed, by letter dated April 19, 1994, Dawson PLC indicated a willingness "to pay up to $25 million"[11] for Faxon's European operations, subject to "full due diligence" and a contract "with the usual warranties."[12] (P. 47). While Dawson PLC was considering a bid for Faxon's European operations, Faxon provided Dawson PLC with certain financial information. (A.669). The record is disputed with respect to the extent and the content of this disclosure of financial information in the spring of 1994.[13]

---

9. Davis testified that she did not know that Faxon was unable to obtain bank financing. She also stated that it was not the case that Faxon had been unsuccessful in obtaining bank financing before selling the company to Dawson. She did, however, acknowledge that Chemical Bank's decision not to renew Faxon's line of credit left Faxon without seasonal financing in late 1993. (S.A.146–147).

10. Other options included exploring financing with publishers and continuing to pursue bank financing. (S.A.146).

11. Bryan C. Ingleby ("Ingleby") of Dawson testified that Dawson PLC had not specifically discussed financing the $25 million price tag with a financial institution at the time Dawson PLC sent the April 19, 1994 letter to Faxon. Ingleby further testified that Dawson PLC expressed an interest of bidding up to $25 million in order to "stay in the game." (P. 17, vol.I, pp. 133–136).

Contrary to plaintiffs' characterization of the letter (Docket Entry # 317, pp. 5–6), it is not an offer. Rather, it is an expression of interest on the part of Dawson PLC to submit a bid for Faxon up to an amount of $25 million. (P. 47).

12. The April 18, 1994 minutes of a Board of Directors meeting of Dawson PLC reflect that Ingleby, Group Chief Executive of Dawson PLC, met with Peter Pyclick ("Pyclick"), then President of Faxon, on March 23, 1994, in Westwood during which Faxon conveyed an intention of disposing of its European operations. (P. 46; P. 21, vol. IV, p. 113). Vernon Cain's notes on Dawson Subscription Services stationary summarize the March 23, 1994 meeting and show that Faxon's European operations generally consisted of operations in Amsterdam, Germany, Sweden and Russia. (P. 43). Dawson PLC board members discussed the feasibility of making an offer to purchase Faxon's European operations and/or all of Faxon at the April 18, 1994 meeting. (P. 46).

13. On behalf of Dawson, Ingleby avers that Faxon provided Dawson PLC "with certain financial information" in the course of Dawson PLC's consideration of bidding on Faxon's European operations in the spring of 1994. (A.669). Vernon Cain ("Cain"), who functioned in November 1996 as President of a number of Dawson PLC companies in the United States and Canada including Faxon, testified that he received "some" of the financial material. Specifically, Cain remembers receiving unaudited interim financial statements of Faxon through either November or December of 1993. (Docket Entry # 18, pp. 1 & 61–64, Vol. I).

As cited by plaintiffs (Docket Entry # 317, p. 5), Mark S. Zuroff ("Zuroff"), former Chief Financial Officer of Faxon, testified that Faxon had a series of binders containing financial information which Faxon would give to individuals during audits in the course of a credit review or a prospective buyer's due diligence review. (P. 21, pp. 147–149, Vol.3). Cain's notes of the March 23, 1994 meeting at Westwood show that Faxon supplied Dawson PLC with audited financials for Faxon's Swedish, German and Amsterdam operations in 1992 and 1993 and agreed to supply additional financial information concerning

Faxon supplied the financial information to Dawson PLC in the spring of 1994 subject to the terms of a confidentiality agreement. The confidentiality agreement allowed Dawson PLC access to the financial information, described as "Evaluation Material" in the confidentiality agreement, provided that Dawson used the material solely for the purpose of evaluating the purchase or acquisition of Faxon. In the event Dawson PLC abandoned the prospective transaction, Dawson PLC agreed to redeliver the financial information to Faxon or to destroy the financial information without retaining copies. (A. 409–410; A. 669–670; S.A. 100).

By letter dated May 9, 1994, Dawson PLC made an offer (subject to meeting with Faxon creditors, conducting due diligence and standard warranties) to purchase Faxon and its subsidiaries for $6.8 million. (P. 50). The May 9, 1994 letter referred to additional financial information received the previous week and also reconfirmed Dawson PLC's interest in buying Faxon's European operations for an amount in the range of $12 to $15 million. (P. 50).

France, the United Kingdom and Russia in the near future. (P. 43).

14. The May 11, 1994 letter additionally acknowledged that, "Although my client has made an offer to acquire Faxon, we do not come to the FTC looking to gain an advantage in any bidding contest." (P. 53). Cain testified that the letter was sent to the FTC because EBSCO was a competitor and he felt that an EBSCO/Faxon combination was "an antitrust matter." Connolly similarly testified to an interest in keeping "EBSCO from becoming a megagiant in the U.S. market." (S.A. 11–12 & 18; P. 16 & 18). Dawson PLC was concerned about EBSCO dominating the United States market thereby marginalizing Dawson's operations. (P. 97).

15. Plaintiffs represent, without record citation, that Faxon rejected this offer. (Docket Entry # 317, p. 9).

16. To support their chapter 93A and fraud claims, plaintiffs allege that Dawson shredded financial material in the spring of 1994. Dawson seeks to dismiss these claims. The testimony, which this court will view in plaintiffs' favor when ruling on Dawson's motion, shows the following.
Connolly testified that information which he used to prepare the May 25, 1994 report would have been kept in Ingleby's files. Connolly did not keep this information in his personal files.

Meanwhile, by letter dated April 28, 1994, EBSCO Industries, Inc. ("EBSCO") offered Faxon $18 million in cash for Faxon. (P. 49 & 51). Although, according to plaintiffs Faxon did not accept EBSCO's offer (Docket Entry # 317, p. 6), plaintiffs point out that Dawson Subscription Services sent a May 11, 1994 letter to the Federal Trade Commission ("the FTC") complaining that EBSCO's acquisition of Faxon would be anticompetitive.[14] (P. 53; S.A. 39–40).

On May 20, 1994, Dawson PLC offered to pay Faxon $17.5 million for 40% of the capital stock of Faxon domestic and 100% of the capital stock of its subsidiaries subject to various adjustments and due diligence review.[15] (P. 55 & 57). In a report dated May 25, 1994, Connolly reviewed the costs associated with buying Faxon and attached certain financial information relative to Faxon. (P. 56; P. 16, pp. 29–30, vol. IV). The report, which analyzes Dawson purchasing 100% of Faxon's subsidiaries and 40% of Faxon, Inc., contains financial data as of March 31, 1994, for Faxon Westwood as well as for Faxon's European operations and Faxon Canada.[16] (P. 56).

(P. 16, pp. 32–34, vol.IV). Connolly also kept a file at Faxon relating to his efforts to obtain seasonal financing for Faxon at and around the time of the closing. He cannot locate the file, however, and remembers last seeing the file either before or immediately after the closing. (P. 16, pp. 8–10, vol.II).

Ingleby avers that Faxon provided Dawson with financial information in the course of Dawson's consideration of acquiring Faxon's European operations in the spring of 1994. He also testified that he kept a file on Faxon in one of the filing cabinets in his secretary's office.

Ingleby testified that "under the confidentiality order, [he] destroyed those files," referring to the files maintained in conjunction with Dawson's bid to acquire Faxon's European subsidiaries. Ingleby cannot remember when he destroyed the Faxon files pertaining to the proposed acquisition of the European subsidiaries. By affidavit, he explains that he would have shredded Faxon material after Dawson's unsuccessful bid for Faxon's European operations in order "to comply with [Dawson's] obligation to protect the confidences of a competitor." As noted *supra*, the confidentiality agreement required Dawson to return the material to Faxon or to destroy the material without retaining any copies "[i]n the event the Transaction is abandoned for any reason." Dawson's May 9, 1994 offer continued only for a reasonable period of time and express-

Ingleby characterized Dawson PLC's efforts in the spring to acquire Faxon's European operations as a "totally different acquisition" from Dawson, Inc.'s acquisition of Faxon and its nonEuropean operations in October 1994.[17] Ingleby also failed to recollect viewing financials involving Faxon in May of 1994. (A.196).

In short, Dawson PLC's attempts in the spring of 1994 to acquire all or part of Faxon proved unsuccessful. The record is disputed as to exactly what documents Faxon provided Dawson and what documents Dawson reviewed relative to Faxon in the spring of 1994. Moreover, even viewing the record in plaintiffs' favor, Dawson PLC's focus and the nature of the proposed transactions in the spring of 1994 differed from its focus in the early fall of 1994 inasmuch as in August 1994 Faxon sold its European operations to another company.

On May 31, 1994, EBSCO made additional offers for Faxon's United States and non-United States operations. (P. 59 & 60). Also on May 31, 1994, R.R. Donnelley & Sons Company ("Donnelley") made an offer, subject to signing a definitive agreement, to purchase the domestic business of Faxon as well as Turner, Faxon Canada and certain Asian/Pacific operations. (P. 61). Davis accepted the offer. (P. 61). Faxon eventually terminated its discussions with Donnelley, however, as shown in Faxon's August 5, 1994 board minutes. (P. 251). As also shown in these minutes, Faxon considered liquidation as an option at that point in time but resolved to proceed with another offer from EBSCO. (P. 251; A. 181).

According to Altman, by the spring and early summer of 1994 Faxon's publishers took the position that Faxon had to sell all or

---

ly envisioned a formal contract by the end of June 1994. It is undisputed that Dawson's May 20, 1994 revised offer remained open until May 31, 1994, and was never accepted within that time frame. (P. 55).

In addition, throughout 1994 Ingleby had an ongoing process whereby he gave old or unwanted information from his files to his secretary who then shredded the material. He avers that he periodically discarded outdated documents from his work files as part of his "normal document retention practice." He also attests that with respect to Faxon documents not associated with Dawson's bid for Faxon's European operations, he would have discarded or destroyed such documents because he no longer needed them.

In a consistent manner, Ingleby testified that he would have shredded copies of accounts and information received in the course of negotiations to acquire Faxon on an ongoing basis. According to Ingleby, to the extent he had handwritten notes of meetings or conversations concerning Dawson's acquisition of Faxon, he would have destroyed the notes.

At one point in Ingleby's testimony, he posited that Connolly "probably" advised him that Connolly had committed to the sellers that Faxon documents relating to the acquisition would not be destroyed. Ingleby could not remember "the time scale" of Connolly's commitment or having a conversation with Connolly about the subject. In addition, plaintiffs repeatedly requested assurances from Dawson in March and May of 1995 that it would preserve relevant internal Faxon documents from fiscal year 1994 onward.

With respect to information on computer hard drive or in backup files, Ingleby testified that he did not create any files on his personal computer concerning the Faxon acquisition. Moreover, any files in his secretary's hard drive, in his computer or in the backup files in the filing system connected with his computer would no longer exist. (P. 17, pp. 46–48, 54–57, 64, 84–96, 103–105 & 162–163, vol. I; A. 409–410; P. 41; A. 668–670; Docket Entry # 332, Ex. A–C).

Notwithstanding the confidentiality agreement, Ingleby further testified that the information provided to Faxon in the spring of 1994 was retained in the files of Bernard Pope ("Pope"), a Dawson employee. (A.670). Pope's initials appear in the corner of one of the pages of Connolly's May 25, 1994 report to the Dawson board. (P. 56). Ingleby did not know whether Pope's files contained the source materials for Pope's projections. Pope's initials also appear in one of the documents which plaintiffs assert is the "selected documents from B. Pope's due diligence files." (Docket Entry # 315, Ex. A). This document refers to actual financial figures of Faxon as of March 31, 1994. (P. 250; P. 17, pp. 10–12, vol. II).

As a final matter, Ingleby avers that, since the beginning of this litigation (October 1995), he has retained materials relating to Faxon and has not destroyed any documents relevant to this case. He also testified that he did not destroy the files he kept relating to the actual acquisition. (P. 17, p. 48, vol.I).

17. Connolly, who came to work for Dawson in May of 1994, believed he visited Faxon in Westwood in or around May 18, 1994, together with Ingleby and Cain. According to Connolly, they primarily discussed making an offer for Faxon's European operations. (A. 132; S.A. 124).

part of the company.[18] (P. 28). After the Donnelley transaction fell through, Altman began talking with Swets Zeitlinger, B.V. ("Swets") about selling Faxon's European operations. Thereafter, in a short period of time, Faxon consummated a deal with Swets in late July or early August of 1994 whereby Swets agreed to purchase Faxon's European subsidiaries. (P. 28).

Meanwhile, in July 1994 Faxon was in ongoing discussions with EBSCO about selling Faxon's United States ("U.S.") operations and/or Turner, Faxon Canada and non-U.S. subsidiaries. (P. 28 & 63). Dawson also remained in the negotiations and in early August 1994 received updated financial statements regarding Turner and Faxon Canada. (P. 65, 67 & 68). By facsimile transmission dated August 3, 1994, Ingleby transmitted a three sentence letter to Altman reminding him that, "Dawson is available as a back stop with cash available and a willingness to negotiate a better price than we previously discussed."[19] (P. 67). On August 5, 1994, Dawson offered to pay Faxon $11 million for Turner and Faxon Canada. (P. 69–71).

EBSCO also made an offer to purchase Turner, Faxon Canada and Faxon's remaining foreign subsidiaries, including Nihon Faxon Company Limited (Japan) ("Nihon Faxon"), on August 5, 1994. Specifically, EBSCO offered to pay Faxon $16.5 million

for these entities subject to conducting due diligence and executing a mutually acceptable final contract. The offer also noted, "[W]e understand that [Faxon] will provide us an exclusive to negotiate on the balance of the Company." Davis and Altman signed the offer.[20] (P. 74). On August 8, 1994, Faxon's agreement to sell Turner, Faxon Canada and its remaining foreign operations to EBSCO was announced to the press. (P. 75). The signed offer to purchase letter was due to expire within ten business days (August 19, 1994) in the event the parties failed to finalize a purchase agreement.[21] (P. 74).

During August 1994 Dawson continued to negotiate with Faxon to acquire Faxon's domestic operations. By letter dated August 23, 1994, after expiration of the aforementioned EBSCO/Faxon exclusive, Connolly advised Altman of Dawson's "confirmed interest" in acquiring various parts of Faxon, including Turner and Faxon Canada. (P. 77). Connolly's letter closed with the statement that, "Our offer would be an all-cash offer for 100% of the stock of Faxon, Inc., including all remaining unsold subsidiaries."[22] The letter did not include a price range for the proposed transaction. (P. 77). At this time, Zuroff also sent a facsimile transmission to Connolly of financial information of Faxon for July 1994. Connolly then sent the materials by facsimile transmission to Cain.[23] (P. 78 & 83).

**18.** In early 1994, Faxon had defaulted on one or more of the notes it had entered into with its publishers in late 1993, according to Altman. (P. 28).

**19.** Plaintiffs point to this testimony to allege that Dawson made a representation of its intention and ability to pay the purchase price in an effort to induce plaintiffs to sell the company to Dawson. (Docket Entry # 332).

**20.** Faxon board minutes for August 5, 1994, reflect that Faxon directors voted to "terminate negotiations with Donnelley Rory Cowan, proceed with the EBSCO offer" but also "continue to consider other potential buyers for the Parent Company operations." (P. 251).

**21.** Specifically, the offer contained a provision whereby Faxon granted EBSCO:

an exclusive . . . to finalize the purchase agreement during [EBSCO's] due diligence period. We request an exclusive period of no more than ten (10) business days to perform our due

diligence, beginning with your acceptance of this letter.
(P. 74).

**22.** Plaintiffs rely on this evidence, as well as other evidence, to support their contention that Dawson represented that it would not alter the payment terms of the acquisition if it were to include the subsidiaries. In support of their fraud claim, plaintiffs assert that Dawson never intended to pay the purchase price and subsequently altered the payment terms to defer the all cash payment. (Docket Entry # 332).

**23.** The transmission consisted of a detailed balance sheet and responsibility statement for July of Faxon's 1995 fiscal year. (P. 78). The balance sheet showed Faxon's intercompany account receivable from Nihon Faxon as $10,893,-839 as of March 1994 and $10,641,151 as of July 1994. (P. 78).

This balance sheet which Zuroff transmitted to Connolly showed a negative net worth of Faxon domestic as of July 1994 of $552,316. (P. 78).

Also on August 24, 1994, EBSCO transmitted to Faxon an offer to purchase "all of the equity of the parent" for $11 million. (P. 79). In a separate August 24, 1994 transmission, EBSCO reconfirmed its prior offer of $16.5 million for Turner and Faxon's non-U.S. subsidiaries, including Nihon Faxon. (P. 80).

On August 25, 1994, Connolly sent a letter to Altman confirming Dawson's "intention to make a bid for 100% of the stock of Faxon, Inc. within the price range mentioned" in an earlier telephone conversation.[24] (P. 81). The letter further noted that, "this offer does not include Faxon Canada, Turner, Latin America or Asia Pacific." Connolly then confirmed that it was Dawson's "intention to proceed with this offer in its entirety, including the above subsidiaries, in the event that the proposed sale of same should fall through for whatever reason." [25] (P. 81).

By letter dated August 25, 1994, Connolly informed Zuroff and Altman that he, together with Cain, intended to visit Faxon in Westwood on August 30, 1994. In connection thereto, Connolly expressed an interest in reviewing, *inter alia,* financial statements for all Faxon subsidiaries and balance sheets vis-a-vis the aging of accounts receivables and the "collectability" of intercompany receivables. (P. 82).

In contrast to the interim balance sheet showing a positive stockholders equity of $5,118,000 as of July 29, 1994, Connolly testified that the negative number in the July 1994 balance sheet did not reflect the sale of Faxon's European subsidiaries to Swets. (P. 16, pp. 226–227, vol.II).

24. According to a note shown to Altman at his deposition, $15 million was the price range that Altman discussed with Connolly. (P. 28, p. 39, vol.III).

25. Plaintiffs point to this document as evidence of Dawson's representation that it did not intend to change the terms of its offer if the acquisition also included the subsidiaries. (Docket Entry # 332).

26. Cain testified, at one point, that he had seen the July consolidated financials and discussed the content with Connolly and Ingleby prior to the closing. Cain stated that he discussed the "general trends" represented by the financials with Connolly perhaps four or five times prior to the closing. According to Cain, he and Connolly reviewed the financial data in late August and September 1, 1994, "relative to the primary Faxon operation in Westwood." Cain believes that all of the financial data he reviewed "had some

Connolly and Cain reviewed financial information of Faxon during their visit to the Westwood headquarters in late August 1994 and September 1, 1994. (P. 18). Connolly testified, in part, that he initially met with Zuroff and that, "In large part [the material requested in the August 25, 1994 letter] was not made available because it wasn't available within the company." (P. 16, p. 182, vol.I). As demonstrated below, the testimony regarding the extent and content of Dawson's review of financials in August and September 1, 1994, is disputed.

Zuroff testified that he presented Connolly with a series of binders containing financial information during the late August 1994 visit. According to Zuroff, the binders would include legal and operational organization charts. Zuroff additionally testified that he provided Connolly with financial statements for all Faxon subsidiaries, including Nihon Faxon, and that Connolly reviewed accounts receivable. It was also Zuroff's practice to provide all potential buyers such as Dawson with the July 21, 1994 draft of Faxon's consolidated financials ("the July consolidated financials" or "the July 1994 consolidated financials") (P. 64) [26] or an iteration thereof.[27] (P. 21, pp. 68–72 & 147–150, vol. III).

level of consolidation." Cain did not recall the exact date of when he viewed the July consolidated financials but he did not remember viewing any additional financial data when he next returned to Westwood on September 19 and 20, 1994, a time when the transaction had changed to include the foreign subsidiaries. (P. 18, pp. 150–158, vol.I).

27. Zuroff also recalled discussing the document (P. 64) or a version of the document with Connolly prior to the October 1994 closing. (P. 21, pp. 71–72, vol.III). The executive summary in the July consolidated financials noted the enhanced cash flow due to the receipt of $16.5 million for the sale of Turner and other nonEuropean foreign subsidiaries. The domestic balance sheet therein, which is also attached as a schedule to the stock purchase agreement, showed the projected balance of the Nihon Faxon intercompany account at $10,444,000 as of July 29, 1994, and zero as of August 31, 1994. (P. 64). The intercompany receipts schedule in the July consolidated financials reflected a $4.5 million payment by Nihon Faxon and the expected discontinuation of intercompany receipts after August 31, 1994 "due to sale of subsidiaries." (P. 64). When reviewing the July consolidated financials

Zuroff also recalled discussing Nihon Faxon's intercompany balance with Connolly prior to the October 1994 closing. In fact, Zuroff characterized Nihon Faxon as the "single largest issue, aside from receivables, which" he talked about with Connolly. (P. 21, pp. 152–153, vol.III). Furthermore, Connolly testified at one point that the cash flow projection provided by Faxon in August 1994 showing a full pay down of the intercompany receivable from Nihon Faxon was not a misrepresentation. (P. 16, pp. 266–268, vol.II).

On August 31, 1994, EBSCO sent a facsimile transmission to Davis withdrawing its offer to purchase all of the equity of the parent for $11 million.[28] (P. 86). The communication nevertheless confirmed that progress was still being made on "the non-USA/Turner acquisition" and urged that the parties must enter into a "common letter" by September 2, 1994, with a closing by September 15, 1994. (P. 86). By facsimile transmission of a letter dated September 1, 1994, EBSCO informed Davis that it was terminating "its consideration of the acquisition of [Faxon's] non-USA operations and Turner." [29] (P. 87).

Whether Dawson knew about the withdrawal of the EBSCO acquisition prior to entering into its own letter of intent to acquire Faxon's domestic operations (P. 85; S.A. 459–465) on August 31, 1994, is disputed. Notwithstanding the later date of the September 1, 1994 EBSCO withdrawal letter, Cain testified that on August 31, 1994, Altman advised both him and Connolly that "EBSCO may withdraw its offer." [30] Cain could not, however, remember whether Altman told him of the EBSCO withdrawal prior to the signing of Dawson's letter of intent. (P. 18, pp. 33–35, vol.III). Connolly testified that "there was a hypothesis on the part of Mr. Altman that as a result of [Dawson's] bid EBSCO might withdraw their bid." [31] (P. 16, pp. 48–49, vol.IV).

It is undisputed that on August 31, 1994, Dawson and Faxon accepted and agreed to Dawson's letter of intent to acquire Faxon's remaining domestic operations for $15 million cash and forgiveness of an estimated $2.2 million debt owed to Faxon by Davis.[32] (p. 85;

---

at his deposition, Connolly acknowledged that the data assumed the sale to EBSCO and, therefore, the payment of the Nihon Faxon intercompany account. He could not definitively remember whether he reviewed the July consolidated financials prior to the August 31, 1994 letter of intent. (P. 16, pp. 154–156, vol. II; A. 136–137).

Plaintiffs therefore imply that there was no misrepresentation of the pay down of the intercompany Nihon Faxon debt inasmuch as Connolly had possession of the July consolidated financials which demonstrated, beyond question, that the reduction in the pay down was due to the $16.5 million sale to EBSCO which, as discussed *infra*, never occurred.

As a collateral matter, plaintiffs' statement of undisputed facts (Docket Entry # 317) contains numerous instances wherein plaintiffs make a statement without providing an adequate reference to the record. Local Rule 56.1 requires that such statements, whether in support or in opposition to a summary judgment motion, provide "page references" to the record. For example, on page 22 (Docket Entry # 317) plaintiffs state that Dawson distributed a form letter to Faxon customers. However, plaintiffs only cite to the draft letter (P. 93) and fail to cite to the relevant testimony to show that Dawson made such a distribution.

28. At the time, EBSCO remained interested in acquiring the entire company. (P. 86; P. 29, p. 177–181, vol. I).

29. The three sentence letter gave the following explanation for EBSCO's decision: "The continuing results of our due diligence work and the efforts recently to fix an agreement and to plan a legal conclusion in a timely manner have not been satisfactory to EBSCO." (P. 87).

30. This court does not consider this testimony for the truth of the matter asserted, i.e., that EBSCO might withdraw its offer.

31. In addition, Altman responded, "That's correct" to the following question[s]:

... My question is did you discuss with Mr. Connolly whether or not EBSCO withdrew the offer before they signed that Letter of Intent? I think you've testified that it's your recollection that the Letter of Intent with Dawson was signed after EBSCO had withdrawn their offer?

(P. 28, p. 41, vol.III).

32. The letter of intent does not expressly refer to the acquisition of Faxon's "domestic" operations but it does attach Faxon's "domestic balance sheet." Rather, the letter of intent sets forth "the proposed acquisition of all the capital stock of Faxon Company, Inc." by Dawson. (P. 85). Connolly understood that Dawson was acquiring Faxon's domestic operations and that EBSCO would be acquiring the nonEuropean foreign subsidiaries. (P. 16, p. 138, vol.III).

S.A. 459–465). The letter of intent included an attached domestic balance sheet showing the projected balance of the Nihon Faxon intercompany debt reduced to zero as of August 31, 1994. (S.A.465).

On September 1, 1994, EBSCO issued a press release announcing its decision to terminate its consideration of acquiring Faxon's "non-US operations" and Turner. (P. 88). Due to EBSCO's withdrawal, Faxon would not receive the anticipated proceeds from the $16.5 million transaction. Dawson was aware of the proposed EBSCO sale prior to entering into the letter of intent and Connolly understood that Faxon planned to apply the proceeds of the EBSCO sale to discharge Faxon's debt to its publishers. (P. 16, pp. 138–140, vol. III; A. 138 & 153).

By September 1 or 2, 1994, Dawson had learned about EBSCO's withdrawal. (A. 153; P. 90). Dawson thus reevaluated its position with respect to its offer to purchase the domestic operations. According to Connolly, Dawson was troubled that the cash from the EBSCO sale would no longer be available to pay Faxon's publishers' debt. Although concerned about the lack of time to adequately investigate the remaining foreign subsidiaries, Dawson agreed to acquire Faxon's remaining foreign subsidiaries as well as the domestic operations and made a public announcement to this effect on September 2, 1994. (P. 90; A. 154).

Dawson did not significantly reduce the $15 million purchase price contained in the letter of intent when it agreed to add the remaining foreign subsidiaries to the proposed transaction.[33] Connolly testified that the parties came to a different agreement to defer payment of the purchase price in light

of Dawson's concern about the absence of cash resulting from the EBSCO withdrawal and Zuroff's assurance, described *infra*, that the subsidiaries would not effect the company's net worth. (A. 154; P. 16, pp. 146–151, vol. III). During September 1994 the agreement thus evolved to provide for an $11 million deferred payment of the purchase price. (P. 16, pp. 149–150, vol.III). In a September 27, 1994 report to the Dawson PLC board Ingleby described the deferred payments as "an earn-out/consultancy/non compete of up to $12m spread over 7 years."[34] (P. 136; P. 17, pp. 124–125, vol. II). In the final agreement, the payment schedule included an initial cash payment of $3 million and the later installment payments totaling $11 million. The final agreement also included a purchase price adjustment mechanism. (P. 1).

On September 6 or 7, 1994, Ingleby and Connolly met with one or more representatives from Reed Elsevier, Inc. ("Elsevier"), a major Faxon publisher. (P. 17, pp. 157–158, vol. II; A. 138; P. 16, p. 197, vol. I; P. 18, pp. 42–48, vol. I). Dawson desired assurances from Elsevier that it would resume normal trading terms with Faxon after Dawson's acquisition. Dawson additionally sought reassurance that Elsevier would allow Dawson to proceed with the transaction. Elsevier was concerned about Dawson's financial ability to complete the transaction. A facsimile transmission dated September 7, 1994, from Ingleby to Zuroff refers to the Elsevier meeting and requests "a cash flow analysis," referenced by Elsevier at the meeting. A September 7, 1994 facsimile transmission by Zuroff's secretary reflects that she transmitted the July consolidated financials to Ingleby. Dawson's meeting

---

**33.** In addition to testifying that Dawson signed the letter of intent after the EBSCO withdrawal, Altman stated that there were no discussions with Connolly about reducing the purchase price after the EBSCO withdrawal. (P. 28, pp. 41–42, vol.III). Connolly testified that Dawson did not wish to reduce the purchase price as a result of the EBSCO withdrawal. Rather, according to Connolly, he advised the sellers that the purchase price would reflect the net asset value of Faxon as of September 30, 1994, and, in the event the foreign subsidiaries reduced this net asset value, there would be a purchase price adjustment. (P. 16, pp. 113–114, vol.III).

**34.** Ingleby did not know whether an "earn-out" was discussed with the sellers. Similarly, Attorney Leonard A. Ferber ("Ferber") testified that he did not recall any discussion with the sellers of any expectation of a purchase price adjustment under sections 1.5 and 1.6 at or around October 4, 1994. Ferber did, however, remember discussing the list of adjustments with Connolly, Attorney John L. Bronson and Attorney Mark Wood at or around October 4, 1994. (P. 17, p. 125, vol. II; P. 20, pp. 69–73, vol. I).

with Elsevier concluded on a cordial note, according to Ingleby. (P. 17, pp. 158–160, vol. II; P. 91; P. 16, p. 150, vol. II; P. 94; P. 16, pp. 197–202, vol. I).

In September 1994 Elsevier, as well as other publishers, continued to pressure Faxon for payment of its outstanding debt. At least in part due to Elsevier's demands, Dawson and Faxon agreed to a separate and expedited sale of Turner and Faxon Canada. On or about September 20, 1994, Dawson and Faxon entered into stock purchase agreements whereby Dawson purchased Turner and Faxon Canada for the aggregate total of $7.5 million.[35] The $7.5 million proceeds were transferred directly to Faxon publishers. (P. 109; P. 16, pp. 127–128, vol. I; P. 16, pp. 170–178, vol. III; P. 76 & 110; A. 107 & 158).

Connolly traveled to the Boston area on September 12, 1994, returning to the United Kingdom on September 15, 1994.[36] During this visit, Connolly discussed with Zuroff the preparation of revised cash flow statements in light of the EBSCO withdrawal. He also reviewed the broad assumptions contained in the cash flows which were then used to ob-

tain financing for Dawson. (A. 127–128; A. 156; P. 16, pp. 224–225, vol. I).

According to Connolly, he asked Zuroff for financial statements relative to Nihon Faxon a number of times. Connolly testified that in September 1994 he reviewed certain financial documents [37] but that there were no relevant or updated financial statements regarding Nihon Faxon for review. (P. 16, pp. 230, Vol. I; A. 162). The extent of Connolly's review of Faxon's financials both before the EBSCO withdrawal when Dawson was acquiring the domestic operations and after the EBSCO withdrawal when Dawson was also acquiring the remaining subsidiaries is disputed. At a minimum, although Connolly initially stated in answer to interrogatories that the interim balance sheet was the only financial information made available by the sellers, he acknowledged at his subsequent deposition that he had seen a copy of Faxon's monthly consolidated report as of June or July 1994 prior to the EBSCO withdrawal. (P. 16, pp. 184–185, Vol. IV; P. 16, p. 231, Vol. I; P. 11, Int. 22). In addition, Zuroff testified that he provided "Dawson" with a copy of "the July consolidating financials" showing negative equity for Nihon Faxon as well as Asia Pacific.[38] Zuroff also testified that, prior to the

---

**35.** The Turner agreement is contained in the summary judgment record and reflects that Dawson, Inc. purchased the company from Faxon. (P. 120). The Faxon Canada agreement, however, is not included in the summary judgment filings. While not material for summary judgment purposes, the amended complaint alleges that Dawson Overseas Holdings, as opposed to Dawson, acquired Faxon Canada. (Docket Entry # 241, ¶ 76).

**36.** Connolly was also in the Boston area from September 20 to 26, 1994, and visited Faxon's Westwood headquarters during that time. (A.127–128).

**37.** For example, viewing the record in plaintiffs' favor, Connolly testified that prior to the closing he reviewed Faxon monthly consolidating reports, with the most recent dating to June or July 1994; notwithstanding Connolly's testimony elsewhere that he had no recollection of seeing Faxon monthly consolidating reports for July 1994 prior to the closing. Connolly also acknowledged that he saw the interim balance sheet of Faxon reflecting Faxon's domestic operations prior to the EBSCO withdrawal.

He does not, however, remember seeing financial documents reflecting Faxon's consolidated net worth as of July 31, 1994, prior to the clos-

ing. Connolly also does not remember any conversations with Ferber about the July 1994 financials prior to the closing. Although Connolly acknowledges that he viewed "consolidated financial statements through June, at least, and possibly July," he characterized his viewing such statements as "irrelevant" inasmuch as Dawson was only acquiring Faxon's U.S. operations at the time he saw the financial statements. In addition, he does not remember seeing Faxon's consolidated balance sheet of March 31, 1994, also referred to as the March 31, 1994 financials, prior to the closing. Moreover, Ferber testified that he did not discuss the July 1994 financials with anyone at Dawson prior to the closing. (A. 129; A. 109–110; P. 16, pp. 26–33 & 223–224, Vol. II; S.A. 134; P. 16, pp. 184–185, vol. IV).

**38.** Zuroff's testimony references deposition exhibit 101 which is plaintiffs' exhibit 113. Exhibit 113 is described as "July consolidating financials." The document is titled Faxon's consolidated balance sheet, world operations, for July 31, 1994. Although the size of the balance sheet requires a magnifying glass to read and a significant portion of the document is therefore illegible, it contains the notation that Cliff Silver prepared the document as of September 9, 1994. This is the same notation which appears on exhibit 99, which does not require a magnifying

closing, he provided Connolly or Dawson with all of the financials which Nihon Faxon would have submitted to Faxon. (P. 21, pp. 83–85, vol. IV; P. 21, p. 100, vol. II; p. 113).

The September 20, 1994 preliminary version of Faxon consolidated financials as of August 31, 1994, is also marked "Dawson" and shows Nihon Faxon's net worth as negative $2,953,737 and a Nihon Faxon negative intercompany liability of $8,107,329 for Faxon domestic. A September 16, 1994 facsimile transmission from Zuroff to Connolly refers to attached financial proformas.[39] A September 23, 1994 facsimile from Dawson [40] contains financial projections for Faxon, referencing as a source Faxon's "Projected Consolidated Financials" dated July 21, 1994.

It is also undisputed that on September 16, 1994, the July 1994 consolidated financials were faxed from Faxon to Attorney Leonard A. Ferber ("Ferber") of Katten, Muchin & Zavis ("Katten Muchin"), Dawson's counsel

in 1994 and Assistant Secretary to Dawson, Inc. as of August 31, 1994.[41] In addition, by letter dated September 26, 1994, Adam H. Schecter ("Schecter") of Katten Muchin filed Dawson's Hart Scott Rodino filing with the Federal Trade Commission.[42] Therein, Schecter refers to Faxon's $8 million loss through July 31, 1994. Dawson thus acknowledges, albeit not until answering an interrogatory in January 1997, that it is likely that it had the July 1994 consolidated financials in its possession prior to the closing. (P. 114; P. 128; P. 123; P. 130; P. 113; P. 20, pp. 7–8, 22–33 & 115–116, vol. I; S.A. 171–172; S.A. 169e–169f; Docket Entry # 356, p. 39; P. 14).

Finally, a September 26, 1994 letter signed by Connolly to an individual at Fleet Bank includes Faxon's September 1994 Projected Consolidated Financials updated to reflect the sale of Turner and Faxon Canada to Dawson.[43] These financials show the com-

glass to decipher and has the title of Faxon's consolidated balance sheet, world operations, for July 31, 1994. To the extent legible, the documents contain similar figures. Exhibit 99 also contains the cumulative domestic loss of $6,989,-419, identified in plaintiffs' counsel's reply letter of April 25, 1995 (P. 203) to Dawson's April 10, 1994 warranty set off letter (P. 200) as a figure taken from the July 31, 1994 preliminary consolidated financial statements prepared on September 9, 1994. It is therefore reasonable to assume that both exhibits 99 and 113 are the July consolidated financials prepared on September 9, 1994. Viewing the record in plaintiffs' favor, as required in ruling on Dawson's summary judgment motion with respect to plaintiffs' chapter 93A and fraud claims, plaintiffs disclosed the July 1994 consolidated financials prepared on September 9, 1994, to Dawson prior to the closing.

Dawson nevertheless initially grounded part of its warranty set off on the nondisclosure of the internal financial statements prepared on or about September 9, 1994. (P. 7, ¶ 36; P. 11, Int. Nos. 11 & 14). In answer to an interrogatory on January 28, 1997, Dawson finally acknowledged that the September 9, 1994 financials were transmitted via fax from Zuroff to Dawson's counsel prior to the closing for purposes of an antitrust filing.

39. Zuroff faxed financial documents to various banks in connection with Dawson's attempts to acquire financing for the transaction. (P. 122; P. 117).

40. Plaintiffs make a representation that Dawson sent the document to National Westminster Bank, Limited but only cite to the document

itself. (Docket Entry # 317, p. 37). The document contains a stamp "Natwest" in the lower right hand corner and an unidentified telephone or facsimile transmission number in the upper right hand corner of the document.

41. In support of their fraud claim, plaintiffs point out that their alleged failure to disclose the July 1994 consolidated financials attached to Zuroff's fax was the basis for paragraph 36 in Dawson's initial counterclaims. Plaintiffs further complain that it was not until August 1996 when Dawson served a subpoena directly on Katten Muchin that Dawson produced a copy of Zuroff's fax. (Docket Entry # 332).

42. Dawson concedes that these July 1994 consolidated financials (S.A. 268–279; P. 113) were located in Schecter's files. (Docket Entry # 356, p. 20).

43. The document speaks for itself. (P. 133). Connolly, however, could not remember exactly what documents were sent to Fleet Bank with the September 26, 1994 letter but he stated that the September 1994 Faxon Projected Consolidated Financials (P. 133) was "most likely" sent "if it was provided by Fleet Bank." The document contains Fleet Bank Bates stamp numbers. (P. 16, pp. 108–115, vol. II; P. 133; P. 16, pp. 83–84, vol. IV).

With respect to Fleet Bank, an agenda for a September 20, 1994 meeting reflects that Connolly attended the meeting to discuss Faxon's operating performance in connection with extending Faxon a working capital loan. (P. 119).

plete pay down of Nihon Faxon's intercompany debt by June 30, 1995.[44] (P. 133; P. 16, pp. 112–115, vol. II).

On the other hand, Connolly testified that in September 1994 and up to the closing he was occupied with arranging financing for the transaction[45] and spent a significant amount of time arranging for a line of credit for the upcoming season from National Westminster Bank, Limited ("NatWest"), a clearing bank based in the United Kingdom.[46] Connolly also spent a considerable amount of time dealing with Faxon's publishers and obtaining their acquiescence to the transaction.[47] Finally, almost on a daily basis in September 1994, Connolly spent time assuring Faxon customers of the safety of their subscription moneys. In light of these tasks, Connolly had less time to undertake a due

diligence review of Faxon.[48] He also characterized the review of Faxon financial reports as less important than the aforementioned duties, in part, because he could rely on the upcoming audits of the business as of September 30, 1994. The importance of the audit provision, i.e., the purchase price adjustment mechanism, to Dawson is evident by the fact that Connolly discussed the provision with Dawson's board. (P. 16, pp. 154–159 & 179–181, vol. III; A. 129, 158 & 162).

Financial documents prepared before the closing show Nihon Faxon intercompany debt to Faxon of: (1) $10,444,000 as of July 29, 1994, and zero as of August 31, 1994; (2) $10,641,151 as of July 29, 1994, and zero as of June 30, 1995; (3) $8,107,000 as of September 30, 1994, and zero as of June 30, 1995.[49]

**44.** By letter dated May 9, 1995, Ferber states that Dawson did not interpret the "financial model of September 24" as a disclosure by the sellers. Rather, Dawson treated the document, later expanded at Dawson's request to September 30, 1995, as a document prepared for the sole purpose of helping Dawson secure bank financing for the transaction. (P. 205). Connolly similarly acknowledged that Dawson did not consider the September 1994 Projected Consolidated Financials to be a disclosure from the sellers.(P. 133; P. 16, pp. 97–98, vol. IV).

**45.** For example, Connolly met with representatives of Chemical Bank ("Chemical") in or around September 1994. (P. 132). On October 3, 1994, Chemical advised Connolly of its approval of a $25 million line of credit. (P. 150).

**46.** In support of Dawson's financing applications with various banks such as NatWest, Connolly prepared a document analyzing the merits of Dawson's acquisition of Faxon. (P. 16, pp. 34–36, vol.II). Therein, Dawson lists a number of reasons in favor of Dawson's acquisition including Dawson's increased purchasing power with publishers. The document, dated September 9, 1994, posited that by returning Faxon to its core business Dawson believed it could achieve profits by the third year. The application also noted that EBSCO would likely acquire Faxon if Dawson proved unable to complete the transaction and that Dawson would therefore "become marginalized" (P. 96).

NatWest eventually provided funding to Dawson but it was concerned about Dawson not employing accountants to review the transaction prior to the acquisition. In September 1994 Piers Hammer ("Hammer") of NatWest visited Faxon's headquarters in Westwood, reviewed Faxon's accounts receivable and other financial documents and spoke with Faxon's auditors, De-

loitte. (P. 27, pp. 100–101, 122–127, 135–136 & 145–146, vol. I).

**47.** According to Connolly, Faxon had agreed to make certain payments to publishers in September 1994 financed from the moneys obtained by the $16.5 million sale to EBSCO. Indeed, Faxon had entered into an agreement in principle with the publishers dated August 12, 1994, subject to definitive documentation. (P. 76). When the EBSCO sale did not occur, Faxon proved unable to meet the agreed upon payment schedule. And, while Connolly was in a Faxon office with Altman in or around September 10 or 11, 1994, Altman received a telephone call from Elsevier, known as the largest supplier of scientific technical and medical journals in the western world and Faxon's largest supplier. While in a "very angry state," Altman told Connolly what had happened, i.e., that Elsevier had just threatened to put Faxon into chapter 11 bankruptcy if the company was not paid by Monday. *See* F.R.E. 803(1) & (2); (P. 16, pp. 171–174, vol. III; P. 76).

**48.** Consequently, in Connolly's opinion, there was not enough time to carry out due diligence between the time of the EBSCO withdrawal and the signing of the stock purchase agreement. In fact, the only foreign operation Dawson visited prior to the transaction was Faxon Canada. (A. 155 & 162).

**49.** Specifically, projected consolidated financials dated September 1994 show cash flow projections of Nihon Faxon's intercompany debt as being paid down to $6,307,000 by December 31, 1994, and by the close of Faxon's fiscal year on March 31, 1995. They also show the debt as being further paid down to $1,307,000 as of May 31, 1995, and reduced to zero as of June 30, 1995. There is also an assumption that Nihon

(P. 64, 133 & 141). Another set of financial documents reflecting Faxon's domestic balance has the date of June 27, 1994, in the lower right hand corner ("the June financials"). These June financials show Nihon Faxon's intercompany debt projected as: $10,840,000 as of March 31, 1995; $10,340,000 as of June 30, 1995; $5,816,000 as of September 30, 1995; and $10,816,000 as of March 31, 1996.[50] (A.438–440).

In light of Nihon Faxon's seasonal fluctuations, Zuroff explained that Nihon Faxon could realistically collect approximately $7,000,000 or perhaps $4,000,000 to $5,000,000 of the receivables. As further explained by Zuroff, however, Faxon would later pay publishers on Nihon Faxon's behalf thereby increasing Nihon Faxon's intercompany debt.

(P. 21, pp. 119–121, vol. IV; P. 21, pp. 75–77, vol. VI). According to Zuroff, he explained to Connolly the difficulty in bringing the Nihon Faxon intercompany balance down to zero and that it was not "realistic to make that assumption in the time frame that was indicated in the forecasts."[51] (P. 21, pp. 124–125, vol.IV).

Connolly, however, testified that Zuroff assured him that there were "back-to-back receivables" and that the Nihon Faxon "intercompany receivable would be paid down as the external receivables were collected by Nihon Faxon." Connolly recalls viewing cash flow projections showing "all of the Nihon receivable being paid down over a period of time going into the next calendar

---

Faxon would be sold during the period of April through September 1995 for $1,300,000. (A. 467–473; P. 133). Another set of projected consolidated financials with the September 24, 1994 date in the lower right hand corner similarly shows a Nihon Faxon intercompany debt of $8,107,000 as of September 30, 1994, paid down to $6,307,000 as of December 31, 1994, and further paid down to zero as of June 30, 1995. (P. 141).

Zuroff provided certain financial proformas to Connolly on or about September 16, 1994. (P. 114). At Connolly's request, Zuroff also transmitted financial proforma statements to one or more banks which showed the Nihon Faxon intercompany debt up to March 31, 1995, as being paid down to $6,307,000. (P. 117 & 122).

Connolly avers that he saw "prior to the closing" more than one set of cash flow projections showing the Nihon Faxon intercompany debt being paid in full. (A.666, ¶ 3). In addition, as previously noted, by letter dated September 26, 1994, Connolly most likely sent Fleet Bank the above noted Faxon financials showing the Nihon Faxon intercompany debt as $6,307,000 by December 31, 1994, and as paid in full by June 30, 1995. (P. 133).

Zuroff explained that Connolly had wanted him to prepare the cash flow projections, which showed the pay down to zero, and that both he and Connolly knew they were unrealistic. Zuroff objected to the representation of the pay down noted in the financials attached to the September 26, 1994 letter, i.e., the representation after the collapse of the EBSCO sale of the pay down of the Nihon Faxon intercompany debt as being $6,307,000 by December 31, 1994, and zero by June 30, 1995. (P. 133; P. 21, pp. 64–66, vol. VI). After Zuroff advised Connolly that the projections were not realistic, Connolly stated that he would be taking the documents to the bank. (P. 16, pp. 71–72, vol.VI). As a collateral matter, this court does not view Connolly's statement for the truth of the matter asserted. In light of

Connolly's statement, Zuroff viewed the documents as Dawson's.

In sharp contrast to this testimony, Connolly denied that he told Zuroff to prepare financials showing the pay down of the Nihon Faxon intercompany debt even though such financials were unrealistic. He also denied having the conversation with Zuroff. (P. 21, pp. 64–72 & 75–79, vol. VI; P. 16, pp. 160–161, vol. II; P. 16, pp. 98–102 & 119–120, vol. IV; S.A. 138–139). The record is therefore disputed as to whether Zuroff advised Connolly that the projections were unrealistic.

The Nihon Faxon intercompany debt is reflected as a negative number in the intercompany liability column of Faxon's balance sheet. The estimated $10 million Nihon Faxon debt is a receivable to the parent Faxon and a liability to the subsidiary Nihon Faxon. (P. 21, p. 118, vol.IV). Accordingly, it is oftentimes referred to interchangeably as a receivable, a debt or simply an account.

50. Dawson refers to paragraph three of Connolly's affidavit as establishing that the June financials were not shown to Dawson. Paragraph three, however, does not establish this fact. The paragraph simply states that after the collapse of the sale to EBSCO, Connolly was concerned about how the Nihon Faxon intercompany receivable would be paid and that Zuroff represented to Connolly that it would be paid with back-to-back receivables. The paragraph additionally states that Connolly reviewed more than one set of cash flow projections showing a complete pay down of the Nihon Faxon intercompany receivable. (A.666).

51. It is also true that at one point Zuroff testified that he "never said that Nihon [Faxon] would repay its intercompany debt." (P. 21, pp. 119–120, vol.IV).

year." (A.131). He also avers that he saw more than one cash flow projection showing the complete pay down of the Nihon Faxon intercompany receivable. (P. 16, p. 248, vol. I; P. 16, pp. 126–127, vol. II; P. 16, pp. 165 & 167, vol. III; S.A. 111–112; A. 157; A. 166; A. 666, ¶ 3; P. 136; P. 141).

In a similar vein, Connolly testified that Zuroff stated that the impact of the additional subsidiaries "would not have an effect on the net worth of the company." Connolly was also told on a number of occasions that the net worth of the newly added subsidiaries due to EBSCO's withdrawal was a "wash" [52] and/or that effectively the net worth of the added subsidiaries was zero. According to Connolly, a subsequent audit of Faxon revealed that the aggregate net worth of the newly added subsidiaries came to a deficit of $4 to $5 million as of September 30, 1994. (A. 128; A. 154–155).

According to Zuroff, however, he spoke with Connolly a number of times and advised him that by acquiring Asia Pacific in addition to Nihon Faxon that "all of Asia was close to a wash from a cash point of view" or that "Asia as a whole … was approximately a wash in terms of cash flow" or that "when you acquire all of the foreign operations, it's probably a wash." [53] (P. 21, pp. 58 & 107, vol. VI; P. 21, pp. 116–117, vol. IV). He also spoke "at length" with Connolly about Nihon Faxon and denied ever saying that Nihon Faxon would pay down or repay the intercompany debt.[54] Zuroff also testified that he informed Connolly that Faxon "had a lot of difficulty getting information" from

Nihon Faxon and that the company "had not been well managed over the years both operationally and financially." (P. 21, p. 153, vol. III; P. 21, pp. 119–120, vol. IV).

Meanwhile, between September 1 and 13, 1994, Minoru Taguchi ("Taguchi"), President of Nihon Faxon (P. 24, p. 155, vol.2), spoke by telephone with an individual identified as Connolly and explained the "general situation" but "nothing specifically." [55] (P. 24, pp. 168–178, vol.II). According to Connolly, it was after the closing that Zuroff told him that he didn't know what was going on at Nihon Faxon.[56] (P. 16, pp. 166–167, vol.IV).

In light of these contrasting versions of events, therefore, whether Zuroff and/or the cash flow projections misrepresented to Connolly that the Nihon Faxon intercompany debt would be paid in full to Faxon is disputed. The circumstances surrounding Zuroff's "wash" statement are also disputed. More specifically, whether Zuroff limited the statement to cash flow or directed the statement to the net worth of the company is disputed.

With respect to the loss of one of Nihon Faxon's major clients (Tsukuba University), Zuroff was aware of the Tsukuba University problem prior to the closing. (P. 21, pp. 90–91, vol.VI). An August 24, 1994 facsimile transmission correspondingly suggests that Faxon knew of the probable loss of the Tsukuba University account and of Taguchi's 50% projected loss of Nihon Faxon's sales volume.[57] (S.A. 40a–40b). In connection thereto, Faxon was discussing the option of recapitalizing Nihon Faxon's intercompany

---

52. This court does not consider Zuroff's statement that the subsidiaries were a wash for the truth of the matter asserted. In fact, Connolly testified that the statement proved false.

53. In other words, according to Zuroff, his statement referenced the cash flow of Asia as opposed to the net worth of the entire company.

54. Zuroff explained that Nihon Faxon could pay down a portion of the intercompany debt at times but then Faxon domestic would have to relend it to Nihon Faxon due to the seasonality of its operations.

55. Connolly could not recall whether he spoke with Taguchi before or after the acquisition. (A.121).

56. Elsewhere during his deposition, Connolly testified that it was approximately during September 1994 that Zuroff advised him that he didn't really know what was going on at Nihon Faxon. (P. 16, pp. 205–206, vol.III).

 This testimony of what Zuroff said, taken from Connolly's deposition, is not considered for the truth of the matter asserted.

57. This court does not consider the facsimile transmission for the truth of the matter asserted therein.

 Taguchi testified that Nihon Faxon would lose 15% of its sales volume if it lost the Tsukuba University business. He further stated that, due to additional losses from other customers in August and September 1994, that Nihon Faxon's total loss was about 50%.

debt to enable the company to successfully bid on the Tsukuba business.[58] (P. 21, pp. 85–90, vol. VI; P. 89).

In fact, through a facsimile transmission dated September 1, 1994, Zuroff informed Taguchi that, pending an official board vote, Faxon "will recapitalize Nihon Faxon for the full amount of the intercompany debt." (P. 89). Noting that the vote would increase Nihon Faxon's equity by approximately $10 million, Zuroff concluded that he hoped "this will allow [Nihon Faxon] to win the bid with Tsukuba." (P. 89).

Sometime between September 1 and 14, 1994, Zuroff testified that a board minute dated June 30, 1994, was prepared.[59] (P. 21, p. 84, vol.VI). Davis could not recall the specifics of the meeting although she recollected that the meeting referred to in the June 30, 1994 minute took place in approximately August 1994. (A.175–176). Zuroff suspected that the minute was post dated and that the meeting did not actually take place on June 30, 1994. (P. 21, p. 96, vol.VI). The minute, however, reads that, "A special meeting of the Board of Directors of the Faxon Company, Inc. was held ... on June 30, 1994." (P. 105; A. 454(a)). Accordingly, there is a discrepancy as to the date of the meeting which took place prior to the closing.

The minute reflects that the Faxon board voted to convert $6 million of the Nihon Faxon intercompany debt into "additional paid in capital" effective immediately. (P. 105; A 454(a)).[60] The agenda for the meeting was Nihon Faxon's intercompany debt and its ability to effectively bid on certain accounts. (P. 105; A. 454(a)).

Whether the minute books of Faxon contained this minute and whether Faxon made this minute available to Dawson is disputed. Connolly attests that the June 30, 1994 minute was not among the copies of minutes he reviewed which were kept at Faxon Westwood.[61] He also testified that he did not see the minute before the closing. Moreover, the minute would have caused Connolly concern because it would contradict Zuroff's statement that the addition of the foreign subsidiaries was a wash and that the Nihon Faxon intercompany receivable was supported by back-to-back receivables. Connol-

**58.** A September 1, 1994 facsimile transmission from Zuroff to Taguchi similarly indicates that Faxon was considering recapitalizing Nihon Faxon for the full amount of the intercompany debt. (P. 89). The magnitude of Nihon Faxon's intercompany debt was hampering its ability to bid on the Tsukuba business. (P. 21, pp. 85–90, vol. VI; P. 89). According to Zuroff, he provided Connolly with copies of Taguchi's facsimile transmissions to Faxon prior to the closing which discussed the possibility of recapitalizing Nihon Faxon and converting the debt to paid in capital. (P. 21, p. 87, vol. VI; P. 107; P. 111; P. 135). Zuroff also testified that he specifically discussed with Connolly "what to do with Tsukuba University" prior to the closing. (P. 21, pp. 104–105, vol. IV; P. 21, pp. 84–86, vol. VI).

On the other hand, Connolly believed there were no current financial statements from Nihon Faxon to review. (P. 16, p. 268, vol.II). Connolly also stated that he was never informed of the projected loss of 50% of Nihon Faxon's sales volume. (A.154). He nevertheless recalls discussing with Zuroff efforts to retain Nihon Faxon customers. He also remembers discussing the recapitalization of the Nihon Faxon intercompany account albeit after the closing. (P. 16, pp. 269–270, vol.II).

In short, although Connolly remembers discussions about efforts to retain Nihon Faxon customers and discussions post closing of recapitalizing the Nihon Faxon intercompany account, he does not remember seeing minutes of a vote at the board level to recapitalize the debt prior to the closing. (P. 16, p. 225, vol.III).

**59.** Davis believed that Zuroff prepared the minutes. (A.176). Zuroff testified that he was not sure whether he prepared the June 30, 1994 minute. (P. 21, p. 95, vol.VI).

**60.** Although the content of the copies of the June 30, 1994 minute in the record (P. 105 & A. 454(a)) are the same, apparently there were several copies or versions of the document. Zuroff's signature intersects the "S" of the word "Secretary" on one copy (A.454(a)) but not on another (P. 105). Davis' signature is on both copies of the minute. (A.188). The copy of the minute with a handwritten note also contains Zuroff's signature intersecting the "S" of the word "Secretary." (A.455).

**61.** At one point during his deposition, Connolly stated that he had no recollection of a minute book at Dawson or where such a minute book was kept. (P. 16, pp. 81–82, vol.III). Contrary to plaintiffs' position, this testimony does not directly contradict Connolly's affidavit testimony. *See generally Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4–5 (1st Cir.1994).

Although Connolly kept a file at Faxon prior to and around the time of acquisition, the file could not be located. (P. 16, p. 141, vol.IV).

ly also viewed the minute as significant inasmuch as it effected the cash flow projections showing the pay down of the Nihon Faxon intercompany debt. (P. 16, pp. 225–226, vol. III; A. 666, ¶ 4; A. 165).

It is also true that via a facsimile transmission dated September 8, 1994, Dawson's counsel requested "all minutes" of the Faxon board "for the last five years." [62] (A.527). A copy of the minute with Zuroff's signature intersecting the "S" of the word "Secretary" (A.455) contains a handwritten note with the words, "Mark Z. said hold!". (P. 23, pp. 54–55, vol.I). Diana Brewer ("Brewer"), who provided general support to Zuroff and was also Assistant to the President at Faxon in 1993 and 1994 (P. 23, pp. 8–13, vol.I), recognized the handwriting on the note as her handwriting.[63]

On the other hand, Brewer could not remember the actual instruction or why she was instructed to hold the note. Assuming that the instruction meant not to distribute the document, Brewer also did not know whether the instruction meant not to place the minute in the minute book. She does not remember anyone asking her not to put a minute in the minute book. (P. 23, pp. 53–55, vol.I).

In June 1994 Faxon kept a complete list of the board minutes in one place, a Pendiflex folder or minute book[64] in a fire safe file cabinet located outside the President's office. For due diligence reviews, Zuroff testified that Faxon would create binders of financial materials containing an exhaustive list of board minutes. According to Zuroff, it was Brewer's responsibility to keep the entire set of minutes in the minute book. (P. 21, pp. 96–98, vol. VI; P. 23, pp. 44–46, vol. I).

Although Zuroff could not recall whether he provided a copy of the June 30, 1994 minute to Connolly, he does remember discussing with Connolly the issue of recapitalizing Nihon Faxon by converting its intercompany debt to paid in capital as one of several options or approaches to retain Tsukuba University as a Nihon Faxon client.[65] Zuroff did not know or couldn't be sure whether he told Connolly that, in fact, the board voted to recaptilize a portion of Nihon Faxon's intercompany debt. Moreover, Connolly recalled that any discussions as to recaptilization took place after the closing. Brewer also could not remember whether the June 30, 1994 minute was included in the multitude of documents sent to Dawson. A student interning at the offices of Dawson's counsel avers that the June 30, 1994 minute was not in the due diligence files produced by Katten Muchin. (P. 21, pp. 85–87 & 98–99, vol. VI; P. 21, p. 138, vol. III; P. 21, pp. 104–105, vol. IV; P. 23, p. 56, vol. II; A. 981).

On September 13, 1994, via facsimile transmission, Zuroff sent Taguchi a copy of the June 30, 1994 minute. (P. 105). On September 14, 1994, Taguchi replied that Japanese law prohibited conversion of the intercompany debt to paid in capital. Taguchi also referred to a Dawson press release signed by Connolly. (P. 111). As previously noted, Zuroff stated that he passed along to Connolly the facsimile transmissions sent to him by Taguchi. (P. 21, p. 87, vol.VI). Neither Zuroff nor Frank Neczypor ("Neczypor"), a tax partner at Deloitte who reviewed and consulted with Faxon on tax matters in late

---

62. Because of evidence that the minute was prepared between September 1 and 14, 1994, however, it is therefore a disputed fact as to whether the minute was created as of the date of the facsimile transmission.

63. Brewer also logically and reasonably assumed that "Mark Z." referred to Zuroff. (P. 23, p. 54, vol.I).

64. Zuroff testified that the minutes were kept in a Pendiflex folder while Brewer testified that they were kept in some form of a binder such as a minute book.

65. One of the notes which Zuroff made on his copy of a draft version of the stock purchase agreement reads, "Nihon Vote?" with an arrow pointing from section 2.5 of the agreement, i.e., the provision that the minute books have been made available to Dawson, are complete and correct and have been properly maintained. Zuroff at first testified that he did not know what he was referring to by the notation. Later, he testified that he would not necessarily have brought the comment "Nihon Vote?" to Bronson's attention because the note could have been a reminder to himself to put the Nihon Faxon vote in the binder. He does not remember "what if anything [he] did to follow up on this comment." (S.A. 265–266 & 202a).

1993 and 1994, could recall whether Faxon implemented the action discussed in the June 30, 1994 minute, i.e., the conversion of $6 million of Nihon Faxon intercompany debt to paid in capital. In September 1994 Dawson was considering the option of closing or selling Nihon Faxon. (P. 26, pp. 15–16 & 119, vol. I; P. 21, pp. 100–103, vol. VI; P. 137; P. 11, Int. 15).

During the week of September 19, 1994, both Ingleby and Cain visited Faxon's Westwood facility. They met with individuals familiar with Faxon's research and development, product marketing and publisher and clients services departments. They also met with Altman and Davis. On September 20, 21 and 22, 1994, Ingleby and Cain traveled respectively to Faxon's operations in New York, Faxon Canada in Ontario and Faxon facilities in Ann Arbor, Michigan. (P. 125).

Notwithstanding these visits, Ingleby testified that Dawson lacked the necessary two to three months to conduct due diligence but believed that Dawson had some protection under the stock purchase agreement.[66] (S.A. 184). Connolly similarly stated that Dawson did not conduct any due diligence of Faxon.[67] According to Connolly, Dawson needed to conclude an agreement within a short time period to alleviate the considerable unrest and concern within the library community. Consequently, Connolly testified that Dawson lacked the necessary time to conduct a thorough review of Faxon's financial statements, internal controls, staffing, organization, customers and premises. (A. 155 & 162; P. 16, pp. 152–154, vol. III).

On September 29, 1994, the board of Dawson PLC met and discussed the acquisition of Faxon for $15 million with $12 million subject to deferred payments over various time periods.[68] The minutes further reflect that NatWest had agreed to provide acquisition funding and that, optimistically, Dawson would obtain $25 million of seasonal funding. The Dawson PLC board also heard reports from Connolly and Ingleby and thereafter approved Dawson, Inc.'s prospective acquisition of Faxon for $15 million. Also on September 29, 1994, the board of Dawson, Inc. issued a resolution to purchase Faxon for $15 million and provided Connolly with the authority to execute a written agreement.[69] (P. 139 & 140).

Concentrated efforts to negotiate the wording and to conclude a final agreement began in earnest in late September 1994. There were a series of drafts of the stock purchase circulated prior to the October 4, 1994 signing of the final agreement. (A.160). On September 28, 1994, Katten Muchin transmitted an initial draft of the agreement to Attorney John L. Bronson of Jager, Smith, Stetler & Arata ("JSSA," "sellers' counsel," "plaintiffs' counsel" or "Bronson") requesting his comments. As explained in greater detail *infra*, the initial draft did not include the adjustments contained in subsection 1.5(a) through 1.5(g) of the final agreement. The benchmark net worth figure was also blank.

Further, the last sentence of section 2.1, which is the first section under the representations and warranties section of the agreement (section 2), defined the term "Company" as including each subsidiary of Faxon. (P. 138). In other words, Dawson initially proposed including all of the subsidiaries in the representations and warranties section of the agreement.

On September 30, 1994, Bronson sent Katten Muchin his comments and a marked-up

---

66. Likewise, Ingleby's affidavit states that he and fellow board members agreed to proceed with the Faxon acquisition because they understood that the agreement protected Dawson from a deficiency in Faxon's book value. (A.669, ¶ 5).

67. Ferber testified that Katten Muchin was performing legal due diligence, albeit not reviewing Faxon's financial records, which his notes and billing records also reflect. (P. 20, pp. 89–94, vol. I; P. 115; P. 180).

68. A September 26, 1994 draft of a revised letter of intent shows a purchase price of $15 million, with $3 million in cash at the closing and the remaining balance delivered in seven installments over a period of time. (P. 102).

69. The resolution referenced forms of the stock purchase agreement "previously delivered to the undersigned," i.e., Ingleby, Peter M. Brown and/or Cain. Ingleby testified that he did not think that forms of the agreement had been delivered previously to him. (P. 139; P. 17, pp. 100–101, vol. III).

draft of the agreement. (P. 146). Therein, sellers' counsel proposed in a comment "that the representations and warranties should exclude the subsidiaries entirely" except for a representation as to Faxon's ownership of the subsidiaries. The last sentence of section 2.1 is crossed out with a reference to the above comment. (P. 146). A subsequently drafted version contains the original last sentence of section 2.1 with handwriting excluding sections 2.3, 2.4 and 2.5 from the definition of the term "Company" which included the subsidiaries.[70] (P. 151). The final agreement includes the subsidiaries in the representations and warranties section except for sections 2.3 (Capitalization), 2.4 (Financial Statements) and 2.5 (Books and Records).[71] (P. 1).

With respect to section 2.4, the initial draft included the representation and warranty that, "Such financial statements and notes fairly present the financial condition (or, in the case of the Pro Forma Balance Sheet, expected financial condition) and results of operations of the Company ... all in accordance with GAAP." (P. 138). The reply draft of sellers' counsel excluded the pro forma balance sheet from this sentence and pro-posed that the sentence read as follows: "Such financial statements and notes (other than the Pro Forma Balance Sheet)[72] fairly present the financial condition and results of the Company ... all in accordance with GAAP." (P. 146). In the final agreement, this sentence does not contain the parenthetical and reads simply that, "Such financial statements and notes fairly present the financial condition and results of operations of the Company ..., all in accordance with GAAP."[73]

The purchase price adjustment mechanism in sections 1.5 and 1.6 was also the subject of various revisions prior to the final agreement. The final section 1.5 contains a $4,118,000 benchmark net worth figure. The purchase price adjustment set forth in the final agreement provides that if the "Adjusted Closing Net Worth" of Faxon, as audited and determined by Deloitte as of October 2, 1994, was below $3,618,000, then the agreement allowed Dawson to take a downward adjustment of the purchase price for each dollar the adjusted closing net worth was below the benchmark $4,118,000 amount.

According to Connolly, the parties derived the $4,118,000 figure from the $5,118,000 fig-

70. Ferber testified that, although his handwriting appears elsewhere in the draft, the handwriting on page four inserting the exclusion of the subsidiaries from sections 2.3, 2.4 and 2.5, did not appear to be his handwriting. (P. 20, vol.II, p. 290). He averred that the sellers initially proposed the exclusion of the subsidiaries from the representations and warranties section but that Dawson was unwilling to agree to such an exclusion. Thereafter, according to Ferber, the parties agreed to exclude the subsidiaries from the definition of the term "Company" only from sections 2.3, 2.4 and 2.5. (S.A.57). Connolly did not know whether Katten Muchin proposed the change to the last sentence of section 2.1 (S.A. 116). This parol evidence, however, cannot vary the unambiguous language defining the term "Company."

71. The sentence is underlined in the final agreement and reads as follows: "As used in the remainder of this Section 2 (other than Sections 2.3, 2.4 and 2.5), the term 'Company' shall include each of the subsidiaries of the Company." (P. 1).

72. The parenthetical words are handwritten in the draft. (P. 146). In a subsequent draft, these words are typed. (P. 151).

73. Connolly testified that he understood that the interim balance sheet attached to the final agree-ment was not consolidated and that the sellers represented the interim balance sheet as a domestic balance sheet. (P. 16, pp. 221–222, vol. II; P. 16, pp. 115–116, vol. III). Examining section 2.4, Zuroff also testified that the interim balance sheet was not a consolidated financial statement and that all of the parties knew that the interim balance sheet was neither consolidated nor "a representation of GAAP." (P. 21, pp. 159–160, vol.VI).

Under the parol evidence rule, however, such testimony cannot alter unambiguous terms within an integrated agreement.

The initial draft, prepared by Dawson, separately references both an "Interim Balance Sheet" and a "Pro Forma Balance Sheet." (P. 138). Plaintiffs argue that this initial draft as well as subsequent drafts were designed to compare the net worth of a consolidated company to a consolidated company rather than to compare a consolidated company to a domestic company. Hence, given this context, plaintiffs assert that subsection 1.5(g) of the final agreement continues this premise of comparing "apples to apples," i.e., adjusting the consolidated closing balance sheet to conform to the domestic basis of the net worth figure in the interim balance sheet.

ure in the interim balance sheet attached to the letter of intent wherein the stockholder net equity figure for the domestic company is $5,118,000 as of July 29, 1994.[74] Connolly explained that the $1,000,000 difference derived from the sellers advising Dawson that the sales proceeds from the European subsidiaries was $1,000,000 less than anticipated.[75] (P. 16, pp. 194–195, vol.III).

With respect to the entirety of sections 1.5 and 1.6, sellers' counsel pointed out, in the reply draft, that the basis for the adjustments needed to be changed due to the EBSCO withdrawal and the sale of Turner and Faxon Canada. The comment reads as follows:

> The basis for the adjustments of the purchase price needs to be changed due to intervening developments since August (e.g. no EBSCO sale; Turner and Canada sales); the projected 9/30/94 balance sheet attached to the 8/31/94 letter agreement is no longer valid. Our suggestion is that if the operating loss for September should exceed a projected amount (on the order of

$2 million) by more than $500,000, then an adjustment should be made.

(P. 146). Altman testified that the purchase price adjustment was not included to compare a consolidated net worth to a domestic net worth.[76] (P. 28, vol.III, pp. 36–37).

As it appears in the final agreement, section 1.5 contains a list of adjustments, (a) through (g). The first handwritten version of these adjustments appears in an undated version of a draft circulated after the September 30, 1994 revision draft by Dawson (P. 146). (P. 151). As previously noted, "INSERT I" in Ferber's handwriting appears on page three of this draft (P. 20, vol.II, p. 291) and refers to a handwritten paragraph later in the draft which reads as follows:

*INSERT I*

For purposes hereof, "Adjusted Closing Net Worth" shall mean the net worth (assets minus liabilities) of the Company, on a consolidated basis with its subsidiaries, as shown on the Closing Balance Sheet (defined in Section 1.6) adjusted so as not to

---

**74.** Referring to a page on a draft of the agreement, plaintiffs allege that Ferber filled in the blank benchmark net worth number with the number $4,118,000. To support this statement, plaintiffs fail to cite to deposition testimony on the part of Ferber that the handwritten $4,118,000 figure is his handwriting. Ferber's cited testimony at page 110 of his deposition (Docket Entry # 317, p. 50, last line) concerns Dawson's FCC filing in connection with the EBSCO offer.

Nevertheless, Ferber elsewhere testified that the changes to the page after page two "do appear to be my handwritten comments. Next page, which is page 3 of the document, does not appear to be mine...." (P. 20, pp. 289–291, vol.II). The document referenced is exhibit 151 which has two page threes. The page three immediately after page two is Bates stamped KMZ0016275 which has the inserted handwritten word "Adjusted" preceding the words "Closing Net Worth," the inserted handwritten benchmark net worth figure of $4,118,000 and the handwritten words "INSERT I." Accordingly, there is evidence in the record to at least support plaintiffs' allegation (Docket Entry # 317, p. 50) that Ferber initially inserted the $4,118,000 figure, the word "Adjusted" and the reference to "INSERT I." There is also no cited evidence to the contrary that Dawson did not draft the initial $4,118,000 figure, the term "Adjusted" and the words "INSERT I." "INSERT I" refers to an entire handwritten paragraph appearing later in the draft which is the genesis for the adjustments in subparts (a) through (g).

**75.** This court does not consider this recitation for the truth of the matter asserted by the sellers, i.e, that the sales proceeds from the European subsidiaries was $1,000,000 less than anticipated.

At his deposition, Connolly testified as to his interpretation of the adjustment. Under Connolly's interpretation, if the adjusted net worth of the consolidated company with the subsidiaries fell below the $4,118,000 by more than $500,000 (the $3,618,000 figure) then there would be a dollar for dollar adjustment in favor of Dawson up to the $4,118,000 figure. (P. 16, pp. 194–196, vol.III).

This court, however, does *not* consider Connolly's interpretation *nor* the statements and interpretations made by other individuals in their depositions or affidavits in arriving at the meaning of the unambiguous language in the agreement. Contract interpretation is solely the province and the responsibility of this court to determine as a matter of law, absent an ambiguity.

**76.** Plaintiffs offer this testimony but also correctly classify it as parol evidence. (Docket Entry # 318, pp. 80–81). Even if it was necessary to consider Altman's testimony in the event of an ambiguity, the evidence is disputed as to the purpose for the purchase price adjustment mechanism.

give effect to the following:[77] (a) Operating losses of the Company and its Subsidiaries on a consolidated basis for August and September 1994; (b) the closing of Subsidiaries located in the Asia/Pacific region and Australia; (c) any increase in the bad debt reserve over $1,341,426;[78] (d) any write-off of capitalized software development costs or write-down of related computer hardware; (e) gain on the sale of Turner Subscription Agency, Inc. and Faxon Canada, Inc., and any taxes thereon; and (f) any other adjustments required so that the Closing Balance Sheet shall have been prepared on a consistent basis with the Interim Balance Sheet (defined in Section 2.4).

(P. 151)

Ferber remembers that Connolly,[79] Bronson, Attorney Mark Wood and himself discussed the list of purchase price adjustments on October 4, 1994, prior to the signing of the agreement that day. Ferber's understanding of subsection 1.5(g) was that it was designed to make sure that accounting policies did not change.[80] (P. 20, pp. 69–72 & 82–84, vol. I).

Connolly testified that he proposed the language in subsection 1.5(g) and that he discussed the subsection with the sellers.

Like Ferber, Connolly recalls that the purpose of subpart (g) was to remedy inconsistencies in accounting practices between those of Dawson and those of Faxon.[81] In contrast, Zuroff viewed subpart (g) as a recognition that "a closing balance sheet, a GAAP closing balance sheet by definition would have to be adjusted to reflect the basis that was used to put together the interim balance sheet."[82] (P. 16, pp. 200–201, vol. III; P. 16, pp. 214–219, vol. II; P. 21, p. 170, vol. VI).

Dawson's initial draft of the agreement proposed the use of Coopers & Lybrand, Dawson's auditors at the time, to conduct the audit in section 1.5, later renumbered as section 1.6. At Faxon's suggestion, the parties substituted Deloitte as the auditors in section 1.6 of the agreement. Zuroff pointed out to Dawson that Deloitte would conduct an audit in a shorter period of time because of its familiarity with Faxon. Dawson agreed and Deloitte became the designated auditors in section 1.6 of the final agreement. (P. 138; A. 90–91; P. 21, pp. 19–20, vol. VII; P. 16, pp. 206–208, vol. III).

The parties also focus their dispute on sections 2.8 and 8.2 of the agreement, the accounts receivable warranty and set off provisions.[83] The final agreement defines the term "Accounts Receivable" as "all accounts

---

**77.** Here, the words "with the following adjustments" in lieu of "adjusted so as not to give effect to the following" appear to be crossed out.

**78.** This number also appears on Faxon's internal preliminary consolidated financials for July 31, 1994. (P. 99). Even assuming that Ferber drafted subsection 1.5(a) through (g), however, plaintiffs' further assumption that Ferber had these financials in front of him when he drafted (a) through (g) (Docket Entry # 317, p. 52) is speculative and contradicted by the record (Docket Entry # 356, Ex. G).

**79.** Connolly arrived in Boston on October 2, 1994, and proceeded to participate in the final negotiations which resulted in the October 4, 1994 signing of the stock purchase agreement. (A.160).

**80.** Ferber's understanding or interpretation of the language of the agreement is irrelevant to this court's interpretation of the meaning of unambiguous language in the agreement.

**81.** Connolly viewed the entirety of the purchase price mechanism as a means to uncover and to recoup losses after the acquisition that would

have appeared if Dawson had conducted an adequate and complete due diligence of Faxon, including the foreign subsidiaries, prior to the acquisition. Further, Connolly noted that he discussed the implications of the EBSCO withdrawal with Altman and that the purchase price adjustment would uncover any problems arising from the acquisition. Given this safety mechanism as well as Zuroff's statement that the foreign subsidiaries were a wash, Connolly testified that he had no reason to believe prior to the acquisition that Dawson would take a purchase price adjustment. (P. 16, pp. 182–184, vol. IV; P. 16, pp. 202–206, vol. III). According to Ferber, Connolly's role in the negotiations involved accounting and financial issues. (P. 20, p. 81, vol.I).

**82.** As noted by plaintiffs, the net worth figure of Faxon on a domestic basis differs from the net worth figure of Faxon on a consolidated basis.

**83.** Much of the parties arguments center around the meaning of the term "Accounts Receivable."

receivable (individually on a gross basis) of the Company." Section 2.1 provides that the term "Company" as used in section 2, except for sections 2.3, 2.4 and 2.5, is to include each of Faxon's subsidiaries. The accounts receivable sections (§§ 2.8 and 8.2) therefore encompassed the receivables due to Nihon Faxon from Nihon Faxon's customers.[84] The language in the penultimate sentence of section 8.2 also establishes that the aggregate outstanding balance due under two demand notes owing to Faxon from Charles E. and Helen R. Rowe ("the Rowe notes") was an account receivable within the meaning of sections 2.8 and 8.2.[85]

Under section 2.8, the sellers agreed to deliver to Dawson "at the Closing a complete and accurate schedule" of the accounts receivable as of October 2, 1994. The aggregate amount of the accounts receivable would then be reflected on the Closing Balance Sheet which, under section 1.6, was going to be prepared by Deloitte within 60 days after the closing.[86] Under section 8.2, Dawson could reduce its installment payments under the notes if Faxon collected less than the aggregate accounts receivable. Specifically, if at the end of 335 days after the closing and thereafter annually, Faxon collected on the accounts receivable an amount less than the aggregate amount of the accounts receivable (minus a bad debt reserve of $1,341,426 for uncollectible accounts), then Dawson could reduce its annual installment payments under the notes by the amount of the uncollected receivables.

With respect to section 2.8's requirement that the sellers deliver to Dawson the "Accounts Receivable Schedule" at the closing,[87] Zuroff testified that he made it clear to everyone that he could deliver a printed schedule. He further stated that all parties knew that delivering a schedule was impractical due to "its immense size." According to Zuroff, "all parties were aware that the information was available to them electronically." Moreover, all parties agreed it would be impractical for the sellers to bring a printed copy of the accounts receivable schedule to the offices of JSSA, according to Zuroff.

With respect to the delivery and content of the accounts receivable, Zuroff stated that Faxon's computing system could provide different slices of information. According to Zuroff, in lieu of delivering an unwieldy printed schedule, what was available at the closing was access to the information on Faxon's mainframe computer. Referring to the accounts receivable schedule, Zuroff further testified that the information was available at the closing electronically. In fact, according to Zuroff, the parties could technically access the information at the closing by telephone.

In addition, Zuroff testified that Faxon made an electronic copy on a computer tape of the receivables database as of October 2, 1994, and made the tape available to Connolly around the time of the closing. According to Zuroff, the accounts receivable database

---

84. Although unambiguous and, therefore, immaterial, the parol evidence in the form of Connolly's notes fully supports this construction. His notes show the words, "Receivables must include inter-co receivables" with the words "inter-co" crossed out and the word "overseas" written over "inter-co." (A. 370; A. 166; A. 135a).

85. Notwithstanding Faxon's efforts to collect the outstanding balance, the Rowe notes remain unpaid. As of September 14, 1996, the amount owed, with accrued interest, was $192,053. (A. 666; A. 678).

86. The first full sentence of section 2.8 expressly reads as follows:
 **ACCOUNTS RECEIVABLE.** Sellers will deliver to Buyer at Closing a complete and accurate schedule (the "Accounts Receivable Schedule") of all accounts receivable (individually on a gross basis) of the Company (the "Accounts Receivable") as of October 2, 1994,
in an aggregate amount which will be reflected on the Closing Balance Sheet, which Accounts Receivable Schedule will set forth the aging of such Accounts Receivable.

87. If there were an ambiguity in the meaning of the delivery requirement, the parol evidence includes the following. Initial drafts of the agreement envisioned the attachment of a schedule to the agreement containing "a complete and accurate list of all accounts receivable of the Company." (P. 138 & 146). In a subsequent draft, handwritten additions, which Ferber testified were not in his handwriting (P. 20, p. 290, vol. II), cross out the requirement of a schedule attached to the agreement and, instead, insert the requirement that, "Sellers will deliver to Buyer at the Closing a complete and accurate schedule (the 'Accounts Receivable Schedule') of all accounts receivable of the Company." (P. 151).

contained "detailed information." He also testified that the tape was made available to Deloitte and that Deloitte had direct access to Faxon's computer database.[88] (P. 21, pp. 84–88, vol. VII; P. 21, pp. 88–92, vol. I).

The existence of the tape discussed by Zuroff is buttressed by an inventory log for September 29, 1995, for Safesite, a national business records management company used by Faxon. The log describes as Faxon inventory certain CODA backup tapes for October 6, 1994.[89] Plaintiffs's expert avers that "we" had access to the "Safesite tape" and reviewed a number of accounts therein.

Zuroff acknowledged, however, that the sellers did not bring a hard copy of the schedule to the offices of JSSA on the day of the closing.[90] Rather, the sellers gave Dawson access to the schedule and Zuroff advised Connolly that there was such access through Faxon's computer system, according to Zuroff. (P. 21, pp. 84–88, Vol. VII; P. 21, pp. 88–92, Vol. I; Docket Entry # 289, ¶, 10).

Similarly, Mark J. Gisherman ("Gisherman"), Treasury Manager at Faxon at the time of the closing, stated that he asked a Faxon employee to make sure that there was a hard copy of the accounts receivable as of the date of the acquisition which he believed was September 30, 1994. He also believed that the hard copy was kept in a filing cabinet outside his office. (P. 22, pp. 43–47, Vol.I).

In contrast to the testimony of Zuroff and Gisherman, Connolly stated that the parties did not agree that the schedule did not have to be produced because of its volume. According to Connolly, he requested the schedule at the closing and Zuroff could not give him a schedule at the closing. Connolly also had no understanding that Zuroff had "downloaded a copy of the accounts receivable database" and "made a copy of the tape."[91] (A. 146; A. 147).

With respect to the content and completeness of the receivables database, plaintiffs did not produce a list of accounts receivable for Nihon Faxon prior to the October 14, 1994 closing. (A.79). Plaintiffs also acknowledge that, "Although all of Faxon's $64,808,224 [92] accounts receivable were contained on the CODA tape, some of Nihon Faxon's $1.2 million in accounts receivable were not included."[93] (Docket Entry # 317, n. 23).

---

88. During Zuroff's tenure at Faxon, the company used a computer software system referred to as "CODA." (P. 21, pp. 93–94, vol.I).

89. The log names John Kane as the Faxon contact person and instructs Safesite to hold the CODA tapes "offsite unless requested." Faxon's visitors' log of January 25, 1995, reflects that an individual from Safesite visited John Kane, Computer Lease Administrator at Faxon. (P. 184; P. 230; P. 19, p. 7, vol. II). The Safesite log further notes that Dave Slater, a Faxon employee in computer operations which is responsible for maintaining daily back up tapes, has a set of CODA backup tapes for October 13, 1994. (P. 230; P. 19, pp. 7–10, vol. II). To support their fraud claim, plaintiffs allege that they discovered the existence of the CODA tape with the accounts receivable schedule, despite Dawson's denials, only after they subpoenaed Faxon's off-site storage facility, Safesite.

90. The final agreement defines the term "Closing" in section 1.3 as "the purchase and sale" of Faxon which would "take place at the offices of Jager, Smith, Stetler & Arata, P.C."

Section 1.3 did not designate a particular day for the closing but stated that the date would be "within five business days after the expiration or termination of the applicable waiting period" under "the Hart–Scott–Rodino Antitrust Improvements Act of 1976."

91. He did attest, however, that the sellers told him that all of the data concerning the accounts receivable schedule was available on Faxon's computer system. (P. 39, ¶ 10). This court does not consider this testimony for the truth of the matter asserted by the sellers.

92. In making this statement in a footnote, plaintiffs do not indicate how they arrive at the $64,808,224 figure. The closing balance sheet reflects a figure of $63,466,818 as the accounts receivable less a $1,343,000 allowance for doubtful accounts. Adding these two figures together yields the figure $64,809,818. The bad debt reserve for uncollectible accounts in the stock purchase agreement is $1,341,426. Adding this amount to the $63,466,818 figure yields a figure of $64,808,244.

93. Dawson understandably emphasizes this concession as establishing that the sellers did not deliver a "complete and accurate" accounts receivable schedule of the company as required under section 2.8. (Docket Entry # 356, p. 24).

Plaintiffs cite to Taguchi's testimony when making this statement. Taguchi testified that

In addition to plaintiffs' concession, Davis testified that portions of Nihon Faxon's export business were not reflected on the CODA system. Significantly, however, she was not sure how Nihon Faxon's import business was reflected. In reference to hard copies or computer data at Faxon listing Nihon Faxon's receivables, she further stated that "there probably was." (A.192). Finally, Riley avers that the bulk of Nihon Faxon's accounts receivable information was not contained in the CODA system.[94] (A.677). Accordingly, whether the sellers made a delivery of a complete and accurate schedule at the closing as required under the first sentence of section 2.8 is disputed. It is therefore unnecessary to decide whether the integration clause (section 11.5) prevented the parties from mutually agreeing not to enforce the requirement that the sellers deliver a schedule at the closing.

In addition to the delivery of a complete and accurate schedule, the parties also dispute the meaning of the term "Accounts Receivable" and, specifically, the manner to calculate the accounts receivable. Dawson contends that, in light of the language "individually on a gross basis," the accounts receivable calculation begins with a gross number, i.e., the gross debits owed by customers to Faxon. Plaintiffs assert that, given the entire text of the sections, accounts receivable begins with a net number, i.e., the net debit amount in customers' accounts.

The parenthetical words "individually on a gross basis" in section 2.8 were added to the agreement relatively late in the negotiation process. (A.89). Neither Davis (A.189) nor Zuroff could remember who suggested the language.[95] Zuroff generally recalled, however, that the words were inserted to clarify that the sellers were providing Dawson with "information about both the debits and the credits." Zuroff also understood that uncollected receivables was a net number which included debits and credits. Viewed in a light favorable to plaintiffs, therefore, Zuroff's testimony (P. 21, pp. 88–93, vol. VII; P. 21, p. 181, vol. 1) establishes that there is

---

Nihon Faxon typically received orders and transmitted them by fax to Faxon Westwood which then generated the invoices. He also estimated that Nihon Faxon had an estimated $1.3 million of receivables outstanding as of October 1994. Nihon Faxon's accounting methods, however, also included a category of unfilled receivables within this $1.3 million of outstanding receivables, according to Taguchi. Taguchi further noted that the Deloitte office in Japan had a record of Nihon Faxon's billed and unbilled receivables as of October 1994. (P. 24, pp. 4–8 & 16–17, vol. II).

It is within this court's discretion to consider counsel's inadvertent statement in a footnote in a brief wherein the summary judgment record is more than voluminous as a binding and irrebuttable admission. *See American Title Insurance Company v. Lacelaw Corporation*, 861 F.2d 224, 226–227 (9th Cir.1988) (citing tenth and second circuit decisions). Moreover, the statement is equivocal inasmuch as it is not date specific. *See* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2724, at 75 (1983) (in considering stipulations as admissions, "summary judgment must be denied if the stipulation is equivocal"); *Council for the Hearing Impaired v. Ambach*, 610 F.Supp. 1051, 1058 (D.C.N.Y.1985) (stipulation only contained broad assertions and was thus insufficient to allow the plaintiffs' summary judgment motion). For example, plaintiffs' statement does not read that as of October 14, 1994, the CODA tape at Faxon was not complete because it did not include some of the Nihon Faxon external receivables as of October 2, 1994. Taguchi's testimony, upon which plaintiffs base their concession, also fails to establish as a matter of law that the CODA tape of accounts receivable as of October 2, 1994, at Faxon at the time of the closing did not include some of Nihon Faxon's $1.2 million in accounts receivable. In fact, Taguchi's testimony makes no mention of the CODA tape. Moreover, in light of Zuroff's testimony that the information was available electronically and that the parties could technically access the information at the closing by telephone as well as his testimony of the existence of a computer tape of the receivables database as of October 2, 1994, which was made available to Connolly around the time of the closing, there is a disputed issue of material fact.

**94.** Dawson cites to this testimony, paragraph 15 of Riley's affidavit, to support their argument that plaintiffs failed to deliver a complete and accurate accounts receivable schedule at the closing. The referenced paragraph in Riley's affidavit undoubtedly supports Dawson's summary judgment motion on this issue but it does not unequivocally state that Nihon Faxon's accounts receivable as of October 2, 1994, was not contained in the Faxon CODA system as of October 14, 1994.

**95.** In other words, the record does not establish as a matter of law that Dawson drafted this language.

some parol evidence [96] in the record showing that the parties intended accounts receivable to include both debits and credits as opposed to simply gross debits.[97]

There is, however, parol evidence to the contrary. In particular, Connolly testified and his notes reflect that he understood that an account receivable was an amount owed by a customer individually on a gross basis excluding certain credits such as prepayments. Connolly understood that Dawson would determine the gross debit balances existing on September 30, 1994,[98] and then compare this figure with the gross debit balances existing one year later in 1995 and then be able to make a claim for the outstanding difference, minus the bad debt reserve. In other words, according to Connolly, the sellers guaranteed the collection of gross debit balances as opposed to net receivables. Connolly also noted that Dawson was concerned about Faxon's accounts receivable and that he discussed the issue at length, primarily with Zuroff. According to Connolly, he further understood that the words "individually on a gross basis" gave Dawson the protection it sought. (A. 145; A. 146; A. 147; A. 370–372; A. 166; A. 167).

The construction of the term "Accounts Receivable" requires consideration of language in the final sentence of section 2.8. Dawson proposed the initial draft of this sentence which also appears in the final agreement.[99] (P. 138). Dawson therefore drafted the final sentence in section 2.8.

According to Zuroff, Faxon's practice during his tenure was to examine a particular credit entry in an account receivable and to ascertain what caused the credit and whether it was proper to apply the credit to a particular receivable. Zuroff described the process of matching a particular credit to a debit as cumbersome and complicated.[100] Similarly, Riley, who occupied the position at Faxon of Chief Financial Officer after the acquisition, averred that it took his staff a substantial number of hours to identify and to apply properly a particular debit to the corresponding credit within an account. (A. 681; P. 38; P. 21, pp. 93–95, vol. VII).

The closing balance sheet prepared by Deloitte shows an entry of $63,466,818 as the accounts receivable minus a $1,343,000 allowance for doubtful accounts. Zuroff testified that this number represented all customers with a net debit balance. (P. 21, p. 114, vol.I). Examining the Deloitte closing balance sheet, Riley similarly testified that the $63,466,818 number under accounts receivable represented the total of customer accounts wherein the customers had debits greater than the amount of credits. (P. 19, p. 99, vol.III). Riley averred that customers in this net debit position are reported under the accounts receivable category. (A.682–683). Riley additionally explained that customer accounts with net credits, i.e., credits in their account in an amount greater than debits in their account, were reflected under the liabilities section of the balance sheet under the subheading "customers' credit balances." [101] The closing balance sheet shows

---

**96.** As previously explained, this court does not consider the parol evidence for purposes of resolving the meaning of the unambiguous language in the agreement.

**97.** At one point in his testimony, Robin R. Riley ("Riley") of Dawson likewise testified that a debit is an entry within an account, at least in the context of a certified public accountant's examination. (P. 19, pp. 111–112, vol.III).

**98.** The actual date in the final agreement is October 2, 1994.

**99.** This sentence reads as follows:
Except for credits to libraries and other customers of the Company reflected on the Interim and Audited Balance Sheets, there is no contest, claim, or right of set-off, other than returns in the Ordinary Course of Business, in any agree-

ment with any maker of an Accounts Receivable relating to the amount or validity of such Accounts Receivable.

**100.** For example, Zuroff testified that Faxon oftentimes received prepayments from customers for subscriptions that would be invoiced at a later time. Such prepayments would be reflected as credits without offsetting invoices. When Faxon later issued an invoice for the particular credit, there would be a credit until the invoice was applied to the credit. Net credit balances in a customer's account could thus include a prepayment. (P. 21, pp. 96–98 & 102–104, vol. VII).

**101.** Stated otherwise, customer credit balances includes those accounts wherein the total debits in the account are less than the total credits in the account. (P. 19, p. 107, vol.III).

the amount of customer credit balances as $10,281,740. (P. 19, pp. 98–102 & 105–107, vol. III; P. 179; A. 682).

After the closing, Riley testified that the account statements Faxon sent to customers showed a total balance net of all credits and debits.[102] Ordinarily, absent a request from the customer, Faxon only sent out account statements to customers having a net debit balance in their account. Faxon did not generally send account statements to customers with accounts in a net credit balance. Typically, when Faxon received a payment from a customer, it posted the payment to the customer's account and determined whether it could apply the credit to a particular invoice or debit. (P. 19, pp. 60 & 69, vol. III; S.A. 84–85).

After the closing, Connolly testified that Faxon continued to make efforts to collect the outstanding receivables due to the company as of the day of the closing. (A.167). Faxon generally credited payments to the particular account as the payment came into the company. Indeed, by the end of the third year after the closing, Faxon's collection efforts had reduced the accounts receivable as of the day of the closing to a number which was below the bad debt reserve, even according to Dawson's calculations. (A. 681; A. 676).

Zuroff testified that at one point during a break in the negotiations on October 4, 1994, Connolly told him that he had "no incentive to collect receivables because there [was] an offset to the purchase price." [103] (P. 21, p. 81, vol.I). A November 20, 1995 report generated by Chemical Connecticut Corporation in connection with Faxon's request for additional funding also describes Faxon's collection efforts for pre-acquisition receivables as "tempered due to the guarantee" and the lack of reimbursement for Faxon's collection costs. In addition, Connolly testified that the amount of accounts receivable funds col-

lected during the initial collection period was "of no interest to [him]." He further explained, however, that it was not his job to get involved in the level of detail with regard to the amount of credits applied during the initial collection period. (P. 237; P. 16, pp. 213–214, vol. IV).

On October 4, 1994, the parties executed the final agreement. The language in the agreement speaks for itself and is produced in more detail in the context of discussing a particular provision. The Dawson PLC board formally ratified the acquisition and approved a $25,000,000 line of credit from Chemical Bank on October 13, 1994. The closing took place on October 14, 1994, at which time Dawson, Inc. took title to the Faxon stock and presumably made the initial $3 million payment due at the closing. Dawson, Inc. also signed the promissory notes promising to pay plaintiffs the $11 million purchase price in seven annual installments subject to the adjustments in sections 1.2, 1.5, 1.6 and 8.2 of the agreement. (P. 1–3 & 158).

In light of section 1.6's requirement for Dawson to prepare and cause Deloitte to audit a closing balance sheet of Faxon within 60 days following the closing, Dawson set about contacting Deloitte. (P. 155). As explained below, however, Deloitte refused to make a determination of the adjusted closing net worth of Faxon in the fall of 1994.

At an undetermined time in October 1994, albeit after the October 2, 1994 signing of the agreement, Edward F. Paquette ("Paquette"), an audit partner at Deloitte, testified that he spoke with Connolly about performing an audit of Faxon's closing balance sheet ("the first audit"). According to Paquette, Deloitte told Connolly that auditors generally audit financial statements and that Deloitte's role in these kinds of assignments was not to determine the purchase price or

---

**102.** He also testified that he was not aware of a list of accounts receivable between the closing date and 11 months later wherein customers asserted a defense or set off. Rather, the information would be located in their account, according to Riley. When asked at his deposition as to whether Faxon kept a file of the written instructions from customers concerning the application of particular payments, Riley stated that

Faxon kept "a file on each account of activity." (P. 19, vol.III, pp. 137–140).

**103.** In contrast, Connolly did not remember telling Zuroff that he had no incentive to collect the accounts receivable prior to February 1995. (P. 16, pp. 244–245, vol.II).

adjustments thereto. Paquette could not recall whether Connolly specifically asked him to determine the adjusted closing net worth of Faxon. (P. 25, pp. 6 & 146–151, vol. I).

At the time Dawson signed the October 4, 1994 agreement, Connolly fully expected that Deloitte would be willing to determine the adjusted closing net worth of Faxon. (P. 16, p. 208, vol.III). Connolly had prior experience in using the mechanism in a purchase and sale agreement whereby an accounting firm would determine the purchase price and adjustments thereto. The British, French and Italian accounting firms used by Connolly in the past to make such determinations never raised any issues concerning such determinations. In addition, the sellers did not indicate any doubt to Connolly before the October 4, 1994 signing of the agreement as to Deloitte's unwillingness to make such a determination.[104] Connolly, however, did not discuss the issue of Deloitte determining the purchase price adjustment with Deloitte prior to the October 4, 1994 signing of the agreement.[105] (P. 16, pp. 208–209, vol. III; P. 16, pp. 171–172, vol. IV).

As pointed out by Dawson (Docket Entry # 295, p. 11), plaintiffs admit that Deloitte did not express any unwillingness to make the determination of the adjusted closing net worth prior to the October 4, 1994 signing of the agreement.[106] (A.83). There is, however, circumstantial evidence to the contrary. As Dawson also points out: (1) Zuroff testified that he discussed Deloitte's unwillingness to perform the determination with Paquette or Gerry Kelly ("Kelly") of Deloitte but Zuroff could not remember whether the discussions took place before or after the closing; (2) Zuroff also stated that he casually discussed the issue with Davis after the closing and that he may have discussed it with her prior to the closing; (3) Zuroff

further testified that the discussion[s] with Davis "[p]robably" would have been at Faxon headquarters in Westwood; and (4) Zuroff did not remember Davis being at Faxon headquarters after the closing. Although at times in his testimony Zuroff could not remember when the discussions took place, he also testified at one point that the discussions "more likely" occurred prior to the October 14, 1994 closing and the October 4, 1994 signing and, indeed, during the iteration of the agreement. (A.225–227).

After the October 4, 1994 signing of the agreement, Connolly received the first draft of Deloitte's engagement letter to perform the audit work. At that time, Connolly first learned about Deloitte's unwillingness to perform the determination.[107] (P. 16, pp. 272–277, vol.I). The final engagement letter dated November 1, 1994 ("the first engagement letter"), as well as a prior draft contain the following limitation:

> The purpose of our engagement to audit the balance sheets of Faxon and Turner, as of October 2, 1994 and September 30, 1994, respectively, is to evaluate the fairness of presentation of such balance sheets in conformity with generally accepted accounting principles, in all material respects, and not for the purpose of determining the purchase price, or adjustments to the purchase price, of Turner or Faxon.

(P. 163; P. 164). The first engagement letter therefore confines the scope of Deloitte's work to performing an audit and disavows performing a determination of adjustments to the purchase price.

Connolly had several discussions with Deloitte about its unwillingness to make the determination. According to Connolly, however, Deloitte remained firmly opposed to

---

**104.** Connolly met with DeLoitte a number of times before and after the closing but he failed to remember the details of the meetings or when they took place. (P. 16, pp. 122–123, vol.IV).

**105.** Connolly "possibly" discussed the issue with DeLoitte prior to the October 14, 1994 closing.

**106.** Dawson presumably offers this evidence to support its alternative theory of mutual mistake.

**107.** As pointed out by plaintiffs, there is evidence that Connolly met with Deloitte officials on October 6, 1994 (P. 155) and thus, given Connolly's testimony that he did not learn of the refusal until receipt of the draft of the engagement letter, there is evidence that Connolly had an opportunity to inquire of Deloitte's willingness to perform the determination prior to the closing.

performing a determination of the purchase price adjustment.[108] Connolly did not inform the sellers about Deloitte's refusal and/or the terms of the November 1, 1995 engagement letter prior to sending them the calculations in December 1994. It is undisputed that Deloitte performed the first audit but that it did not perform the determination. (P. 16, pp. 272–277, vol. I; P. 16, p. 210, vol. III).

The 60 day time limit for Deloitte to audit Faxon in subsection 1.6(a) of the agreement expired on December 13, 1994. Deloitte pro-duced an audit report dated December 13, 1995.[109]

On December 23, 1994, Dawson sent plaintiffs a letter and included therein the first audit prepared by Deloitte. Dawson also claimed a purchase price adjustment under sections 1.5 and 1.6 in an amount of $3,961,-723. The letter contains a schedule of the adjusted closing net worth of Faxon. The letter referred to the determination of the adjusted closing net worth pursuant to section 1.6 but did not advise plaintiffs that

**108.** Paquette does not remember whether Connolly specifically asked him to do an independent determination. (P. 25, pp. 149–151, vol.I).

**109.** In a March 30, 1995 letter from plaintiffs' counsel to Dawson's counsel, plaintiffs' counsel states that, "Although Deloitte delivered its audit report on Faxon's Closing Balance Sheet as required by Section 1.6(a), it made no determination under Section 1.6(b) whatsoever." (A.562). Dawson submits that plaintiffs therefore admitted that Dawson performed the required audit under subsection 1.6(a) within the 60 day time period. Although the letter states that "Deloitte delivered its audit report .. as required by Section 1.6(a)," subsection 1.6(a) does not speak in terms of a "delivery" or of an audit "report," as Dawson points out elsewhere in its papers. Subsection 1.6(a) only required Deloitte to audit Faxon within 60 days of the closing date. It did not require Deloitte to make a delivery or to produce an audit report. Accordingly, the "admission" is without effect and cannot be construed as an admission by plaintiffs with respect to the first audit that Deloitte audited Faxon by the December 13, 1994 deadline.

Evidence to the contrary includes the following. An internal draft of the first audit report is date stamped December 15, 1994, even though the final report is dated December 13, 1994. (P. 174 & 179). Hence, viewing the record in plaintiffs' favor, there is evidence that Deloitte did not complete the first audit until December 15, 1994.

Irrespective of this finding, plaintiffs' citation to a document (P. 176) for the representation that it is Deloitte's "Record of Report Issuance" and is dated December 16, 1997, is unavailing. The document is one page, without a cover sheet, and simply contains a signature and an illegible date, without any indication of the substance of the document.

For purposes of plaintiffs' chapter 93/fraud claim, it is also worth noting that Connolly did not advise the sellers of DeLoitte's refusal prior to sending them the adjusted closing net worth calculation. (P. 16, vol.I, pp. 276–277). The December 23, 1994 letter from Dawson to plaintiffs wherein Dawson submits the first audit and claims a $3,961,723 purchase price adjustment under sections 1.5 and 1.6 also fails to inform plaintiffs that Dawson, as opposed to Deloitte, performed the adjustments which are unsigned and appear on the second page. (P. 179). Section 1.6, of course, requires Deloitte to determine the adjusted closing net worth. The letter, which plaintiffs submit represented that Deloitte had made the required determination (Docket Entry # 332), reads, in pertinent part, as follows:

> Pursuant to Section 1.6 of the Agreement, Dawson hereby delivers to the Sellers the Closing Balance Sheet, audited by Deloitte & Touche in accordance with GAAP, together with a determination of the Adjusted Closing Net Worth.

(P. 179)

In addition, when plaintiffs' counsel in April 1995 requested correspondence between Dawson and Deloitte vis-a-vis Deloitte's determination of the adjusted closing net worth, Dawson's counsel did not comply with the request but, instead, represented that Deloitte's letter requesting the audit did not mention the purchase price adjustment. As previously noted, such correspondence expressly mentions Deloitte's refusal to determine the purchase price adjustment. (P. 204 & 206).

Further, in a January 11, 1995 memorandum from Connolly to Zuroff, Connolly instructed Zuroff not to disclose any information relating to the time period after the acquisition. The memorandum particularly advised Zuroff not to disclose "the audit report and matters pertaining thereto." (P. 183). It does not take an inference in plaintiffs' favor to find that this instruction logically and naturally encompasses Connolly's calculation of the adjusted closing net worth.

In a February 8, 1995 memorandum, Connolly reiterates to Zuroff that all requests for information "should be handled by me" and that Zuroff should forward any request for information to him. (P. 186). As also shown in a June 29, 1995 letter, Ferber warned Zuroff, then a former Faxon employee, that he had a duty to maintain the secrecy of Faxon's financial and accounting practices or risk legal action against him. (P. 213). Meanwhile, sellers' counsel was reminding Dawson's counsel of their request to interview Zuroff as well as their view that Dawson's refusal constituted a violation of section 11.3. (P. 188).

Connolly had made the determination. The schedule with the determination of Faxon's adjusted closing net worth is neither on Dawson stationary nor on Deloitte stationary. It is undisputed that Connolly, using the net worth in the closing balance sheet as audited by Deloitte, performed the adjustments set forth in subsections 1.5(a) through 1.5(g) and determined the adjusted closing net worth of Faxon. (P. 16, pp. 211–212, vol.III).

By letter dated January 5, 1995, plaintiffs made a timely[110] objection to Dawson's claimed purchase price adjustment under sections 1.5 and 1.6. Plaintiffs objected to the set off because it failed to make a proper adjustment under subsection 1.5(g) given the difference in comparing the consolidated closing balance sheet and the unconsolidated interim balance sheet. The letter also complained about insufficient information to allow plaintiffs to determine the basis for Dawson's adjustment and requested, pursuant to section 11.3,[111] an opportunity to review Deloitte's work papers. (A.555–556).

In reply, by letter dated January 10, 1995, Dawson advised plaintiffs that the "consistent basis" in subsection 1.5(g) referred to consistent accounting policies. (P. 182). Dawson's letter also noted that Dawson agreed with the suggestion of plaintiffs' counsel to discuss the proposed section 1.5 and 1.6 purchase price reductions before submitting the issues to "the 'Accountants.' "[112]

It is undisputed that the parties met in early February 1995 in an attempt to resolve their differences. (Docket Entry # 356, p. 44; Docket Entry # 317, p. 64). During this meeting, whose participants included Zuroff, Connolly and Altman, there is evidence that

Connolly made a statement which, in substance, indicated that Dawson had no intention to try and collect the outstanding accounts receivable. Dawson submits that Rule 408, F.R.E., prohibits the admissibility of the statement.

According to Connolly, the February meeting amongst the parties was "part of negotiation of a settlement, of the ultimate settlement of the transaction." A letter from Dawson's counsel to sellers' counsel suggested that the parties meet to resolve their dispute. (A.185). In the context of these negotiations, Connolly remembers making a statement to Altman in the nature of that he had no incentive to collect the accounts receivable. (P. 16, p. 244, vol.II). Altman and Zuroff recall similar statements.[113] (P. 28, pp. 197–198, vol. I; P. 21, pp. 132–133, vol. I; P. 21, pp. 33–34, vol. II). In light of the purpose and the context in which Connolly made the statement during the February 1995 meeting, *see Kleen Laundry and Dry Cleaning Services Inc. v. Total Waste Management Corporation,* 817 F.Supp. 225, 228–229 (D.N.H.1993) (rejecting the plaintiffs' argument that statements preceded formal complaint); *see also Derderian v. Polaroid Corporation,* 121 F.R.D. 9, 11 (D.Mass.1988) (noting that Rule 408 applies to statements made during compromise negotiations as well as the offer or completed compromise itself); *see generally McInnis v. A.M.F., Inc.,* 765 F.2d 240, 247–248 (1st Cir.1985) (discussing Rule 408), the evidence is inadmissible for summary judgment purposes.[114]

As result of the February 2, 1995 meeting, the parties allegedly agreed to forestall resolving the dispute via the accountants under

110. Section 1.6 requires sellers to give Dawson notice of any objection within 15 days of the delivery of the closing balance sheet. In addition, "[S]uch notice must contain a statement of the basis of such objection."

111. Section 11.3 allows each party to make reasonable requests to the other party to furnish information for the purpose of carrying out the intent of the agreement.

112. Section 1.6 states that if the sellers give Dawson notice of their objection[s] then the disputed issues "will be submitted to a mutually agreeable firm of certified public accountants (the 'Accountants'), for resolution."

113. Zuroff's testimony regarding Connolly's similar statement at or around the time of the closing reflects Connolly's state of mind and thus falls within an exception to the hearsay rule. F.R.E. 803(3). This court expresses no opinion as to the propriety of admitting such testimony at trial which is the province of the trial judge.

114. This court expresses no opinion on the merits of the admissibility of Connolly's statement at trial. A more expansive record may reveal that the meeting did not involve "compromise negotiations." It is solely the province of the trial judge to determine admissibility at trial.

section 1.6 and to allow the sellers an opportunity to view Deloitte's work papers with respect to the first audit. A meeting took place in late February or early March 1995 during which Joseph Caplice ("Caplice"), an accountant advising the sellers, had access to a portion of Deloitte's work papers. Negotiations at the meeting deteriorated and Paquette halted the meeting. (P. 25, pp. 88–91, vol. I; P. 188).

On March 1, 1995, Dawson's counsel notified sellers' counsel that it would no longer agree to the postponement of the procedures set forth in section 1.6. (P. 189). On March 23, 1994, Dawson's counsel specifically advised the sellers that, if they did not accept the closing balance sheet, as audited by Deloitte, then the next step was to submit the dispute to the accountants as provided for in section 1.6. (P. 193). Sellers' counsel replied to the March 23, 1995 letter by letter dated March 30, 1995. Therein, the sellers raised a further objection to Dawson's purchase price adjustment under sections 1.5 and 1.6, to wit, that Deloitte did not perform the determination of the adjusted closing net worth as required under subsection 1.6(b).[115] (P. 194).

By letter dated April 10, 1995, Dawson's counsel acknowledged to sellers' counsel that the adjusted closing net worth was not determined by Deloitte. Dawson's counsel also maintained that Deloitte's corporate policy precluded undertaking the determination thereby rendering performance of the condition in subsection 1.6(b) an impossibility. The letter also suggested that Deloitte, if indemnified by Dawson and the sellers,.

might be willing to examine the correctness of Dawson's adjustment figures. Noting that Dawson would accept these conditions, the letter concluded that, unless the sellers are willing to accept these approaches, then Dawson would proceed in accordance with the agreement, i.e., to arbitration by the accountants.[116] (P. 201).

According to Connolly, because the sellers raised an issue about his determination of the closing net worth, he reopened discussions with Deloitte. Paquette discussed with both Connolly and Ferber the maximum amount of work that Deloitte could perform. Paquette understood that the central purpose of the second audit was to accommodate Dawson with respect to the purchase price adjustment. Paquette also testified that he discussed the difficulty in reconciling the net worth figures in the interim balance sheet and the consolidated closing balance sheet with Connolly.[117] (P. 25, pp. 163–167, Vol.I).

In June 1995 Dawson and Deloitte issued a second engagement letter ("the second engagement letter") for Deloitte to perform another audit of Faxon as of October 2, 1994 ("the second audit"). (P. 214). According to Paquette, the second audit and/or the second engagement letter was the maximum effort that Deloitte "could possibly do." (P. 25, pp. 144–145 & 152–153, vol. I).

Ultimately, once Dawson agreed to indemnify Deloitte from any legal action arising from performing more extensive work, Deloitte performed the second audit which included a footnote,[118] prepared by Dawson [119]

**115.** Plaintiffs allege in their statement of undisputed facts, without citation to the record, that Caplice learned that Deloitte had not determined the adjusted closing net worth at the February 27, 1995 meeting to review the work papers. (Docket Entry # 317, p. 66). Dawson disputes plaintiffs' allegation. To state the obvious, absent evidentiary support, plaintiffs' allegation remains an allegation.

**116.** Dawson submits that the sellers waived their right to proceed to arbitration. By letter dated October 13, 1995, however, the sellers noted their receptiveness to the arbitration of all issues in dispute. (P. 234).

**117.** According to Paquette, the problem was that the interim balance sheet "was oranges and the final [balance sheet] was bananas," a compari-

son counsel frequently used in argument before this court.

**118.** Footnote two is contained in the notes to Faxon's consolidated financial statements attached to the second audit report. (A. 589–590; P. 218).

**119.** An August 10, 1995 letter from Connolly and Riley to Deloitte confirms that, "The Company has determined the computation of adjusted closing Net Worth as presented in Note 2 to the consolidated financial statements and believes it appropriately reflects the comparison required under Section 1.5 and 1.6 of the Stock Purchase Agreement...." (P. 219, ¶ 14).

In further support of plaintiffs' chapter 93A/ fraud claim, plaintiffs correctly point out that

together and in consultation with Deloitte, which contained the closing net worth adjustments and determination. Unlike the first audit, the second audit included an audit of the consolidated financial statements of Faxon for the period from August 1, 1994 to October 2, 1994.[120]

(P. 214; P. 176; P. 163; P. 16, pp. 212–215, vol. III; S.A. 45–47; P. 25, pp. 151–152, vol. I; P. 25, pp. 186–187, vol. I; S.A. 34b–34c; A. 216; P. 218).

Paquette testified that Deloitte does not opine on individual items within a financial statement nor opine on items within a footnote. Rather, the company gives an overall opinion on the reasonableness or fairness of the financial statements. It is nevertheless true that the company makes inquiries about information within the financial statements and the footnotes thereto. Furthermore, because the footnotes are part of the financial statements, Deloitte's work also includes reviewing the footnotes.[121] As previously explained, the second audit was the maximum effort Deloitte was willing to perform. (P. 25, pp. 136–138, vol. II; P. 25, pp. 189–190, vol. I).

Deloitte issued the second audit dated August 10, 1995. The second audit report states that, Deloitte has audited the accompanying consolidated balance sheets and financial statements of Faxon. The second audit report further states that in Deloitte's opinion, such financial statements "present fairly, in all material respects, the financial position of" Faxon in accordance with GAAP.

The attached consolidated financial statements characterize the footnotes as "an integral part." Footnote two makes a calculation of Faxon's adjusted closing net worth as of October 2, 1994, in the negative amount of $284,235. The footnote also states that there were no adjustments under subsection 1.5(g). (P. 218; A. 583–590). With respect to the lack of an adjustment under subsection 1.5(g), Paquette testified that Deloitte examined the consistency in the application of accounting principles in the consolidated closing balance sheet and the domestic interim balance sheet. (P. 25, pp. 195–197, vol.I).

By letter dated October 4, 1995, Dawson "readjusted" its purchase price adjustment claim under sections 1.5 and 1.6 in light of the second audit. In writing to sellers' counsel, Dawson's counsel claimed a purchase

---

Dawson did not immediately disclose the terms of paragraph 14 in the second engagement letter to plaintiffs. By letter dated October 4, 1995, Dawson referred to the second audit and claimed a purchase price adjustment under sections 1.5 and 1.6 of $4,402,235. In the letter, Dawson represented that the audited statements "contain, in Footnote 2, the determination of the Adjusted Closing Net Worth." (P. 233). Stating that the numbers for the purchase price adjustment are now known, Dawson reiterated its offer, discussed at a May 26, 1995 meeting, whereby Dawson would agree to forego its indemnity claim if the parties would agree to either: (1) proceed under the provisions of section 1.5 and 1.6 and have the accountants determine the adjusted closing net worth if the sellers disagreed "with *Deloitte & Touche's determination* [emphasis added];" or (2) "ignore *Deloitte & Touche's determination* [emphasis added]" and proceed to have the accountants determine the adjusted closing net worth and resolve any other issues relating to the audit. (P. 233).

The letter additionally expressed a willingness to meet and negotiate a settlement provided that if the parties did not reach a settlement within a certain period of time, "then the parties agree to proceed in accordance with (1) or (2) above." (P. 233).

**120.** With respect to the first audit, as set forth in the title page and the first sentence of the inde-

pendent auditor's report, Deloitte audited the consolidated balance sheet of Faxon as of October 2, 1994. With respect to the second audit, as set forth in the title page and the first sentence of the independent auditor's report, Deloitte audited the consolidated balance sheet of Faxon as of October 2, 1994 and the consolidated financial statements of income, stockholders' equity and cash flow of Faxon from August 1, 1994 to October 2, 1994. (P. 218; P. 214; P. 179; P. 163).

Connolly's December 23, 1994 letter to plaintiffs enclosing the first audit and Connolly's determination of the adjusted closing net worth makes a subsection 1.5(a) adjustment of $2,959,-805 for the ordinary course operating losses in August and September 1994. To support this determination, Connolly referenced the attached responsibility statements of Faxon for August and September. (P. 179).

The adjustment for the loss from Faxon operations for August and September 1994 in the second audit yielded a different figure, $2,708,-840. (P. 218).

**121.** According to Connolly, under the second audit Deloitte would render an opinion on the financial statements including the footnote. (P. 16, p. 214, vol.III).

adjustment of $4,402,235 [122] based on the adjusted closing net worth in footnote two of negative $284,235. (P. 233).

After the closing and in addition to the aforementioned purchase price adjustment claim under section 1.5 and 1.6, Dawson took several deductions from the purchase price installment payments based on uncollected balances in accounts receivable. By letter dated September 22, 1995, Dawson gave notice to plaintiffs that it would take, as of September 14, 1995, a purchase price adjustment for uncollected receivables in an amount of $4,533,283, net of the bad debt reserve.[123] (P. 229). Dawson calculated the accounts receivable adjustment by taking the aggregate amount of the gross debits in customer accounts which existed as of October 2, 1994, minus the amount in cancellations of pre–October 1994 orders after the agreement ("credit book onlys"). This amount of gross debits as of October 2, 1994, minus credit book onlys was $79,349,639 for Faxon. The total amount of accounts receivable was $1,293,060 for Nihon Faxon.[124] The total amount of gross debits of Faxon and accounts receivable of Nihon Faxon as of October 2, 1994, together with the amount outstanding under the Rowe notes as of October 2, 1994, came to $80,821,599. (A. 602; A. 674–676).

By the end of the first collection period (September 14, 1995), Faxon had reduced the $79,349,639 gross debits of Faxon to $5,004,-621 and the accounts receivable of Nihon Faxon to $678,035. (A.675–677). The balance on the Rowe notes as of September 14, 1995, was allegedly $192,053. Taken together, these amounts ($5,004,621, $678,035 and $192,053) total $5,874,709 which, minus the bad debt reserve, resulted in a claimed accounts receivable adjustment of $4,533,283.[125] In the September 22, 1995 letter informing the sellers of the claimed accounts receivable adjustment, Dawson also noted, in the alternative, that if the sellers' theory under section 1.5 proved correct then Dawson would take a further adjustment for Nihon Faxon's uncollected receivable.[126] (P. 229).

By letter dated September 24, 1996, Dawson took a second adjustment for uncollected receivables as of September 12, 1996, effective October 14, 1996, in an amount of $317,-204, net of the bad debt reserve.[127] (P. 243). In light of Faxon's continued efforts to collect receivables, Dawson advised plaintiffs it would restore the difference between the two uncollected receivables, $4,216,079, to the ag-

---

122. As previously noted, Dawson initially claimed a purchase price adjustment under sections 1.5 and 1.6 in the amount of $3,961,723 by letter dated December 23, 1994. (P. 179).

123. Section 8.2 allowed for an adjustment for the uncollected accounts receivable during the time from the closing date to "335 days thereafter," defined as the "Collection Period." Section 8.2 further envisioned adjustments during each of the six subsequent installment payments under the notes, defined as a "Subsection Collection Period." During the first "Collection Period," Riley attests that his staff "applied nearly three-quarters of the pre–Acquisition credits." (P. 38, ¶ 9). Plaintiffs take issue with the fact that Dawson failed to collect all the customer credits during the first year (Docket Entry 317, p. 81) notwithstanding that the agreement permits adjustments during the subsequent collection periods, a six year time span.

124. Dawson arrives at the $1,293,060 Nihon Faxon figure by taking the accounts receivable of Faxon's foreign operations from its consolidated September 30, 1994 world balance sheet. (A. 677; Docket Entry # 266, Ex. A).

125. An August 16, 1995 memorandum from Riley to Connolly refers to $6,747,542 as the "gross debits" and $9,522,034 as the "gross credits" of Faxon as of September 30, 1994. (P. 221). Thereafter, by facsimile transmission on August 21, 1995, Connolly instructed George Mansfield ("Mansfield") to prepare material to support Dawson's anticipated accounts receivable claim. (P. 224). Connolly hired Mansfield, an independent consultant who specializes in CODA systems, because nobody within Faxon had sufficient technical proficiency. The August 21, 1995 facsimile details the task. (P. 224; P. 16, pp. 211–212, vol. IV).

126. Dawson made the same alternative claim in its second and third accounts receivable adjustment letters of September 22, 1996 and September 22, 1997. (P. 243; Docket Entry # 356, Ex. G).

127. Dawson arrived at the $317,204 figure in a manner similar to that used to arrive at the $4,533,283 figure. Dawson used a gross debits figure for Faxon and an estimated uncollected receivables figure for Nihon Faxon. (A.676–677).

gregate outstanding balance under the notes.[128] (P. 243; A. 167–168).

By letter dated September 22, 1997, Dawson advised plaintiffs that it would not seek a third accounts receivable adjustment inasmuch as the uncollected receivables as of September 12, 1997, had fallen below the bad debt reserve. Accordingly, Dawson advised plaintiffs it would restore the previous year's $317,204 adjustment to the purchase price and the aggregate outstanding balance under the notes, effective October 14, 1997. Riley similarly avers that Dawson will restore $317,203 to the purchase price, effective October 14, 1997. (Docket Entry # 356, Ex. H; A. 681).

In all of these accounts receivable adjustments, Dawson did not include the amount of Nihon Faxon's intercompany debt in either the accounts receivable initial figure or the uncollected receivables figure. Dawson did, however, include the amounts owed to Nihon Faxon by Nihon Faxon customers. (Docket Entry # 356, Ex. H).

After the closing, Dawson also took several deductions from the purchase price installment payments due to alleged breaches of warranty. The first set off letter from Dawson's counsel is dated April 10, 1995, the same day Dawson's counsel issued the letter acknowledging that Deloitte did not perform the determination of the adjusted closing net worth under subsection 1.6(b) and suggesting that the sellers agree to allow Deloitte to assess the correctness of Dawson's determination and, if not, Dawson would proceed in accordance with the agreement.[129] The April 10, 1995 letter claims a warranty set off in the aggregate amount of $6,641,404 due to: (1) plaintiffs' nondisclosure of the internal

financial statements prepared on September 9, 1994, showing actual losses to Faxon of $6,857,000, for the period from April to July 1994, as opposed to the $5,347,000 actual loss figure in the interim balance sheet; [130] and (2) plaintiffs' misrepresentation that the foreign subsidiaries did not materially impact the overall financial state of Faxon when, in fact, the foreign subsidiaries had a negative net worth of $5,131,400 as of September 30, 1994.[131] (P. 200).

By letter dated April 25, 1995, sellers' counsel expressly advised Dawson's counsel that Dawson had received the July 31, 1994 consolidated financials prepared on September 9, 1994, prior to the closing. (P. 203). In reply, on May 9, 1995, Dawson denied that it obtained the July 31, 1994 statements prepared on September 9, 1994, prior to the closing. (P. 205).

On October 11, 1996, Dawson revised, as opposed to restated, its breach of warranty claim initially made in the April 10, 1995 letter. The revised claim omits reference to the nondisclosure of the financials prepared on or about September 9, 1994, and relies on misrepresentations of Faxon's net worth contained in the interim balance sheet including the projected pay down of the Nihon Faxon intercompany debt. The October 11, 1996 claim letter, signed by Connolly and addressed to plaintiffs, also raises issues surrounding the nondisclosure of the June 30, 1994 board minute, the nondisclosure of the cancellation of a customer account with Nihon Faxon and matters involving certain tax liabilities and the accounts receivable schedule. (P. 244; A. 608–621; P. 16, vol. III, p. 232).

---

128. Section 8.2 requires Dawson to restore to the purchase price the amount of the accounts receivable deduction it took in the previous collection periods if it collected the amount in a subsequent collection period.

129. Plaintiffs posit that Dawson's April 10, 1995 set off letter is simply a restatement of Dawson's purchase price set off under sections 1.5 and 1.6. Plaintiffs also complain about Dawson's changing theories concerning its purchase price, warranty and accounts receivable set offs. Plaintiffs use these theories to buttress their chapter 93A and fraud claims. (Docket Entry # 332).

130. Viewing the record in plaintiffs' favor, it is reasonable to assume, as plaintiffs allege (Docket Entry # 332, pp. 13–14; Docket Entry # 317, pp. 67–68), that Dawson's reference to the financial statements prepared on or about September 9, 1994, in the April 10, 1995 letter refers to the July 31, 1994 consolidated financial statement prepared on September 9, 1994.

131. Plaintiffs argue that Dawson's April 10, 1995 set off letter for alleged breaches of warranty was simply a restatement of Dawson's purchase price adjustment claim under sections 1.5 and 1.6.

As a final matter, plaintiffs raise additional allegations concerning their fraud claim with respect to the Turner agreement and a severance agreement with a former Faxon employee. Dawson claims that the law of this case bars plaintiffs from reasserting allegations based on the Turner agreement. In November 1995 Dawson filed a motion to dismiss the original complaint including the Count III claim based on breach of the Turner agreement. By Endorsed Order of July 8, 1996, the district judge allowed Dawson's motion to dismiss Count III with the following language:

> After hearing, ALLOWED as to Count III [of the original complaint] without prejudice to arbitrating that provision. Plaintiffs' counsel shall advise by 7/12/96 if Count III will be submitted to arbitration. Otherwise, the motion is DENIED.

(Docket Entry # 4). Plaintiffs' fraud count in the amended complaint alleges that Dawson: (1) misrepresented that its purchase price reduction claim under Turner had been determined in accordance with the Turner agreement when, in fact, Deloitte's engagement letter with Dawson expressly stated that Deloitte's audit was not to be used for purposes of determining a purchase price adjustment of Turner; and (2) failed to disclose that it had changed Turner's revenue recognition policy in the Turner closing balance sheet from the policy used in the benchmark interim balance sheet (thereby resulting in a purchase price reduction claim due to Turner's lowered net worth) and then concealed this fact by representing that the change in policy was due to a restructuring charge.[132] (Docket Entry # 241, ¶¶ 81 & 82).

In contrast to a fraud claim of misrepresentation and concealment, Count III of the original complaint was a breach of contract claim, albeit also grounded on the Turner agreement. Dawson moved to dismiss the claim because the Turner agreement only required Deloitte to audit a closing balance sheet within 60 days. (Docket Entry ¶¶ 4 & 5). Plaintiffs opposed dismissal of Count III because the audit report was dated November 25, 1994,[133] after the November 19, 1994 60–day deadline. (Docket Entry # 14).

On July 8, 1996, the district judge heard oral argument on the motion to dismiss. With respect to the Turner issue of timeliness under Count III, the district judge noted that, where the parties are only ten days or a week late without any showing of prejudice, Massachusetts law, specifically, the decision in *Quirk v. Schenk*, 34 Mass.App.Ct. 931, 612 N.E.2d 1194 (1993), *review denied*, 415 Mass. 1106, 616 N.E.2d 809 (1993), did not enforce time of the essence clauses when equitable relief was being sought.[134]

---

132. Dawson's summary judgment motion seeks dismissal of the Turner portion of plaintiffs' fraud claim on the basis that the court's ruling prohibits plaintiffs' reintroduction of the Turner claim. Under the law of the case, Dawson contends that the court's ruling prevents plaintiffs from repackaging their Turner set off claim as a fraud claim.

Count III of the original complaint was a breach of contract count based on Dawson's purportedly improper purchase price set off under the Turner agreement. The original complaint alleged that Dawson was required to have Deloitte prepare a closing balance sheet of Turner within 60 days, i.e., by November 19, 1994. The original complaint additionally alleged that Deloitte did not prepare the closing balance sheet by the November 19, 1994 deadline and that the agreement stated that time was of the essence. (Docket Entry # 1, ¶¶ 53–59).

The Turner agreement, like the Faxon agreement, required Dawson to cause Deloitte to audit a closing balance sheet of Turner as of September 30, 1994, within 60 days of the date of the agreement. Although the Turner agreement did not contain a requirement that Deloitte determine the adjusted closing net worth, it did, like the Faxon agreement, require the parties to submit their dispute to the accountants, i.e., arbitration. (P. 120).

133. This court assumes that the date referenced in plaintiffs' opposition, "November 25, 1995," is a mistake.

134. Relevant statements by the district judge made during the hearing are as follows:

> ... the question is just: If you accept all their allegations on the Turner point, does that one week late state a claim?
>
> ... But on this count, that *Quirk v. Schenk* case seems to suggest that where equitable relief is being sought, which is basically compelling arbitration on the point, the "time is of the essence" thing is not quite as fine. So the fact that they were ten days late without some showing of prejudice....
>
> ... I'm just not willing to let the whole arbitration mechanism hinge on the ten days in light of this *Quirk v. Schenk* [case] and the fact that what is being sought here is not necessarily—

On July 12, 1996, plaintiffs filed a motion for reconsideration (Docket Entry # 66) which Dawson opposed (Docket Entry # 74). After plaintiffs filed a reply (Docket Entry # 81) and Dawson filed a surreply (Docket Entry # 87), the district judge denied plaintiffs' motion for reconsideration with the following endorsement: "DENIED as untimely. There is no record indication of newly discovered evidence." The district judge therefore denied reconsideration on procedural grounds and did not reach the merits of the substantive arguments, including plaintiffs' argument that the engagement letter for Deloitte to audit the Turner balance sheet stipulated that the audit could not be used for purposes of determining the purchase price adjustment under Turner.

The substance of plaintiffs' fraud claim is based on Dawson's change in the revenue recognition policy used to calculate the Turner adjusted closing net worth. Plaintiffs assert that Dawson changed the Turner interim balance sheet's revenue recognition policy when calculating the Turner closing net worth as shown on the Turner closing balance sheet.[135] (Docket Entry # 241, ¶¶ 77–82).

By letter dated December 19, 1994, Dawson asserted a section 1.5/1.6 purchase price adjustment under the Turner agreement in the amount of $337,024. (P. 178). The attached Deloitte closing balance sheet for Turner as of September 30, 1994, identified the revenue recognition policy used by Deloitte. Therein, Deloitte states that it used a policy to defer the revenue received at the time of a subscription sale until the time when the subscription began. The notes to the closing balance sheet state that:

> The Company recognizes the full amount of subscription sales (which includes a service fee) and the related cost of the subscriptions (net of publisher discounts) in the period in which subscriptions begin, which generally coincides with the period in which billings are made to customers. Such period also generally coincides with the period in which customer subscriptions are actually placed with publishers and the principal services are rendered.

> Deferred revenue arises from billings in advance of the period in which subscriptions begin, and are actually placed with publishers.

(P. 178). Faxon's consolidated financial statements for the periods ending March 1992, 1993 and 1994, under the heading revenue recognition policy, also consistently used this same revenue recognition policy.[136] (S.A. 216, 232–233 & 248).

the defense is really an equitable one, which is we should be allowed a setoff mechanism. The mere fact that we're ten days late shouldn't conclude us from having this arbitration mechanism.

... This is what's going to happen. I'm going to allow the Motion to Dismiss Count 3 without prejudice to arbitrating that provision—all right?—on the grounds that the fact that they were ten days late under *Quirk v. Schenk*, 34 Mass.App.Ct. 931, 612 N.E.2d 1194 (1993), is not going to cut them off from that remedy of arbitration.

(Docket Entry # 119). The district judge then issued the Endorsed Order the same day and allowed plaintiffs' counsel additional time to review whether there was a substantive objection to the number sought in the purchase price reduction claim thereby necessitating arbitration. The district judge was therefore not only concerned about the absence of prejudice but was also concerned about the short, ten day time period involved.

135. Plaintiffs conclude that Dawson therefore improperly calculated the Turner closing net worth and took an improper set off under the Turner agreement. According to plaintiffs, this conduct provides further evidence that Dawson never intended to pay the purchase price for Faxon and/or Turner but rather intended to create improper set offs as a means to avoid its obligations.

136. Plaintiffs reference Neczypor's testimony (Docket Entry # 332, p. 58) which, together with Neczypor's testimony referenced by Dawson (Docket Entry # 354, pp. 9–10), this court has reviewed in full. The cited testimony, however, does not create a material issue of fact with respect to plaintiffs' fraud claim due to the alleged change in the Turner closing balance sheet's revenue recognition policy and the Turner interim balance sheet's revenue recognition policy. Plaintiffs also rely on the affidavit of Joseph Floyd (P. 35, ¶¶ 5–6), which this court has also reviewed.

Plaintiffs additionally point out that, Faxon's federal corporate tax return for the period ending September 30, 1994, or a draft thereof prepared by Deloitte, shows Turner stockholder equity in excess of the $1,212,540 net worth benchmark in the Turner agreement. (P. 148). Changes between tax and book value accounting

After the sale of Turner and Faxon to Dawson, Faxon changed its revenue recognition policy on the closing balance sheet as of October 2, 1994, prepared by Deloitte in December 1994. The Faxon closing balance sheet recognizes revenue in the period in which billings are made to customers without the above described deferral of revenue. The attached notes explain that:

> The Company records the full amount of subscription sales (which includes a service fee) in the period in which billings are made to customers. Consistent with the Company's fiscal year end accounting policies, at October 2, 1994, no deferral of income or accrual of costs relating to the fulfillment of subscriptions, other than publisher payables are made for subscriptions which begins (sic) after the balance sheet date.

(P. 179).[137]

As a final matter, in addition to the fraud allegation based on the Turner agreement, plaintiffs make another fraud allegation, to wit, that Dawson misrepresented that Joel Baron ("Baron"), a former Faxon employee, terminated his employment with Faxon voluntarily and that Faxon incurred liability under the Key Employee Severance Plan ("the Plan"). (Docket Entry # 241, ¶¶ 84–87). Section 9.2(f) of the agreement is part of the indemnity provision whereby the sellers agreed to indemnify Dawson "for any loss, liability, claim [or] damage . . . in con-

nection with . . . (f) any act, omission, circumstance or condition described on *Schedule 9.2*." Schedule 9.2 sets forth certain "Indemnification Matters" including "Any liability of [Faxon] pursuant to its Key Employee Severance Plan ('the Plan') resulting from the voluntary termination by any participant in the Plan of his or her employment with [Faxon]." According to Altman, who remembers discussing the need for a plan, Faxon was concerned about losing key employees due to the instability at Faxon prior to the acquisition. (P. 28, p. 81, vol. II; A. 109). Baron, Vice President and Chief Publications Officer, was a named participant under the Plan. (S.A.63).

The Plan provided that if a participant such as Baron "terminates his or her own employment for any reason" after a merger, consolidation or sale of Faxon then the participant was "entitled to receive a lump sum payment in an amount equal to his or her then-current annual compensation."[138] (S.A.63). Baron claimed a right to severance pay under the Plan and was therefore paid severance of $115,000, equal to one year of his salary. (A.667).

As pointed out by plaintiffs to support their fraud claim, Dawson was interested in retaining Baron as early as the spring of 1994 to lead a publisher relations team. (P. 18, pp. 144–145 & 149, vol. I; P. 58). Prior to the sale of Faxon, Zuroff knew that Dawson was involved in discussions with Baron.[139]

---

methods, however, are not what is required under the sections 1.5 and 1.6 of the Turner agreement. Furthermore, even assuming that this document evidenced a change in revenue recognition policy between the Turner interim balance sheet and the Turner closing balance sheet, the change is immaterial. As discussed more fully *infra*, sections 1.5 and 1.6 of the Turner agreement did not require consistency in revenue recognition policies between the Turner interim balance sheet and the Turner closing balance sheet.

**137.** Plaintiffs point to Dawson's answers to interrogatories (P. 11) wherein Dawson states, in the context of the Faxon closing balance sheet and any adjustments required under subsection 1.5(g) of the stock purchase agreement, that the accounting principles used in calculating the Faxon closing balance sheet were consistent with the policies used in calculating the Faxon interim balance sheet. (Docket Entry # 374). The fact that prior Faxon consolidated financial state-

ments employed revenue recognition policies different from those used in the Faxon closing balance sheet, prepared after the Turner sale, does not materially impact plaintiffs' fraud claim based on the differences between the Turner closing balance sheet's revenue recognition policy and the Turner interim balance sheet's revenue recognition policy.

**138.** The Plan also allowed the participant to receive the lump sum payment if Faxon terminated his employment within the year following a merger, consolidation or sale of Faxon. The Plan did not, however, allow the participant to recover his annual salary if Faxon terminated him for cause such as "deliberate dishonesty" or "conviction of a crime involving moral turpitude." (S.A.63–64).

**139.** Plaintiffs cite this testimony as evidence that Ingleby negotiated a Dawson employment agreement with Baron before Baron resigned in De-

(P. 21, pp. 54–55, vol.I). By facsimile transmission on December 9, 1994, Baron sent his December 8, 1994 letter of resignation, effective December 23, 1994, to Ingleby and, on a separate page, noted that he was "responding to your request that I detail the issues that need to be addressed in our ongoing employment arrangement." The facsimile describes Baron's ongoing employment arrangement as involving 40% of his time.[140] It also describes his short term duties as, in part, "Corporate/executive role at Faxon relative to re-shaping Faxon policies and in redirecting acquisition to its core business." (P. 173; A. 537).

After Baron resigned from Faxon, Zuroff testified that he continued to work at Faxon in the same office as a consultant. In fact, Zuroff believed that Baron was still consulting for Dawson and working in Faxon's Westwood office as of August 12, 1996. Connolly similarly avers that Baron accepted an offer to become a consultant to Dawson. Richard Lynch ("Lynch") and Zuroff also resigned under the Plan but did not continue to work at Faxon. After leaving Faxon, Zuroff became Chief Financial Officer of Business Matters, Inc. whereas Lynch started his own consulting business in the field of rengineering. (A. 536; P. 21, pp. 13, 30–35 & 52–53, vol. I; A. 667).

On December 19, 1994, Connolly wrote to plaintiffs and asserted an indemnification claim under section 9.2(f) for $370,000, inclusive of Baron's $115,000 severance payment. The letter makes the following representation which plaintiffs rely on in their fraud claim (Docket Entry # 241, ¶ 32):

> Dawson hereby represents that Joel Baron, Richard Lynch and Mark Zuroff, each of whom are participants in the Plan, have each voluntarily terminated their employment with Faxon and, as a result, Faxon has incurred a liability of $370,000.00, representing the sum of $115,000 paid to Mr.

Baron, $115,000 paid to Mr. Lynch and $140,000 paid to Mr. Zuroff. (P. 178).

By letter dated February 24, 1995, however, sellers' counsel informed Dawson's counsel that the sellers would no longer oppose the $370,000 claimed setoff for severance pay. In particular, sellers' counsel stated that:

> [T]he Sellers have determined not to further oppose a set-off in the aggregate amount of $370,000 relating to severance payments to Messrs. Lynch, Baron and Zuroff, in reliance upon assurances from Dawson that The Faxon Company, Inc. ("Faxon") has actually paid or incurred liability to pay such severances as described in Dawson's letter dated December 19, 1994 to the Sellers.

(A.557).

## DISCUSSION

■ As expressly stated in section 11.10, the stock purchase agreement is governed by Massachusetts law. It is also without doubt that the stock purchase agreement is an integrated agreement representing the parties' final expression. As expressed in section 11.5 of the agreement by the parties, "This Agreement supersedes all prior oral or written agreements between the parties with respect to its subject matter ... and constitutes as a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter." Section 11.5 also contains the language that, the "Agreement may not be amended except by a written agreement executed by all of the parties hereto." To the extent there is any doubt as to integration, the completeness, specificity and length of the agreement uniformly dictate that it is an integrated agreement. *See Coll v. PB Diagnostic Systems, Inc.,* 50 F.3d 1115, 1123 (1st Cir.1995) (where parties reduce agreement to a writing "which in view of its completeness and specificity reasonably appears to be a complete agree-

---

cember 1994. (Docket Entry # 332, p. 25). The deposition testimony does not reflect that the subject matter of Ingleby and Baron's discussion[s] was Baron's employment.

**140.** Zuroff similarly testified that it did not appear that Baron was working full-time after he resigned. Zuroff also stated that he "was not paying [Baron] out of Faxon." (P. 21, p. 35, vol.I).

ment, it is ... an integrated agreement unless" otherwise established as not a final expression); *Town & Country Fine Jewelry Group, Inc. v. Hirsch,* 875 F.Supp. 872, 876 (D.Mass.1994) (factors to assess in determining if agreement is integrated include length, existence of integration clause and parties' prior negotiations).[141]

Language and wording become all the more important in an integrated agreement. "[T]he interpretation of an integrated agreement is directed to the meaning of the terms of the writing or writings in the light of the circumstances of the transaction." *Boston Edison Company v. Federal Energy Regulatory Commission,* 856 F.2d 361, 365 (internal quotation marks and citations omitted); *accord Robert Industries, Inc. v. Spence,* 362 Mass. 751, 291 N.E.2d 407, 409–410 (1973) (construing integrated agreement and noting, "[i]nterpretation is directed to the meaning of the terms of the writing in light of the circumstances, not to the meaning of the conversations of the parties" during negotiations); *Restatement (Second) of Contracts* § 212(1) (1981) (same). Examining the words of an agreement in the context of the entire writing is a search for the "manifested meaning, not a privately held belief or intent of one party" left uncommunicated "to other parties to the bargain." *Donoghue v. IBC USA (Publications), Inc.,* 70 F.3d 206, 212 (1st Cir.1995); *accord ITT Corporation v. LTX Corporation,* 926 F.2d 1258, 1263 (1st Cir.1991) (" '[c]ontracting parties are bound by objective manifestations and expressions, not subjective expectations' "); *see also Louis Stoico, Inc. v. Colonial Development Corporation,* 369 Mass. 898, 343 N.E.2d 872, 875 (1976) ("circumstances surrounding the making of an agreement must be examined to determine the objective intent of the parties"); *Edmonds v. United States,* 642 F.2d 877, 881 (1st Cir. 1981) (quoting *Stoico* ).

Furthermore, where, as here, the parties are sophisticated business entities [142] who, represented by attorneys, freely entered into a contract, it is not appropriate for a court to rewrite their agreement. *RCI Northeast Services Division v. Boston Edison Company,* 822 F.2d 199, 205 (1st Cir. 1987); *see also Louis Stoico, Inc. v. Colonial Development Corporation,* 369 Mass. 898, 343 N.E.2d 872, 875 (1976) (wording employed in agreement "is particularly significant in discerning [parties'] intent if it is unambiguous" and wording used becomes "even clearer" because amendment inserted with aid of "experienced attorney ... after discussion with .. parties"). "Rather, courts must give effect to the language of such agreements and to their discernible meaning." *RCI Northeast Services Division v. Boston Edison Company,* 822 F.2d at 205.

Under the parol evidence rule in Massachusetts, "[e]vidence of prior or contemporaneous oral agreements cannot be admitted to vary or modify the terms of an unambiguous written contract." *Fairfield 274–278 Clarendon Trust v. Dwek,* 970 F.2d 990, 993 (1st Cir.1992); *Coll v. PB Diagnostic Systems,* 50 F.3d 1115, 1122 (1st Cir.1995) (quoting *Fairfield* ). Such unambiguous contracts are enforced according to their terms. *Den Norske Bank AS v. First National Bank of Boston,* 75 F.3d 49, 52 (1st Cir.1996) ("should court find language unambiguous," contract is interpreted "according to its plain terms"); *McDonald's Corporation v. Lebow Realty Trust,* 888 F.2d 912, 914 (1st Cir.1989) (unambiguous contract "must be enforced according to its terms"); *Edmonds v. United States,* 642 F.2d 877, 881 (1st Cir.1981) (where wording is unambiguous, contract "enforced according to its terms"). Thus, where the agreement or the particular provision therein is unambiguous, " 'parties are bound by the plain terms of their contract' and their subjective contemplations are immaterial." *Coll v. PB Diagnostic Systems,* 50 F.3d at 1122.

Parol evidence cannot be used "to create an ambiguity where none otherwise exists." *ITT Corporation v. LTX Corpora-*

---

141. A court may examine the parties prior or contemporaneous negotiations in determining whether an agreement is integrated. *Restatement (Second) of Contracts* § 214 (1981).

142. Davis ran a multinational corporation and had the benefit of counsel throughout the negotiations leading to the final agreement.

tion, 926 F.2d at 1261. "A contract is not ambiguous simply because litigants disagree about its proper interpretation." *Federal Deposit Insurance Corporation v. Singh*, 977 F.2d 18, 22 (1st Cir.1992). An agreement is considered ambiguous only where its "terms are inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and obligations undertaken." *Rey v. Lafferty*, 990 F.2d 1379, 1384 (1st Cir.), *cert. denied*, 510 U.S. 828, 114 S.Ct. 94, 126 L.Ed.2d 61 (1993); *accord Coll v. PB Diagnostic Systems*, 50 F.3d at 1122 (quoting *Rey* ). Stated otherwise, an agreement is ambiguous when it is susceptible to "differing, but nonetheless plausible constructions." *Federal Deposit Insurance Corporation v. Singh*, 977 F.2d at 22; *see Boston Edison Company v. Federal Energy Regulatory Commission*, 856 F.2d at 367; *Edmonds v. United States*, 642 F.2d at 881.

The parol evidence rule carries with it certain exceptions. *See Donoghue v. IBC USA (Publications), Inc.*, 70 F.3d at 215. "One exception to the general principle is that a court may consider parol and extrinsic evidence for the very purpose of deciding whether the documentary expression of the contract is ambiguous." *Donoghue v. IBC USA (Publications), Inc.*, 70 F.3d at 215. Where the agreement is uncertain, the court may examine the circumstances leading to its execution to elucidate the terms and make clear their meaning and thereby determine if an ambiguity exists. *Robert Industries, Inc. v. Spence*, 362 Mass. 751, 291 N.E.2d 407, 409 (1973); *Boston Edison Company v. Federal Energy Regulatory Commission*, 856 F.2d at 367 n. 3 (citing *Robert Industries, Inc. v. Spence*, 291 N.E.2d at 409 and quoting *Sunstream Jet Express, Inc. v. International Air Service Company*, 734 F.2d 1258, 1268 (7th Cir.1984)); *Antonellis v. Northgate Construction Corporation*, 362 Mass. 847, 291 N.E.2d 626, 628 (1973); *New England Financial Resources, Inc. v. Coulouras*, 30 Mass.App.Ct. 140, 566 N.E.2d 1136, 1139 (1991). In addition, as pointed out by plaintiffs, "The parol evidence rule does not preclude consideration of background facts that explain the context in which the agreement was made." *SAPC, Inc. v. Lotus Development Corporation*, 921 F.2d 360, 361 n. 2 (1st Cir.1990).

In the event the court determines that contract language is ambiguous then the court may consider extrinsic evidence to ascertain the parties' intent. *Den Norske Bank AS v. First National Bank of Boston*, 75 F.3d at 52; *see also RCI Northeast Services Division v. Boston Edison Company*, 822 F.2d 199, 202 (1st Cir.1987) (where contract phrase is not unambiguous, "proper direction becomes one for the factfinder who must ferret out the intent of the parties"). "In descending order of importance, extrinsic evidence may include: (1) the parties' negotiations . . .; (2) their course of performance; (3) their prior course of dealing; and (4) trade usage in the relevant . . . industry." *Den Norske Bank AS v. First National Bank of Boston*, 75 F.3d at 52–53 (citations omitted). In addition, where uncertainty exists as to the intended meaning of the words employed, then the language may be construed against the drafter. *Federal Deposit Insurance Corporation v. Singh*, 977 F.2d at 24; *Merrimack Valley National Bank v. Baird*, 372 Mass. 721, 363 N.E.2d 688, 690–691 (1977) (writing construed against "author of the doubtful language if the circumstances surrounding its use and the ordinary meaning of the words do not indicate the intended meaning of the language"); *RCI Northeast Services Division v. Boston Edison Company*, 822 F.2d at 203 n. 3. It is also true that, "Separately negotiated or added terms are given greater weight than standardized terms or other terms not specifically negotiated." *In re 604 Columbus Avenue Realty Trust*, 968 F.2d 1332, 1358 (1st Cir.1992).

An agreement is examined and construed " 'with reference to all of its language and to its general structure and purpose and in light of the circumstances under which it was executed.' " *Cofman v. Acton Corporation*, 958 F.2d 494, 498 (1st Cir.1992) (quoting *Radio Corporation of America v. Raytheon Manufacturing Company*, 300 Mass. 113, 14 N.E.2d 141 (1938)); *accord In re 604 Columbus Avenue Realty Trust*, 968 F.2d 1332, 1357 (1st Cir.1992) (court should

consider each phrase and clause in light of all other phraseology). Both the structure and the specific words set out an agreement's meaning. *Boston Edison Company v. Federal Energy Regulatory Commission,* 856 F.2d 361, 366 (1st Cir.1988); *see, e.g., McDonald's Corporation v. Lebow Realty Trust,* 888 F.2d at 915 (noting that the fixed price option and right of first refusal appeared in "separate paragraphs with eight intervening paragraphs between them").[143]

▮▮▮▮ Words within an agreement are "construed in their ordinary and usual sense," *Boston Edison Company v. Federal Energy Regulatory Commission,* 856 F.2d at 365; *Shane v. Winter Hill Federal Savings and Loan Association,* 397 Mass. 479, 492 N.E.2d 92, 95 (1986), "unless it appears that [the words] are to be given a peculiar or technical meaning." *Woogmaster v. Liverpool & London & Globe Insurance Company,* 312 Mass. 479, 45 N.E.2d 394, 395 (1945); *see also Restatement (Second) of Contracts* § 202(3) (1981). More specific contract terms ordinarily control over more general contract terms. *Lawson v. Federal Deposit Insurance Corporation,* 3 F.3d 11, 17 (1st Cir.1993). Courts also examine the location of words within a sentence as well as the grammatical signals used, such as commas. *See Massachusetts Mutual Life Insurance Company v. Aritech Corporation,* 882 F.Supp. 190, 194–195 (D.Mass.1995).

▮▮▮▮ Sentences and the words therein, however, cannot be read in isolation. Rather, contract language is read in the context of the entire agreement in light of the circumstances. *Cofman v. Acton Corporation,* 958 F.2d at 498. Finally, a construction of an agreement which renders part of an agreement a nullity is disfavored inasmuch as "no part of [a] contract should be deemed superfluous." *Den Norske Bank AS v. First Na-*

*tional Bank of Boston,* 75 F.3d at 54 (paraphrasing *Merchants National Bank v. Stone,* 296 Mass. 243, 5 N.E.2d 430, 433 (1936)); *accord Federal Deposit Insurance Corporation v. Singh,* 977 F.2d at 22 ("every word and phrase of an instrument is if possible to be given meaning").

With these principles in mind, this court turns to the disputed language and the following principal areas of disagreement as set forth in the summary judgment motions: (1) the purchase price adjustment; (2) the accounts receivable adjustment; (3) the alleged breaches of warranty; (4) plaintiffs' fraud and chapter 93A claims; and (5) Dawson's fraud and chapter 93A claims.

## A. PURCHASE PRICE ADJUSTMENT

Dawson moves for partial summary judgment on the basis that it is entitled to take a purchase price adjustment in the amount of $4,402,235 under sections 1.5 and 1.6 of the stock purchase agreement. (Docket Entryè257, 295, 308, 347, 351 & 356). Plaintiffs oppose partial summary judgment (Docket Entry # 341) [144] and incorporate by reference their 83 page statement of undisputed facts (Docket Entry # 317) and their 158 page memorandum in support of their motion for partial summary judgment.[145] Plaintiffs also move for summary judgment on this issue (Docket Entryè315 & 318) which Dawson opposes (Docket Entry # 357).

Count V of the amended complaint seeks a declaratory judgment that Dawson is not entitled to any reductions in the purchase price pursuant to sections 1.5 and 1.6 (Docket Entry # 241, ¶ 113). Counterclaim VII of the amended answer and counterclaims requests declaratory relief that Dawson is entitled to purchase price adjustments under sections 1.5 and 1.6. (Docket Entry # 312, ¶ 112).

---

143. For example, the structure of the stock purchase agreement includes a section devoted to warranties and representations (section two) and another section devoted to the sale and transfer including the payment of the purchase price (section one). Sections within the sale and transfer section include two sections devoted to an adjustment of the purchase price installment payments in the event the adjusted closing net worth of Faxon as of October 2, 1994, falls below a benchmark figure, $3,618,000.

144. Plaintiffs withdrew their earlier opposition. (Docket Entry # 331).

145. Notwithstanding the length of plaintiffs' response, they do not specifically address the background facts in Dawson's memorandum. *See* LR. 56.1. Dawson's background facts, however, are not material for purposes of resolving the meaning and effect of the language in the agreement.

Plaintiffs submit that Dawson did not cause Deloitte to audit the closing balance sheet nor cause Deloitte to determine the adjusted closing net worth of Faxon within 60 days of the closing as required under section 1.6. Plaintiffs also assert that Dawson did not cause Deloitte to audit Faxon for the purpose of determining Faxon's adjusted closing net worth. (Docket Entry # 318, pp. 92–99).

Dawson contends that Deloitte's audit report, dated December 13, 1994, is timely. Dawson further maintains that the district judge already ruled on the issue of timeliness by the aforementioned endorsed orders in the context of the Turner agreement and, given the absence of prejudice, Dawson is therefore not foreclosed from claiming a purchase price reduction. Dawson additionally argues that Deloitte's second audit constitutes a determination under section 1.6 and, if not, then the doctrines of either mutual mistake or impracticability preclude the forfeiture of a purchase price reduction claim.

The parties also vehemently dispute whether the calculation under subsection 1.5(g) requires the closing net worth of Faxon to be adjusted from a consolidated to an unconsolidated basis.

1. *TIMELINESS*

The critical language in the stock purchase agreement with respect to timeliness reads as follows:

> **ADJUSTMENT PROCEDURE.** For purposes of **Section 1.5,** Buyer shall prepare, and cause Deloitte & Touche, the Company's certified public accountants, at Buyer's expense, (a) to audit in accordance with GAAP, within sixty days following the Closing Date, a balance sheet ("Closing Balance Sheet") of the Company as of October 2, 1994 and (b) to determine the Adjusted Closing Net Worth.

The language places the onus on Dawson, as the buyer, to cause Deloitte to audit a closing balance sheet and also to cause Deloitte to determine the adjusted closing net worth of Faxon.

The 60 day requirement appears only under parenthetical (a), not parenthetical (b).

Parenthetical enclosures such as (a) and (b) commonly enumerate a series of separate items.

The 60 day requirement is also separated by commas thereby modifying the preceding phrase "to audit in accordance with GAAP." The nonrestrictive clause of "within sixty days following the Closing Date" describes its antecedent, "to audit in accordance with GAAP." *See, e.g., Massachusetts Mutual Life Insurance Company v. Aritech Corporation,* 882 F.Supp. at 195. Ordinarily modifying clauses are placed as close as possible to the word[s] the clause modifies. *See Moulton v. Brookline Rent Control Board,* 385 Mass. 228, 431 N.E.2d 225, 227 (1982) (general rule of grammatical construction is that "modifying clause is confined to the last antecedent unless there is something in the subject matter or dominant purpose which requires a different interpretation"). Contrary to plaintiffs' position, therefore, it is illogical for the clause "within sixty days following the Closing Date" to modify or describe a determination which appears in a separate parenthetical.

For similar reasons, it is also illogical for the words "For purposes of Section 1.5" to modify Deloitte as opposed to Buyer or the entire paragraph. Either of the latter two reasonable interpretations eliminates plaintiffs' theory that Deloitte must perform the audit for the purpose of section 1.5. *See, e.g., Baker v. Central Intelligence Agency,* 580 F.2d 664, 667–668 (D.C.Cir.1978) (introductory clause of statute did not impose requirement suggested by appellants and was simply preliminary pronouncement of purpose for the enactment); *Champion v. State of Alaska,* 908 P.2d 454, 464 (Alaska App.1995) (recognizing that an introductory clause of a statute would modify all of the sections as opposed to only the first section). Plaintiffs' desire to translate the phrase "For purposes of Section 1.5" to require that Deloitte must perform the audit for the purpose of taking a purchase price adjustment under section 1.5 is contrary to the "usual and ordinary significance," *Woogmaster v. Liverpool & London & Globe Insurance Company,* 45 N.E.2d at 395, of the words employed. As an introductory clause, the phrase simply introduces the

paragraph. It ties section 1.6, captioned "Adjustment Procedure," to section 1.5, captioned "Adjustment." [146] Although not without meaning, the introductory clause is not materially significant in the sense that it creates a contractual duty. It is neither a promise nor a condition imposed on Deloitte.

Accordingly, the agreement required Deloitte to perform the audit as opposed to the determination "within sixty days following the Closing Date," i.e., December 13, 1994. The stock purchase agreement also contained a time is of the essence clause.[147] Viewing the record in plaintiffs' favor for purposes of resolving Dawson's summary judgment motion on this issue, an internal draft of the first audit report is date stamped December 15, 1994, although the first audit report is dated December 13, 1994.[148] The words of the agreement, however, are for Deloitte "to audit" by December 13, 1994, as opposed to produce an "audit report" by December 13, 1994.

In their statement of undisputed facts, plaintiffs admit that, "the December 13 date on the Deloitte audit report is the date that Deloitte completed its audit 'field work.'" [149] (Docket Entry # 317, p. 61). Robert H. Temkin ("Temkin") opined that, "As a general rule, the date of the audit report is the date of the close of the field work." (A.627).

Even accepting Dawson's position that the relevant date is the completion of the field work, however, there is an issue of disputed fact as to when Deloitte completed the field work for the first audit. On the one hand there is the December 13, 1994 date of the first audit report. On the other hand, there is a draft of the first audit report with a combined balance sheet which contains the notation, "Prepared by Cliff Silver 12/15/94" in the lower left hand corner.[150]

Dawson further submits, however, that notwithstanding the time is of the essence clause, plaintiffs fail to show prejudice resulting from Deloitte's delay of a few days. Dawson points out that the district judge already ruled in the context of the Turner agreement that Dawson would not forfeit its purchase price adjustment due to untimeliness. (Docket Entry # 308, ¶ B; Docket Entry # 295, ¶ IV(A)(2); Docket Entry # 357, ¶ (I)(D)). As discussed below, because the first determination fails to satisfy the condition set forth in subsection 1.6(b) of the agreement and Dawson's defenses of mutual mistake and impracticality fail, it is unnecessary to reach the untimeliness issue vis-a-vis the first audit. This court will, however, address the issue *supra* with respect to the second audit inasmuch as there is an

---

**146.** Even if construed to modify Buyer, as Dawson reasonably suggests, plaintiffs' theory is likewise without merit.

The cases relied upon by Dawson to support this position, *Centric-Jones Company v. Town of Marana*, 188 Ariz. 464, 937 P.2d 654, 658 (1996) ("adjectival or adverbial phrase modifies only the clause that immediately precedes it"); *Moulton v. Brookline Rent Control Board*, 431 N.E.2d at 227 ("modifying clause is confined to the last antecedent"), however, are inapposite inasmuch as they apply to phrases with antecedents or immediately preceding clauses. "For purposes of Section 1.5" has no immediately preceding clause inasmuch as it begins the sentence and the section.

**147.** Section 11.9 reads: "**TIME OF ESSENCE.** With regard to all dates and time period set forth or referred to in this Agreement, time is of the essence."

**148.** See footnote number 109.

**149.** Plaintiffs make a similar admission in their memorandum to support their summary judgment motion. (Docket Entry # 318, p. 95).

**150.** Viewing the record in plaintiffs' favor, Dawson's summary judgment motion on this issue is therefore unavailing. Due to this conflicting evidence and viewing the record in Dawson's favor, plaintiffs' summary judgment motion on this issue is also without merit.

As a collateral matter, to support their contention that neither the audit report nor the closing balance sheet were completed by December 13, 1994, plaintiffs cite to paragraph 23 of exhibit 34 of the affidavit of Joseph J. Floyd ("Floyd"). The cited paragraph, however, concerns the reasonableness of the purchase price paid by Dawson for the Faxon stock. In a record this size, this court cannot be expected to repeatedly comb through the documents each time there is a mistake in citing to the record.

In addition, plaintiffs cite certain testimony of Paquette (Docket Entry # 318, p. 93) which is not material to the determination of the date when Deloitte completed the field work of the first audit.

issue of fact as to the sufficiency of the second determination.

Next, the parties dispute whether Deloitte performed the required determination. In order for Dawson to take a purchase price adjustment under section 1.5, the agreement set forth the condition that Dawson "shall .. cause Deloitte .... (b) to determine the Adjusted Closing Net Worth," defined in section 1.5 to include the aforementioned adjustments.

It is undisputed that, using the first audit, Deloitte did not determine the adjusted closing net worth of Faxon within the meaning of sections 1.5 and 1.6. Instead, Connolly performed the adjustments under subsections 1.5(a) through (g) and thereby calculated Faxon's "Adjusted Closing Net Worth." Under the first audit, therefore, Dawson did not perform the condition of causing Deloitte to determine Faxon's adjusted closing net worth. Absent mistake, impracticality or a material question of fact as to the second audit, plaintiffs are entitled to summary judgment on this issue.[151]

■ It is an issue of fact with respect to the second audit as to whether in the summer of 1995 Deloitte, Faxon or Dawson determined the adjusted closing net worth, as defined in section 1.5 to include the adjustments under subsections (a) through (g). Footnote two to the financial statements attached to the second audit report contains the required adjustments and expressly refers to sections 1.5 and 1.6 of the stock purchase agreement. It is unclear, however, whether Deloitte, Dawson or Faxon made the determination reflected in the footnote. The second audit report, issued by Deloitte, refers to the financial statements which contain the footnote and opines that the financial statements fairly present Faxon's financial position. In conducting an audit, Deloitte makes inquiries about the information in such notes attached to the financial statements. The only logical reason for conducting the second audit was to comply with

subsection 1.6(b) and Paquette understood that the central purpose for the second audit was to accommodate Dawson vis-a-vis the purchase price adjustment.

There is, however, evidence to the contrary. The second audit report states that the financial statements are the responsibility of Faxon's management. Paragraph 14 of the August 10, 1995 letter also states that Faxon determined the adjusted closing net worth and references sections 1.5 and 1.6. Other evidence in the summary judgment record also shows the existence of a factual dispute as to whether, in connection with the second audit, Deloitte, Faxon or Dawson determined the adjusted closing net worth within the meaning of subsection 1.6(b). The same evidence also establishes a factual dispute as to whether Dawson substantially performed this obligation, to wit, causing Deloitte to determine the adjusted closing net worth. Summary judgment in favor of either Dawson or plaintiffs on this issue is therefore inappropriate.

■ Dawson additionally argues that even if Deloitte's determination falls short of complying with subsection 1.6(b), there was a mutual mistake because both parties assumed that Deloitte would agree to perform the determination. According to Dawson, neither party knew that Deloitte would refuse to perform the work at the time of the closing.

Dawson also raises the argument that Deloitte's performance was impracticable.[152] According to Dawson, the doctrine of impracticability arises due to events subsequent to contracting, for instance, where Deloitte developed a policy against performing the determination after the closing. (Docket Entry # 357, n. 23). In either situation, Dawson urges that its performance under subsection 1.6(b) is therefore excused. (Docket Entry # 308, ¶ C; Docket Entry # 295, ¶ IV(B)(2); Docket Entry # 357, ¶ I(E)). Plaintiffs, of course, disagree with these contentions.

---

**151.** In addition to mistake and impracticality, therefore, Dawson understandably relies on Deloitte's determination under the second audit as satisfying the subsection 1.6(b) requirement.

**152.** Dawson distinguishes between the two doctrines by noting that mutual mistake exists where, unbeknownst to both parties at the time of contracting, Deloitte had a policy against performing the determination.

■ Dawson's efforts to avoid the impact of the condition precedent set forth in subsection 1.6(b) under either doctrine, however, are unavailing. Simply put, under the agreement Dawson assumed the burden of causing Deloitte to determine the adjusted closing net worth. It thereby also assumed the burden of obtaining Deloitte's cooperation notwithstanding an internal Deloitte policy to avoid such undertakings due to increased liability risks. In other words, a party to an integrated agreement who undertakes to cause an independent accounting firm to make a determination about the adjusted net worth of the company being sold can fairly be required to secure the cooperation of the independent accounting firm in making the required determination. *See, e.g., Maloney v. Sargisson,* 18 Mass.App.Ct. 341, 465 N.E.2d 296, 300 (1984) (buyer claiming mutual mistake who, under agreement, undertook burden of making soil test "can fairly be required to secure soil tests made in locations ... prescribed by State and local regulations" and mistakes made performing tests are thus unilateral ones borne by buyer); *see generally Chase Precast Corporation v. John J. Paonessa Company, Inc.,* 409 Mass. 371, 566 N.E.2d 603, 606 (1991) ("principal question" under doctrine of impracticality and related doctrine of frustration is " 'whether an unanticipated circumstance, *the risk of which should not fairly be thrown on the promisor,* has made performance vitally different' ") (emphasis added).

■ The doctrine of mutual mistake allows the adversely affected party to void the contract at his election because "there has been no 'meeting of the minds.'" *LaFleur v. C.C. Pierce Company, Inc.,* 398 Mass. 254, 496 N.E.2d 827, 830 (1986). By definition, the mistake must be mutual, that is, it "must be shared by both parties." *LaFleur v. C.C. Pierce Company, Inc.,* 496 N.E.2d at 830. The mistake must also "relate to an essential element of the agreement." *LaFleur v. C.C. Pierce Company, Inc.,* 496 N.E.2d at 830 (citing *Cavanagh v. Tyson, Weare & Marshall Company,* 227 Mass. 437, 116 N.E. 818, 820 (1917)).[153]

■ Dawson's underlying burden, as the party seeking to avoid the agreement through reformation, is to establish the mistake by " 'full, clear and decisive' evidence." *LaFleur v. C.C. Pierce Company, Inc.,* 496 N.E.2d at 833 n. 10; *accord Polaroid Corporation v. Travelers Indemnity Company,* 414 Mass. 747, 610 N.E.2d 912, 917 (1993). Finally, "The parol evidence rule is no bar to the consideration of extrinsic evidence of intent when mistake is alleged." *Mickelson v. Barnet,* 390 Mass. 786, 460 N.E.2d 566, 569 (1984); *accord Polaroid Corporation v. Travelers Indemnity Company,* 414 Mass. 747, 610 N.E.2d 912, 917 (1993).

There is sufficient evidence for a reasonable jury to find that the mistake as to Deloitte's willingness to perform the determination was mutual. The assumption that Deloitte would make the determination also had a material effect on the agreed upon exchange, to wit, Dawson's ability to reduce the purchase price. *See Restatement (Second) of Contracts* § 152(1) (1981).[154] The mistake, however, did not concern a "basic assumption" of the agreement.[155] *Cf. Malo-*

---

153. The cited text in *Cavanagh* states that, the mistake must relate to "the very essence of the contract, the material element in the minds of both parties, and material in the sense that it is one of the things contracted about." *Cavanagh v. Tyson, Weare & Marshall Company,* 116 N.E. at 820. "In *Cavanagh,* the court held that a mutual mistake as to the character of the ground (rock fill instead of the expected mud) into which piles were contracted to be driven, 'was of importance only in the determination of the price to be demanded.' " *Wright and Pierce v. Town of Wilmington, Massachusetts,* 290 F.2d 30, 33 (1st Cir.1961).

154. With respect to the impracticality doctrine, Dawson contends that whether it was Deloitte or

another reputable accounting firm which performed the determination was not an essential element to the agreement. (Docket Entry # 357, pp. 24–25; Docket Entry # 295, p. 22).

155. Comment b to section 152 provides that the term "basic assumption"has the same meaning in both section 152 (the mutual mistake section) and section 261 pertaining to discharge by supervening impracticality. *Restatement (Second) of Contracts* § 152 comment b (1981). Comment (b) to section 261 provides examples of basic assumptions including one which is similar to the present circumstances:

A contracts to produce a movie for B. As B knows, A's only source of funds is a $100,000 deposit in C bank. C bank fails, and A does

ney v. Sargisson, 465 N.E.2d at 299–300 (mistake about soil conditions which precluded lot from being a buildable lot in purchase and sale agreement for land constituted "basic assumption"). As acknowledged by Dawson, whether Deloitte or another reputable accounting firm performed the determination was not an essential part of the agreement. Whereas a mistake as to the size of the an apartment in a lease justifies relief as a mutual mistake, see Golding v. 108 Longwood Avenue, Inc., 325 Mass. 465, 91 N.E.2d 342, 344 (1950), the character of ground fill in a contract to drive piles into the ground does not. See Cavanagh v. Tyson, Weare & Marshall Company, 116 N.E. at 820.

In the alternative, and even more noteworthy, whether viewing the record in Dawson's favor for purposes of resolving plaintiffs' summary judgment motion or viewing the record in plaintiffs' favor for purposes of resolving Dawson's summary judgment motion, the stock purchase agreement allocated the risk to Dawson to cause Deloitte to perform the determination. Dawson therefore bore the risk that Deloitte might prove unwilling to perform. Massachusetts cases "are substantially in accord with the articulation made in Restatement (Second) of Contracts § 152 (1979)." Maloney v. Sargisson, 465 N.E.2d at 299 (also citing to section 154); Covich v. Chambers, 8 Mass.App.Ct. 740, 397 N.E.2d 1115, 1121 (1979). Section 152 states the previously described general rule that:

Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154.

not produce the movie. A's duty to produce the movie is not discharged, and A is liable to B for breach of contract.
Restatement (Second) of Contracts § 261 comment b (1981).

**156.** There is no material difference in the language in the 1979 edition quoted in Sargisson and the language in the 1981 edition quoted above.

Restatement (Second) of Contracts § 152 (1981) (emphasis added).[156]

Section 154 states the exception, applicable to both mutual mistakes under section 152 and unilateral mistakes under section 153,[157] that:

A party bears the risk of a mistake when
(a) the risk is allocated to him by the agreement of the parties, or
(b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient. . . .

Restatement (Second) of Contracts § 154 (1981). It is true that Connolly might not have been aware of his limited knowledge about Deloitte given his past experience with other accounting firms in the context of similar provisions. Connolly's limited knowledge on a subjective basis, however, only speaks to his ability to take advantage of section 154(b). This case falls under section 154(a) inasmuch as the agreement placed the burden on Dawson to cause Deloitte to make the determination. As such, the circumstances more closely resemble those involving contracts wherein the parties assumed the risk, Aldrich v. Travelers Insurance Company, 317 Mass. 86, 56 N.E.2d 888, 889 (1944); Maloney v. Sargisson, 465 N.E.2d at 299–300; Covich v. Chambers, 397 N.E.2d at 1121–1122, as opposed to a contract which did "not provide for [the] risk." Dover Pool & Racquet Club, Inc. v. Brooking, 366 Mass. 629, 322 N.E.2d 168, 171 (1975).

Dawson also relies on the defense of impracticality. Dawson submits that "[t]his case falls squarely within the Restatement rule," referring to section 271 of Restatement (Second) Contracts (1981).[158] (Docket Entry # 295, p. 22). Section 271 reads as follows:

**157.** Dawson also cannot take advantage of the doctrine of unilateral mistake. Section 153 permits a party to avoid an agreement on the basis of a unilateral mistake "if he does not bear the risk of the mistake under the rules stated in § 154. . . ." See First Safety Fund National Bank v. Friel, 23 Mass.App.Ct. 583, 504 N.E.2d 664, 667 (1987) (quoting section 153).

**158.** Dawson primarily relies on section 271 to set forth the applicable legal principles of the doctrine of impracticality. Other than to note that

Impracticality excuses the non-occurrence of a condition if the occurrence of the condition is not a material part of the agreed exchange and forfeiture would otherwise result.

*Restatement (Second) of Contracts* § 271 (1981).[159] Comment a to section 271 describes section 271's relation to the other rules of impracticality and notes that the impracticality must "be such as would suffice to discharge a duty or prevent it from arising," citing to sections 261 and 266(1) of *Restatement (Second) of Contracts* § 271 comment a (1981).

The general statement of the impracticality doctrine is found in section 261 of *Restatement (Second) of Contracts* (1981). Comment e to section 261 is particularly apropos to the case at bar and states that:

> Even if a party contracts to render a performance that depends on some act by a third party, he is not ordinarily discharged because of a failure by that party because this is also a risk that is commonly understood to be on the obligor.

*Restatement (Second) of Contracts* § 261 comment e (1981).[160] Even though Connolly had no personal experience in the past with accounting firms refusing to make similar

determinations, it is, as noted above, reasonably foreseeable that a third party such as Deloitte might not perform under the agreement.

Thus, the nonperformance of a third party such as Deloitte is reasonably foreseeable and one of the risks Dawson undertook in the agreement. Under the agreement, Dawson undertook the duty to cause Deloitte to determine the adjusted closing net worth of Faxon. In so doing, Dawson also impliedly undertook the obligation that Deloitte would, in fact, perform the determination. Deloitte's reluctance due to an internal policy against making such determinations is a risk allocated to Dawson under the contract. *See Chase Precast Corporation v. John J. Paonessa Company, Inc.*, 566 N.E.2d at 605–606. As such, it is not fairly thrown upon plaintiffs even though, viewing the record in Dawson's favor, plaintiffs suggested the use of Deloitte as opposed to Arthur Anderson.[161]

In short, Dawson cannot avail itself of the defenses of mutual mistake and impracticability. Having already decided that the first determination did not comply with the agreement and that there exists an issue of fact as to the second determination, the issue arises whether the second audit was timely.[162]

---

impracticality does not require rescission of the entire contract but instead excuses Dawson's performance "'to the extent to which performance is impossible,'" (Docket Entry # 357, p. 25; Docket Entry # 295, n. 28) (quoting or citing *Van Dusen Aircraft Supplies of New England, Inc. v. Massachusetts Port Authority*, 361 Mass. 131, 279 N.E.2d 717, 722 (1972)), Dawson does not elaborate upon the legal principles behind the impracticality doctrine. Instead, it argues that Deloitte's performance, rather than the performance of another qualified accounting firm, was not essential to the agreement and that its efforts to obtain Deloitte's cooperation constituted substantial performance thereby excusing Dawson's performance of the condition.

**159.** The impracticality doctrine cited and relied upon by Dawson concerns the excuse of impracticality due to the nonoccurrence of a condition. *Restatement (Second) of Contracts* § 271 (1981).

**160.** An illustration under section 266 is also similar to the case at bar:

> A, an engineering form, contracts with B to lay water mains under a river. After diligent effort, A is unable to do the work, although

other, more experienced firms could do it. Performance is not impracticable ... See Comment e to § 261.

*Restatement (Second) of Contracts* § 266 (1981).

**161.** Furthermore, Dawson's failure to inquire of Deloitte prior to the executing the agreement is not properly shifted to plaintiffs. *See Century Plastic Corporation v. Tupper Corporation*, 333 Mass. 531, 131 N.E.2d 740, 743 (1956) (recognizing that "ignorance through negligence does not relieve a party from his contractual obligations").

**162.** It is inappropriate to use the first audit and the second determination as satisfying Dawson's obligations under sections 1.5 and 1.6. As explained in footnote number 120, the two audits differed both in the ultimate figures arrived at to calculate the adjusted closing net worth and in their calculations (or lack thereof) of Faxon's ordinary course operating losses in August and September 1994. There is also no evidence that Deloitte used the first audit, as opposed to the second audit, to make its second determination. Because it is the second determination which survives summary judgment, therefore, it is the second audit which must satisfy the 60 day requirement in subsection 1.6(a).

Plaintiffs argue that the second audit "is untimely on its face." Plaintiffs additionally point out that Dawson provides no explanation as to why Deloitte did not initially perform the additional procedures contained in the second audit in the first audit. (Docket Entry # 318).

In response, as well as to support its summary judgment motion, Dawson correctly points out that the language of subsection 1.6(a) only requires Deloitte to perform the audit of Faxon by the December 13, 1994 deadline. It does not require Deloitte to complete the audit report. It also does not

require Dawson to deliver the audit to plaintiffs by the December 13, 1994 deadline.

Dawson submits the following additional arguments.[163] First, Dawson contends that the district judge already decided the timeliness issue in the context of the Turner agreement.[164] Second, Dawson contends that plaintiffs fail to show any prejudice from the delay due, in part, to the fact that Dawson has claimed but not taken or implemented the purchase price adjustment. Accordingly, any delay purportedly does not result in the forfeiture of Dawson's purchase price adjustment.[165] To bolster this argument, Dawson also quotes section 11.4 of the agreement.[166]

In addition, in open court during argument, Dawson's counsel unequivocally stated that the arguments of plaintiffs' counsel:

> go to the first audit. They don't go to the second audit, and that's a crucial problem with a lot of what [plaintiffs' counsel] has argued here. He's overlooking the fact that *the purchase price claim that we're asserting that's at issue here is based on the second audit* [emphasis added]. It's a different claim ... The first audit's another story, but the second audit was done by Deloitte with that [referring to the purchase price determination] in mind, and *that's the audit which is the basis for the claim here* [emphasis added].

In their opposition to plaintiffs' summary judgment motion, Dawson similarly states that, "the significant Deloitte audit is the second one...." (Docket Entry # 357).

Even more importantly, the language of section 1.6 requires Deloitte to audit "and" to determine the adjusted closing net worth of Faxon. The language is neither inconsistent on its face nor capable of generating a reasonable difference of opinion as to its meaning. The usual and ordinary meaning of the word "and" used in the single sentence in section 1.6 is to connect the grammatically coordinate clauses. *See generally Random House Dictionary of the English Language* (2d ed.1987) (defining "and" as "used to connect grammatically coordinate words, phrases or clauses"). Therefore, in connection with performing an audit by the December 13, 1994 deadline, the first sentence of section 1.6 also required Deloitte to determine Faxon's adjusted closing net worth with that audit. More specifically, such language means that Deloitte should use the audit conducted within the 60 days after the closing, as opposed to another untimely audit, and from this audit determine the adjusted closing net worth.

The language of section 1.5 similarly confirms that the audit which resulted in the closing balance sheet was inexorably intertwined with the determination of the adjusted closing net worth. Section 1.5 states that the " 'Adjusted Closing Net Worth' shall mean the net worth ... as shown on *the Closing Balance Sheet (defined in*

*Section 1.6* ) [emphasis added]...." The "Closing Balance Sheet" is defined in subsection 1.6(a) as the audited balance sheet of Faxon prepared in accordance with GAAP by December 13, 1994. The definition of the "Adjusted Closing Net Worth" is therefore linked to the definition of the "Closing Balance Sheet." Subsections 1.6(a) and 1.6(b), which respectively contain these terms, therefore link the audit to the determination.

163. This court has already assumed an issue of fact with respect to Dawson's argument that the first audit was completed or substantially completed by the December 13, 1994 deadline. The first audit, however, is deficient because, as a matter of law, Deloitte did not determine Faxon's adjusted closing net worth.

As a separate matter, Dawson states in a footnote that, "The second of these objections was not timely raised under Section 1.6 (providing 15–day objection window)." The reference to the second objection is to plaintiffs' argument that "no 'determination' was made by Deloitte." Dawson, however, unequivocally states that it "does not wish to press the untimeliness issue," referring to the 15–day objection window vis-a-vis plaintiffs' objection to Deloitte's failure to determine the adjusted closing net worth. (Docket Entry # 295, p. 15 & n. 17). Dawson therefore waived this objection.

164. This court construes Dawson's argument as raising the issue that the decision constitutes the law of this case or, alternatively, that the decision constitutes binding precedent. As to the latter construction, the decision involved a ten day delay and therefore differed factually from the seven to eight month delay presently at issue.

165. Dawson additionally argues that plaintiffs waived their right to arbitrate the amount of the purchase price claim which, in light of this court's resolution, need not be addressed.

166. The only legal authority cited by Dawson for its position is: (1) *Quirk v. Schenk*, 34 Mass.App.

Plaintiffs respond with the argument that Massachusetts strictly enforces "time is of the essence clauses," particularly in agreements providing for the exercise of an option.

Addressing the arguments *seriatim*, the law of the case doctrine " 'expresses the practice of courts generally to refuse to reopen what has been decided.' " *Piazza v. Aponte Roque*, 909 F.2d 35, 38 (1st Cir.1990). Once " 'a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.' " *Piazza v. Aponte Roque*, 909 F.2d at 38 (quoting earlier edition of 18 James Wm. Moore *Moore's Federal Practice* ¶ 134.20[1] (1997)).

The doctrine, however, is inapplicable for two reasons. First, in this circuit, as well as in the eighth [167] and eleventh [168] circuits, the doctrine does not apply to interlocutory orders which the district court remains free to reconsider. *Perez–Ruiz v. Crespo–Guillen*, 25 F.3d 40, 42 (1st Cir.1994); *Union Mutual Life Insurance Company v. Chrysler Corporation*, 793 F.2d 1, 15 (1st Cir .1986). Second, even assuming its application, the law of the case doctrine does not apply where, as here, the issue was not decided, explicitly or implicitly, by the district judge. *See, e.g., Abbadessa v. Moore Business Forms, Inc.*, 987 F.2d 18, 22 (1st Cir. 1993); *Matter of Resyn Corporation*, 945 F.2d 1279, 1282 (3rd Cir.1991); *see generally* 18 James Wm. Moore *Moore's Federal Practice* ¶ 134.20[3] & ¶ 134.21[2] (1997) (doctrine applies to issues actually decided as opposed to statements made by court in passing or as dicta). The district judge only decided that, absent prejudice, the delay of ten days would not result in the forfeiture by Dawson of the remedy of arbitration. *See* Docket Entry # 119, p. 24. Here, the delay of more than seven months is far more lengthy than ten days. A decision on a ten day delay does not transform itself into a decision on a seven to eight month delay.

Turning to the absence of prejudice argument, it is necessary first to determine the meaning of the language in sections 1.5, 1.6 and 11.9. At first glance as well as upon closer inspection, the event of auditing Faxon in accordance with GAAP within 60 days following the closing date, i.e., on or before December 13, 1994, as well as the determination of Faxon's adjusted closing net worth, was a condition precedent to effectuating the purchase price adjustment. As defined in Massachusetts, a condition precedent is "an event which must occur before a contract becomes effective or before an obligation to perform arises under the contract." *Massachusetts Municipal Wholesale Electric Company v. Town of Danvers*, 411 Mass. 39, 577 N.E.2d 283, 288 (1991). Under Massachusetts law, it is generally, albeit not absolutely, necessary to use emphatic words to create a condition precedent. *Massachusetts Municipal Wholesale Electric Company v. Town of Danvers*, 577 N.E.2d at 288. Examples of such emphatic words include the word "if." *Massachusetts Municipal Wholesale Electric Company v. Town of Danvers*, 577 N.E.2d at 288 (citing *Restatement (Second) of Contracts* § 226, comment a (1981)).

Here, the first sentence of section 1.5 reads that, "*If* [Faxon's] Adjusted Closing Net Worth, as defined below, . . . is less than $3,618,000, *then and only then*, the Purchase Price will be reduced. . . ." (Emphasis added). To use the language of *Massachusetts Municipal*, the "event" or "condition precedent," i.e., the adjusted net worth being less than $3,618,000, "must occur before a contract becomes effective," i.e., must occur before the reduction of the purchase price becomes effective.

The words "Adjusted Closing Net Worth, as defined below" mean the net worth of Faxon "as shown on the Closing Balance Sheet (defined in Section 1.6)" subject to the adjustments in subsections 1.5(a) through

Ct. 931, 612 N.E.2d 1194 (1993), *review denied*, 415 Mass. 1106, 616 N.E.2d 809 (1993); (2) *Restatement (Second) of Contracts* § 242, comment d (1981); and (3) Arthur Linton Corbin *Corbin on Contracts* § 715 (1951). Plaintiffs' cited legal authority (three Massachusetts decisions concerning option contracts) is equally sparse.

**167.** *Murr Plumbing, Inc. v. Scherer Bros. Financial*, 48 F.3d 1066, 1070 (8th Cir.1995).

**168.** *Vintilla v. United States*, 931 F.2d 1444, 1447 (11th Cir.1991).

1.5(g).[169] Stated otherwise, Deloitte's determination of the adjusted closing net worth begins with the net worth figure on the Closing Balance Sheet. The "Closing Balance Sheet" defined in section 1.6 is the audit, by December 13, 1994, of a balance sheet of Faxon. The event of creating the "Adjusted Closing Net Worth, as defined below," therefore incorporated the requirement of an audit by December 13, 1994. Without such an audit, Deloitte could not even begin to determine the adjusted closing net worth.

 In sum, both the audit by December 13, 1994, as well as the determination of the adjusted closing net worth figure arising from the audit were conditions precedent to the effectuation of the purchase price adjustment under sections 1.5 and 1.6. If a condition precedent "is not fulfilled, the contract, or the obligations attached to the condition, may not be enforced." *Massachusetts Municipal Wholesale Electric Company v. Town of Danvers,* 577 N.E.2d at 288 (citing *Restatement (Second) of Contracts* § 225 (1981)); *Cheschi v. Boston Edison Company,* 39 Mass.App.Ct. 133, 654 N.E.2d 48, 53 (1995.), *review denied,* 421 Mass. 1102, 655 N.E.2d 1277 (1995) ("[i]f the condition is not fulfilled, the contract, or the obligations attached to the condition, may not be enforced"); *see also Powers, Inc. v. Wayside, Inc. of Falmouth,* 343 Mass. 686, 180 N.E.2d 677, 681 (1962) (purchaser not entitled to specific performance due to expiration of time to exercise repurchase option; "[t]here being no contract, there can be no specific performance"); *Charles River Park, Inc. v. Boston Redevelopment Authority,* 28 Mass. App.Ct. 795, 557 N.E.2d 20, 26 (1990), *review denied,* 408 Mass. 1103, 562 N.E.2d 90 (1990)

(citing *Restatement (Second) of Contracts* § 225 comment a and § 237 comment a (1981)); *American Oil Company v. Katsikas,* 1 Mass.App.Ct. 437, 300 N.E.2d 204, 206 (1973) (at "expiration of the closing date ... contract was at an end, and both parties were discharged"). As expressed in section 225 of *Restatement (Second) of Contracts* (1981), "Unless [the condition] has been excused, the non-occurrence of a condition discharges the duty when the condition can no longer occur." *Restatement (Second) of Contracts* § 225(2) (1981).

Because the stock purchase agreement has a severability clause, however, the effect of the non-occurrence of the conditions precedent in sections 1.5 and 1.6 operates only to discharge the corresponding purchase price adjustment mechanism.[170] It does not operate to discharge either parties' remaining obligations contained elsewhere in the agreement. *See generally* E. Allan Farnsworth *Farnsworth on Contracts* § 8.13 (1990).

The contract language therefore required, as a condition precedent to the purchase price adjustment, that Dawson cause Deloitte to audit Faxon by December 13, 1994. Here, two sophisticated business parties negotiated an agreement and chose to insert the condition of an audit by December 13, 1994, into the agreement. *See, e.g., Cheschi v. Boston Edison Company,* 654 N.E.2d at 53. The delay at issue is seven to eight months as opposed to seven to ten days. Notwithstanding the alleged absence of prejudice, the parties to the agreement "did not require proof of prejudice as a condition of its enforcement." *Cheschi v. Boston Edison Company,* 654 N.E.2d at 53–54 (applying traditional contract principles and denying specific performance due to non-occurrence

---

169. The language of the pertinent sentence in section 1.5 reads, in part, as follows: " 'Adjusted Closing Net Worth' shall mean the net worth (assets minus liabilities) of [Faxon], on a consolidated basis with its Subsidiaries, as shown on the Closing Balance Sheet (defined in Section 1.6).... " The language defining the closing balance sheet in section 1.6 reads as follows: "[Dawson] shall prepare and cause Deloitte ... (a) to audit in accordance with GAAP, within sixty days following the Closing Date, a balance sheet ('Closing Balance Sheet')...."

170. Section 11.7 unambiguously evidences the parties' intent that if a court determines that one provision of the agreement is unenforceable (the purchase price reduction provided for in sections 1.5 and 1.6) then the other provisions in the agreement, such as the purchase price reduction provided for in sections 2.8 and 8.2, would remain in full force. Section 11.7 reads as follows:

> **11.7 SEVERABILITY.** If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect.

of condition precedent of prompt notification). Dawson's failure to require Deloitte to audit Faxon by December 13, 1994, therefore precluded the enforcement of the purchase price adjustment mechanism in sections 1.5 and 1.6.

■ The existence of the time is of the essence clause renders this result all the more certain. It is generally true that a party is not required to perform its promise if "there is an uncured material failure to perform" by the other party. *Mistler v. Horace Mann Insurance Company*, 1994 WL 879038 at * 2–3 (Mass.Super.1994); *Restatement (Second) of Contract* § 237 comment a (1981). Parties to an agreement can, however, insert a time is of the essence clause into an agreement and thereby make performance at the specified time "essential to one's right to require performance of the other party." *Federal Deposit Insurance Corporation v. Graham*, 882 S.W.2d 890, 895 (Tex.App.1994); *cf. Luo v. Main Street Associates*, 212 A.D.2d 675, 622 N.Y.S.2d 761, 761 (N.Y.A.D.2nd Dept.1995) (delay in performance where time not of "essence is not a material breach on which to base the equitable remedy of rescission").[171] Notwithstanding these general principles of contract law, it is nevertheless Massachusetts law which controls the agreement and to which this court now turns with respect to the effect of time is of the essence clauses.

■ Under Massachusetts law, "Parties have a right to make a stated time for performance the essence of a contract." *Porter v. Harrington*, 262 Mass. 203, 159 N.E. 530, 531 (1928). When not waived by either words or conduct, the provision "is binding and will be given effect by courts of equity as well as of law." *Porter v. Harrington*, 159 N.E. at 531; *accord Vickery v. Walton*, 26 Mass.App.Ct. 1030, 533 N.E.2d 1381, 1383 (1989) ("When parties agree in writing that time is to be of the essence, courts will hold parties to the deadlines they have imposed on themselves"); *American Oil Company v. Katsikas*, 300 N.E.2d at 206 (absent waiver or modification by oral agreement, "contract provision terminating the agreement upon passage of the closing date without tender of performance must be given effect" resulting in discharge); *see also Federal Deposit Insurance Corporation v. Slinger*, 913 F.2d 7, 11 (1st Cir.1990) (presence of time is of the essence clause created rebuttable presumption of discharge absent waiver, contrary provision, modification or estoppel); *Curley v. Mobil Oil Corporation*, 860 F.2d 1129, 1132 (1st Cir.1988) (recognizing that although time for performance in agreement for sale of land, ordinarily, is not of the essence, "it 'may be made so by clear manifestation of the intent of the parties in the contract itself' ").

In the case at bar, the parties did not simply insert a boilerplate clause stating simply that "time is of the essence." As noted in the *Restatement (Second) of Contracts* § 242 comment d (1981), cited by Dawson, "Such stock phrases as 'time is of the essence' do not necessarily have" the effect of creating a discharge. *Restatement (Second) of Contracts* § 242, comment d (1981). "What the court must know, in order to give effect to such a cryptic provision is: What performance at what time is a condition of which party's duty to do what?" Arthur Linton Corbin *Corbin on Contracts* § 715 (1960). Here, the parties provided that, "With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence." The parties therefore agreed not just that time was of the essence generally but also that time was of the essence specifically with respect to the December 13, 1994 audit date. Thus, performance of the audit by December 13, 1994, was a condition of effectuating the purchase price adjustment.

---

**171.** Under general principles of contract law, therefore, the time is of the essence provision had the effect of making the 60 day period to audit Faxon a material part of the agreed upon exchange of allowing Dawson to take a purchase price adjustment under sections 1.5 and 1.6. Dawson repeatedly points out that it lacked adequate time to conduct due diligence. The time period to conduct the audit effectively allowed Dawson a set period of additional time in which to conduct further due diligence concerning the actual net worth of Faxon. The agreement, however, did not extend this time period indefinitely.

■ There is little, if any, evidence of a waiver or of a modification of the time to perform the audit. The words used in the March 30, 1995 letter do not provide sufficient evidence of a waiver. There is no indication that plaintiffs knew the essential facts as to the first audit at that time.

The decision of *Quirk v. Schenk,* 34 Mass. App.Ct. 931, 612 N.E.2d 1194 (1993), *review denied,* 415 Mass. 1106, 616 N.E.2d 809 (1993), is not to the contrary. In *Quirk,* the parties entered into a purchase and sale agreement with a standard time is of the essence provision.[172] By agreement, the parties extended the closing three times. They executed the second extension after the expiration of the closing thereby evidencing an intent not to adhere strictly to the deadlines set in the agreement.[173] While the court in *Quirk* makes no mention of waiver or of the parties engaging in conduct inconsistent with rigid enforcement of the closing date, the cases cited by the court uniformly involve such circumstances. *See Church of God in Christ, Inc. v. Congregation Kehillath Jacob,* 370 Mass. 828, 353 N.E.2d 669, 672 (1976) (oral conversation and other conduct reasonably led the plaintiff to believe there was extension of agreement; waiver therefore resulted and time "was not of the essence"); *Gentile Brothers Corporation v. Rowena Homes, Inc.,* 352 Mass. 584, 227 N.E.2d 338, 342 (1967) (specific performance allowed inasmuch as purchaser had right to rely on oral agreement that parties would not carry out closing on June 5 which operated as "waiver of the provision of the purchase and sale agreement which made time of the essence"); *M. De Matteo Construction Company v. Daggett,* 341 Mass. 252, 168 N.E.2d 276, 281 (1960) ("conduct over the months ... reasonably led Construction's representatives to understand .. that matters were to be held in abeyance ... and that Construction would be notified thereby rendering it inequitable to enforce time is of the essence clause

and demand performance on particular date"); *Porter v. Harrington,* 262 Mass. 203, 159 N.E. 530, 531 (1928) (specific performance to convey land affirmed where party accepted overdue payments not made in accordance with contract terms, conduct amounted to waiver and thus "inconsistent with rigid insistence upon a clause of the contract" which characterized performance and time as being of essence); *Morgan v. Forbes,* 236 Mass. 480, 128 N.E. 792, 794 (1920) ("evidence tending to show that the plaintiff did not reasonably expect he would be held to a strict performance of the contract"); *Lagasse v. Lagasse,* 20 Mass.App.Ct. 911, 478 N.E.2d 154, 157 (1985), *review denied,* 395 Mass. 1103, 481 N.E.2d 197 (1985) (where, "as here, the conduct of the parties demonstrates an intention to waive the time set for performance, the parties may set, or the court will establish for them, a reasonable time for performance;" citations omitted); *see also Gevalt v. Diwoky,* 319 Mass. 715, 67 N.E.2d 481, 482 (1946) (wherein there was no provision in contract making time of essence).

Dawson's quotations of section 11.4 are also unavailing. This provision concerning waiver does not encompass a condition precedent which, as previously explained, is generally defined as "an event which must occur before a contract becomes effective or before an obligation to perform arises under the contract." *Massachusetts Municipal Wholesale Electric Company v. Town of Danvers,* 577 N.E.2d at 288. Rather, the language unambiguously extends only to "any right, power or privilege under this Agreement." In full, the pertinent sentence reads as follows:

Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power,

---

**172.** Such a standard time is of the essence provision differs from the provision in the case at bar where the parties expressly applied the provision to the date specific clauses in the agreement.

**173.** This court recognizes and has considered that an additional circumstance weighing in favor of nonenforcement of the standard time is of

the essence clause included Quirk's "substantial payment ahead of the closing date." *Quirk v. Schenk,* 612 N.E.2d at 1195. Solely for purposes of assessing Dawson's forfeiture argument, this court assumes *arguendo* that the magnitude of the forfeiture is the loss of a $4,402,235 purchase price adjustment.

or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege.

Extending this provision to conditions and/or duties under the agreement would nullify section 11.9 (the time is of the essence provision) as well as other provisions in the agreement. *See Vickery v. Walton,* 26 Mass.App. Ct. 1030, 533 N.E.2d 1381, 1383 (1989) (enforcing deadline in standard written offer to purchase form which included time is of the essence provision and indicating that provision for the execution of a purchase and sale agreement could not be treated "as surplusage").

In short, the first audit and determination fail to comply with the agreement inasmuch as Deloitte made no determination of the adjusted closing net worth. The second audit, occurring an estimated seven to eight months after December 13, 1994, is untimely. Dawson, which bore the risk under the agreement of Deloitte's nonperformance, is therefore not entitled to take a purchase price adjustment under sections 1.5 and 1.6.[174]

## B. *ACCOUNTS RECEIVABLE AD-JUSTMENT*

■ Dawson moves for partial summary judgment consisting of a declaration that it acted properly in: (1) taking a set off of $4,533,283 on October 14, 1995; and (2) restoring all but $317,204 effective October 14, 1996. In so doing, Dawson seeks the dismissal of Count II of the amended complaint and portions of counts I, III, IV and V with respect to the accounts receivable claim. (Docket Entryè257, 294, 302, 357, 352 & 356).

Plaintiffs oppose Dawson's motion and separately move for partial summary judgment on Count II of the amended complaint. (Docket Entryè315, 317, 318 & 342). Coun-terclaim VII of the amended answer and counterclaims requests declaratory relief that Dawson is entitled to purchase price adjustments under sections 2.8 and 8.2. (Docket Entry # 312, ¶ 112).

As an initial issue, section 2.8 unambiguously required plaintiffs to "deliver ... a complete and accurate" accounts receivable schedule of all accounts receivable of Faxon as of October 2, 1994. The relevant language in the agreement states that, "Sellers will deliver to Buyer at the Closing a complete and accurate schedule (the 'Accounts Receivable Schedule') of all accounts receivable (individually on a gross basis) of the Company (the 'Accounts Receivable') as of October 2, 1994...."

The usual and ordinary meaning of the word "deliver" controls, unless it appears that the parties accorded the term a peculiar meaning. *See Woogmaster v. Liverpool & London & Globe Insurance Company,* 45 N.E.2d at 395 (words in contract given "their usual and ordinary significance, unless it appears that they are to be given a peculiar or technical meaning"). It does not appear that the parties intended to accord the word "deliver" a legal, technical meaning. *See, e.g., Baetjer v. New England Alcohol Company,* 319 Mass. 592, 66 N.E.2d 798, 801 (1946) (construing the word "delivery" as including actual loading of goods onto the buyer's vessel even though technical passing of title and payment occurred at the earlier time when goods were delivered into seller's tank). The word "deliver" is commonly defined as "to carry or turn over to the intended recipient" or "to give to another's possession or keeping." *The Random House Dictionary of the English Language* (2d ed.1987); *see, e.g., ITT Corporation v. LTX Corporation,* 926 F.2d 1258, 1263 (1st Cir.1991) (using dictionary definition to clarify meaning of terms "intermittent" and "intermittent current"). When used elsewhere in the agreement, the word takes on this common meaning.[175]

---

**174.** Consequently, this court need not address the parties' arguments with respect to the proper adjustment under subsection 1.5(g). As previously noted, this court accepted *arguendo* Dawson's position that it would experience the forfeiture of a $4,402,235 purchase price adjustment.

**175.** Section 1.4, entitled "Closing Deliveries," states that, "At the Closing: (a) Sellers shall deliver to Buyer" various certificates and other documents and, similarly, that "Buyer shall deliver to Sellers" the notes, guaranty and other documents.

Thus, the word did not encompass simply making the accounts receivable schedule available at the Closing. Such an interpretation is contrary to the commonly accepted meaning of the word and the parties expressly added the words "made available" to "delivered" elsewhere in the agreement when they intended to have this effect.[176]

It is also significant that the language describes a delivery "at the Closing." Section 1.3 of the agreement defines the term "Closing" as "[t]he purchase and sale." This section further identifies the location of the closing as "at the offices of [JSSA]." Whereas the words "the Closing" by themselves refer to the purchase and sale, the words "at the Closing" refer to the offices of JSSA. Moreover, the parties did not use the words "on the Closing Date," as they did in subsection 1.4(a)(xi), which might have broadened the delivery requirement. Interpreting the delivery requirement in section 2.8 as requiring the delivery of an accounts receivable schedule at the offices of JSSA at the closing on October 14, 1994, also corresponds to the requirement in subsection 1.4(c) that, at the closing, the parties "shall also deliver such other documents, instruments and certificates as may be required by this Agreement."

Given the factual disputes, however, it is a material issue of fact as to whether plaintiffs did "deliver" the accounts receivable schedule at the offices of JSSA within the meaning of the first sentence of section 2.8. An electronic copy of the accounts receivable would suffice provided it was complete and accurate and provided that Dawson could get access to it at the offices of JSSA. As previously noted, Zuroff testified that, "you could get access to it over the telephone at the closing."

Section 2.8 also required plaintiffs to deliver a complete and accurate accounts receivable schedule at the closing. Whether the accounts receivable schedule was both complete and accurate, however, depends on the meaning and definition of the term "Accounts Receivable" and, in particular, whether the accounts receivable within the schedule would include gross debits in accounts receivable wherein the customer was in a net credit

position. In other words, the completeness and accuracy of the schedule cannot be determined without defining its required contents. This court therefore turns to the meaning and definition of the term "Accounts Receivable." Indeed, the parties focus much of their argument on the meaning of the term "Accounts Receivable."

The determinative question is whether the language in sections 2.8 and 8.2 with respect to the term "accounts receivable" creates an ambiguity. In other words, does the contractual language concerning "accounts receivable" support two or more reasonable differences of opinion as to its meaning? The parties dispute whether the term means all gross receivables or the net receivables of those customers in a net debit position. If there is a reasonable difference of opinion, then this court may consider the parol evidence, such as the parties' negotiations with respect to inserting the words "individually on a gross basis," which party drafted various provisions and the motivations of the parties. Absent an ambiguity, the agreement is enforced according to its terms.

In determining the existence of an ambiguity, it is important to note that Faxon's business consisted, in large part, of customers who prepaid for subscriptions for a future year several months prior to the beginning of the subscription year. *See Donoghue v. IBC USA (Publications), Inc.*, 70 F.3d at 215–216 (describing exceptions to consideration of parol evidence including that court may consider parol and extrinsic evidence to determine whether contract language is ambiguous). Faxon posted the credit to the customer's account but, because it was a prepayment, it could not necessarily apply the credit to an existing, unrelated debit in that customer's account.

Turning to the language of sections 2.8 and 8.2, accounts receivable is initially defined as "all accounts receivable (individually on a gross basis) of the Company (the 'Accounts Receivable') as of October 2, 1994, in an aggregate amount which will be reflected on the Closing Balance Sheet. . . ." An account typically includes debits as well as credits.

---

**176.** Section 2.11 provides that, "Sellers have de- livered or made available to Buyer copies. . . ."

Significantly, the parties chose to use the words "accounts receivable" as opposed to the words "gross debits" or "gross receivables." Such a choice of language weighs heavily in favor of finding that the term "accounts receivable" refers to a net number. Furthermore, the closing balance sheet reflects a net number, i.e., the aggregate amount of those customers who had net debit balances in their accounts as of October 2, 1994.[177]

This net number, however, conflicts with the language "individually on a gross basis" which rationally and objectively means a gross number.[178] In addition, grammatical rules of interpretation show that "gross basis" modifies the immediately preceding phrase, "all accounts receivable," as opposed to the phrase accounts receivable schedule. Although additional language in section 8.2 slightly favors the use of a net number,[179] this court cannot simply ignore the contractual language "individually on a gross basis." *See Den Norske Bank AS v. First National Bank of Boston,* 75 F.3d 49, 54 (1st Cir.1996) (paraphrasing Massachusetts case "that, where possible, no part of contract should be deemed superfluous").

Turning to the additional language in both sections 2.8 and 8.2, accounts receivable in section 2.8 are described as "current and collectible." Such language could just as easily describe an account in a net debit position as a gross debit. Accounts receivable are also described as representing "valid obligations arising from sales actually made or services actually performed in the Ordinary Course of Business." Again, such language could describe an account in a net debit position or a gross debit.

The final sentence in section 2.8 reads as follows:

> Except for credits to libraries and other customers of the Company reflected in the Interim and Audited Balance Sheets, there is no contest, claim, or right of set-off, other than returns in the Ordinary Course of Business, in any agreement with any maker of an Accounts Receivable relating to the amount or validity of such Accounts Receivable.

This sentence, while not an example of the textbook use of the English language, does not favor either interpretation. If accounts receivable was a net debit number wherein credits had already been applied, there would arguably be no need to include the language excluding credits from the warranty. On the other hand, this sentence can be viewed as simply confirming that the warranty did not extend to credits or to returns in the ordinary course of business, i.e., that the warranty extended to a net debit number.

Additional language in section 8.2 also does not unequivocally favor either construction. Section 8.2 defines "Uncollected Receivables" as "the portion of the Accounts Receivable that was not collected during the Collection Period." Reasonably, this language could describe the portion of the gross debits which remained uncollected as easily as it could describe the portion of the net debits which remained uncollected.

Additional language in section 8.2 describes the manner of applying a collection to items within a customer's account. The relevant language reads that:

> For purposes of determining collections against the Accounts Receivable,[180] collec-

177. The closing balance sheet also has a corresponding section in the liabilities side of the balance sheet for those customers in a net credit position.

178. Dawson understandably urges the use of a gross debit number. Using the net number in accounts with net debit balances as the "accounts receivable" excludes debits of customers in a net credit position, i.e., those customers whose accounts appear on the liability side of the closing balance sheet. Dawson, desiring greater protection, contends that the language encompasses debits appearing in accounts with net credit balances.

179. Section 8.2 repeats the reference to the "Accounts Receivable reflected on the Closing Balance Sheet," i.e., a net number. The section provides that Dawson could only take a reduction in the purchase price if Faxon collected "an amount less than the aggregate Accounts Receivable reflected on the Closing Balance Sheet."

180. It is just as easy to apply a collection to a gross debit number as it is to apply a collection against a net debit number. This language therefore favors neither party.

tions from each customer will be applied against the oldest portion of the accounts receivable due from such customer to the Company, unless the customer specifies in writing that the payment is to apply to a specific invoice or it is otherwise clear from the circumstances that the payment applies to a specific invoice (in each of which cases the payment shall be applied to the applicable invoice).

This language simply clarifies the treatment of prepayment credits in a customer's account. As clear from the circumstances or as expressly instructed by the customer, such prepayments would be applied to the invoice for the upcoming year's subscription.

In sum, because the language yields reasonably differing interpretations, parol evidence is admissible to clarify the ambiguity. Unfortunately, the parol evidence, as explained in the factual background, is conflicting. Hence, there is a material issue of fact as to the meaning of the term "accounts receivable" which, when viewing the record in favor of the particular nonmoving party, precludes allowing either plaintiffs' or Dawson's summary judgment motions on this issue.[181]

## C. *BREACHES OF WARRANTY*

Dawson moves for partial summary judgment on liability only to the effect that: (1) plaintiffs misrepresented that the interim balance sheet was prepared in accordance with GAAP inasmuch as it contained knowing misrepresentations regarding the expected pay down of the Nihon Faxon intercompany debt; and (2) plaintiffs intentionally failed to provide Dawson with the June 30, 1994 board minute showing the conversion of Nihon Faxon intercompany debt into additional paid in capital in violation of section 2.5.[182] (Docket Entryè293, 304, 353, 356 & 357).

Plaintiffs oppose partial summary judgment on these issues. They also separately move for partial summary judgment on the allegations in Counterclaim V that they breached representations and warranties made in section 2 of the stock purchase

**181.** In making this determination, this court has considered the parties' remaining arguments, including plaintiffs' argument as to Dawson's failure to adequately document its adjustments and Dawson's arguments with respect to the use of the word "all" in section 2.8 and the seven year collection period envisioned in section 8.2. In addition, the amount owed on the Rowe notes is not subject to summary judgment. The amount owed ($192,053 as of September 14, 1996) may or may not result in an accounts receivable purchase price adjustment depending on the construction of the term "Accounts Receivable."

Finally, due to the existence of a genuine issue of material fact as to the meaning of the ambiguous term "Accounts Receivable," it is premature to decide the completeness and the accuracy of the accounts receivable schedule inasmuch as the required contents of the schedule depends on the definition of the term "Accounts Receivable."

**182.** Elsewhere, Dawson also seeks a ruling that plaintiffs breached section 2.4 because of their misrepresentation that the interim balance sheet fairly presented the financial condition of Faxon with respect to the expected pay down of the Nihon Faxon intercompany debt. In seeking a ruling as to liability on these issues, Dawson confines its arguments to plaintiffs' alleged breach of either section 2.4 or 2.5 of the agreement. Indeed, Dawson states that, "the within motion ... addresses only breach of contract" (Docket Entry # 304, n. 4) and that it "is entitled to partial summary judgment that sellers breached the representations and warranties in Sec-

tions 2.4 and 2.5 of the Agreement." (Docket Entry # 293, p. 7).

In reviewing the merits of the requested determination, this court does not resolve the issue of damages. It is important to recognize, however, that damages constitute an essential element in Dawson's breach of contract claim in Counterclaim V and plaintiffs' breach of contract claim in Count I. "The law does not contemplate that a party victimized by fraud or breach of contract prove, without reference to the rest of the record, the narrow effects of the fraud or breach; it requires that party to prove, *as an element of its case*, the extent to which it was damaged by the fraud or the breach." *Fleet National Bank v. Anchor Media Television, Inc.*, 45 F.3d 546, 560 (1st Cir.1995) (emphasis in original); *accord Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir.1996) (in order to sustain breach of contract claim, the plaintiffs must plead, *inter alia*, that they "were damaged").

A determination on plaintiffs' breach of contract with respect to the aforementioned issues would partially resolve Count I, the breach of contract count (Docket Entry # 241, ¶¶ 49, 51, 53 & 54) and Count V, the declaratory relief count (Docket Entry # 241, ¶ 115). It is also relevant to plaintiffs' chapter 93A count inasmuch as plaintiffs assert that Dawson's breach of warranty set off was used to force plaintiffs to forgo their claim that Dawson failed to preserve its purchase price adjustment claim. (Docket Entry # 241, ¶ 108(d)).

agreement.[183] (Docket Entryè317, 318 & 340). In particular, plaintiffs argue that they did not breach sections 2.4, 2.5, 2.8, 2.11, 2.13, 2.17 and 2.25 of the stock purchase agreement. After addressing the alleged breaches of warranty under sections 2.4 and 2.5, this court will turn to plaintiffs' summary judgment motion on the aforementioned breaches of warranty. Throughout, the record is construed in favor of the nonmovant.

### 1. Section 2.4 and the Interim Balance Sheet

Dawson contends that plaintiffs violated section 2.4 by making a number of misrepresentations concerning the interim balance sheet. Because they seek summary judgment on liability only, this court need not determine the extent of the damage resulting from the alleged breach. Plaintiffs, in turn, move for summary judgment on Counterclaim V which alleges that plaintiffs breached the stock purchase agreement, including section 2.4, and the Turner agreement.

As a preliminary matter, it is necessary to define the parameters of the Interim Balance Sheet [184] for purposes of section 2.4. The parties disagree as to whether the Interim Balance Sheet consists of an entire document with 13 columns or simply one column.

The language of section 2.4 defines the term "Interim Balance Sheet." The language therein refers to "an unaudited balance sheet of the Company as of July 29, 1994 (the 'Interim Balance Sheet,' a copy of which is attached hereto as *Schedule 2.4(b))*." The import of this language is that the referenced balance sheet of Faxon was both unaudited and, more importantly, "as of July 29, 1994."

Schedule 2.4(b) shows a balance sheet divided into 13 columns. At the top of each column is a date next to either the word "Balance" or the words "proj Balance," i.e., projected balance. The only column with the date July 29, 1994, is the fifth column. Here, the words "Proj Balance 07/29/94" appear above the entire column both on the first and second page of the two page balance sheet.

In addition, above the fifth column appear the handwritten words "Interim Balance Sheet" on the first page and "Interim Balance Sheet (Continued)" on the second page with an arrow pointing to the fifth column. The words "Interim Balance Sheet" appear only on top of the fifth column.

Consequently, the term "Interim Balance Sheet" is unambiguous.[185] Notwithstanding Dawson's argument to the contrary, the Interim Balance Sheet consists of the fifth and only the fifth column in schedule 2.4(b).

The parties also dispute whether the warranty in section 2.4 extended to the Interim Balance Sheet. Section 2.1 defines the term "Company" for purposes of section 2 as including the subsidiaries except for sections 2.3, 2.4 and 2.5. Unambiguously, therefore, the term "Company" in section 2.4 refers to Faxon on a domestic, unconsolidated basis.[186]

183. With respect to alleged breaches of representations and warranties, plaintiffs' supporting memorandum confines itself to seeking the dismissal of Counterclaim V. (Docket Entry # 318, pp. 103–138). Counterclaim V is a breach of contract claim. The merits of Dawson's breach of warranty set offs also impact plaintiffs' motion for summary judgment on Count I wherein plaintiffs allege that Dawson defaulted on the notes by taking improper set offs.

Counterclaim V incorporates paragraphs 1 through 69 of the counterclaims and alleges a breach of the stock purchase agreement and of the Turner agreement. Plaintiffs do not address the Turner agreement in their papers with respect to the breach of warranty allegations due to the pending arbitration and, thus, are not entitled to summary judgment with respect to breaches of warranty in the Turner agreement.

184. When typed in capital letters, the term "Interim Balance Sheet" refers to the document defined in the stock purchase agreement.

185. Plaintiffs submit that Connolly and all the parties involved understood that the Interim Balance Sheet was a domestic balance sheet and was not consolidated. (Docket Entry # 318, pp. 110–112). The language of section 2.4, however, is unambiguous and parol evidence cannot vary its terms. As explained *infra*, section 2.4 unambiguously defines the Interim Balance Sheet to be "in accordance with GAAP."

186. Plaintiffs rely, in part, on the definition of the term "Company" in section 2.1 as excluding any representation or warranty of a subsidiary from the reach of section 2.4.

The exclusion of the subsidiaries from the term "Company" in section 2.4, however, does not

Section 2.4, which creates a warranty for certain financial statements, reads as follows:

**2.4 FINANCIAL STATEMENTS.** Sellers have delivered to Buyer the following consolidated financial statements (including in each case the notes thereto, if any): (a) audited balance sheets of the Company as of March 31 in each of the years 1990 through 1992 and unaudited balance sheets as of March 31 in each of the years 1993 and 1994 ... and (b) an unaudited balance sheet of the Company as of July 29, 1994 (the "Interim Balance Sheet," a copy of which is attached hereto as *Schedule 2.4(b)* ). Such financial statements and notes fairly present the financial condition and results of operations of the Company as at the respective dates thereof and for the period therein referred to, all in accordance with GAAP; the financial statements referred to in this **Section 2.4** reflect the consistent application of such accounting principles throughout the periods involved. No financial statements of any Person other than the Subsidiaries are required by GAAP to be consolidated with the financial statements of the Company.

Even accepting that the Interim Balance Sheet is not a "consolidated financial statement," it undeniably appears under an entire

subpart in section 2.4. Unless this language is simply ignored, there can be no other reason to include the Interim Balance Sheet in the section other than to make a representation or a warranty.[187]

In addition, the primary warranty or representation, which appears in the second sentence, applies to "[s]uch financial statements," as opposed to consolidated financial statements. The omission of the word "consolidated" as well as the use of the word "[s]uch," which references the financial statements noted in the preceding sentence, confirm that the warranty or representation applies to the Interim Balance Sheet, a financial statement listed in the preceding sentence. Notwithstanding plaintiffs' arguments to the contrary, section 2.4 therefore unambiguously extends the representations therein to the Interim Balance Sheet, i.e., the fifth column in schedule 2.4(b).

As pointed out by Dawson, the language of section 2.4 makes at least two representations. First, there is the representation that "[s]uch financial statements" are "in accordance with GAAP."[188] Second, there is the representation that "[s]uch financial statements and notes fairly present the financial condition and results of operations of the Company."

foreclose a representation as to an intercompany debt owed to Faxon domestic by one of its subsidiaries. The warranty or representation, which appears in the second sentence of section 2.4, applied to certain financial statements of "the Company," i.e., Faxon domestic. If those financial statements contained a misrepresentation as to the repayment of an intercompany debt of a subsidiary owing to Faxon domestic then there would be a violation of section 2.4.

Plaintiffs' similar argument, based on the language "THE FAXON COMPANY DOMESTIC BALANCE SHEET" is also unavailing. The Interim Balance Sheet of Faxon domestic can include and encompass representations about the probable occurrence of a loss due to the inability to collect an intercompany debt owed by a subsidiary to the parent.

187. The Interim Balance Sheet is a representation of a projected balance *as of July 29, 1994.* Plaintiffs made a representation when they *signed the agreement in October 1994* with respect to the projected balance as of July 29, 1994.

188. Plaintiffs assert that the GAAP requirement only applies to the financial statements and notes in section 2.4(a). Plaintiffs reason that the representation applied only to financial statements which presented the "results of operations of the Company." Because the Interim Balance Sheet shows a projected balance as of July 29, 1994, plaintiffs maintain that section 2.4 did not represent that the Interim Balance Sheet was in accordance with GAAP. Plaintiffs additionally argue that because GAAP only governs historical events, the language in section 2.4 requiring the "financial statements" to be "in accordance with GAAP" only applies to the financial statements listed in schedule 2.4(a). (Docket Entry # 318, p. 110).

This court disagrees. The Interim Balance Sheet is indisputably a financial statement which is described in the first sentence of section 2.4. The second sentence of section 2.4 creates the representation that "[s]uch financial statements" fairly present the financial condition of Faxon domestic and that such financial statements are in accordance with GAAP. Plaintiffs' construction would also render subsection 2.4(b) superfluous.

With respect to the first representation, Dawson points to plaintiffs' "admission" that, "the Interim Balance Sheet is not a financial statement and could not possibly be 'in accordance with GAAP.'" (A.85). The statement, however, appears under plaintiffs' objection to the request to admit and not in the subsequent paragraph wherein plaintiffs respond to the request by denying it for various reasons. Accordingly, the statement is simply argument and does not establish the fact that the Interim Balance Sheet was not in accordance with GAAP for purposes of section 2.4.

Dawson's argument pertaining to Financial Accounting Standard No. 5 also does not establish as a matter of law that plaintiffs misrepresented that the Interim Balance Sheet was in accordance with GAAP because it incorporated misrepresentations regarding the expected pay down of the Nihon Faxon intercompany receivable. It is true that GAAP incorporates Financial Accounting Standard No. 5 which, in turn, requires that a company must accrue a loss contingency for possible losses, such as uncollectible intercompany debts, "when the loss is probable of occurrence and can be reasonably estimated." (S.A.61, ¶ 3). Whether the loss from the inability to collect the Nihon Faxon intercompany debt was "probable of occurrence" and could "be reasonably estimated" at the relevant time, however, is a material issue of fact with respect to plaintiffs' breach of section 2.4. The June 30, 1994 board minute, does not establish these facts as a matter of law. Construing the record in plaintiffs' favor and even assuming its creation in June as shown in the document itself, the June 30, 1994 board minute was never implemented and was designed to avoid preventing Nihon Faxon from bidding on certain accounts. The June financials, while also relevant, similarly fail to establish these facts as a matter of law. Other financial statements in the record, as well as the prospective sale to EBSCO, militate against a finding that the loss was probable of occurrence at the relevant time.

For similar reasons, Dawson's assertion that plaintiffs misrepresented that the Interim Balance Sheet fairly presented the financial condition and results of operations of Faxon is unavailing.

With respect to plaintiffs' motion for summary judgment seeking a determination that they did not breach section 2.4, whether the Interim Balance Sheet was in accordance with GAAP by complying with Financial Accounting Standard No. 5 with respect to carrying the Nihon Faxon intercompany debt is likewise a material issue of fact. Viewing the facts in Dawson's favor, the June financials, as well as other documents, create a factual dispute as to the probability of the loss.

On the other hand, the fact that Dawson knew that the Interim Balance Sheet was not in accordance with GAAP or knew, through the disclosure of other financial data, that the Nihon Faxon intercompany debt was misstated, is, unfortunately for plaintiffs, immaterial. Plaintiffs agreed to the insertion in an integrated document of the following language in section 9.1: "The right to indemnification, reimbursement, or other remedy based on such representations and warranties, will not be affected by any investigation conducted by Buyer or by any Knowledge of facts determined or determinable by Buyer pursuant to such investigation." In other words, Dawson's knowledge of facts which it had determined or could have determined pursuant to any investigation cannot affect its right to a remedy for the breach of a representation made in section 2.4.[189]

Because the Interim Balance Sheet only encompasses the fifth column in schedule 2.4(b), however, there is no representation of the pay down of the Nihon Faxon intercompany receivable in the sixth column wherein the projected Nihon Faxon's intercompany debt is zero. The Interim Balance Sheet, as defined in the agreement, does not encompass the sixth column of the document. Similarly, plaintiffs correctly submit that the Interim Balance Sheet does not state losses for

189. Plaintiffs' further argument that the parties included the Interim Balance Sheet solely for establishing a benchmark net worth figure for sections 1.5 and 1.6 ignores the fact that the parties chose to define the Interim Balance in section 2.4 as opposed to either section 1.5 or 1.6.

**128**

the period from April to July 1994 inasmuch as the Interim Balance Sheet is confined and defined in the agreement to be a projected balance of Faxon domestic as of July 29, 1994. The only reference to Nihon Faxon in the Interim Balance Sheet, defined in section 2.4 as the fifth column, is that the Nihon Faxon intercompany debt as of July 29, 1994, was "[10,444]."

As a further argument, plaintiffs contend that Dawson failed to make a claim within two years as required under section 9.1. Plaintiffs' argument is belied by Dawson's October 1996 set off letter. (A.609–610). Therein, Dawson makes a claim based on plaintiffs' breach of section 2.4. The agreement does not require Dawson to set forth the precise boundaries of their legal theory as to plaintiffs' breach of section 2.4, or identify the particular accounting rule which demonstrates the noncompliance with GAAP.

█ As a collateral and final matter, Dawson cites to a number of cases involving the torts of deceit, fraudulent misrepresentation and/or fraud. (Docket Entry # 293, p. 8). Although relevant to Dawson's first three counterclaims based on common law fraud, statutory fraud and negligent misrepresentation, such cases are inapposite to a breach of contract claim. Breach of an express warranty is generally understood as a contract claim and the standard of performance is set by the defendant's promises. *See Anthony's Pier Four, Inc. v. Crandall Dry Dock Engineers, Inc.*, 396 Mass. 818, 489 N.E.2d 172, 175 (1986). Under section 2.4, plaintiffs essentially promised that certain financial statements would be in accordance with GAAP and would fairly present the financial condition of Faxon.[190] "To state a claim for breach of contract under Massachusetts law, a plaintiff must allege, at a minimum, that there was a valid contract, that the defendant breached its duties under its contractual agreement, and that the breach caused the plaintiff damage." *Guckenberger v. Boston University*, 974 F.Supp. 106, 150

(D.Mass.1997) (citations and internal quotation marks omitted); *see also Doyle v. Hasbro, Inc.*, 103 F.3d 186, 196 (1st Cir.1996) (stating elements for breach of contract); *see, e.g., Kravetz v. United States Trust Company*, 941 F.Supp. 1295, 1311 (D.Mass. 1996); *Roadmaster Industries, Inc. v. Columbia Manufacturing Company*, 893 F.Supp. 1162, 1173 (D.Mass.1995).

In sum, having considered all of the remaining arguments of the parties with respect to section 2.4, because of material issues of fact, Dawson is not entitled to a ruling that sellers misrepresented that the Interim Balance Sheet fairly presented the financial condition of Faxon or was prepared in accordance with GAAP because it incorporated knowing misrepresentations regarding the expected pay down of the Nihon Faxon intercompany receivable. Also due to material issues of fact, plaintiffs are not entitled to summary judgment that they did not breach section 2.4.

### 2. Section 2.5 and the June 30, 1994 Board Minute

█ Dawson next moves for summary judgment on the issue of plaintiffs' breach of section 2.5 due to their failure to provide Dawson with the June 30, 1994 board minute.[191] Plaintiffs move for summary judgment that they did not breach section 2.5. Although the parameters of section 2.5 are relatively straight forward, the facts with respect to the June 30, 1994 are not, as alleged by Dawson, undisputed.

Under section 2.5, plaintiffs made representations that the minute books of Faxon were "complete," "correct," "made available to" Dawson, "maintained in accordance with sound business practices" and "contain accurate and complete records of all meetings held." The language creating these five representations is as follows:

**2.5 BOOKS AND RECORDS.** Except as set forth on *Schedule 2.5*, ... minute

---

190. Section 9.2 of the agreement also provides that the sellers would reimburse Dawson for any loss or damages arising from or in connection with "any breach of any representation or warranty made by Sellers in or pursuant to this agreement."

191. As with Dawson's allegation that plaintiffs breached section 2.4, they move for summary judgment as to plaintiffs' breach of contract as to liability only. *See* footnote number 182 *supra*.

books ... of the Company [192] ..., all of which have been made available to [Dawson], are complete and correct and have been maintained in accordance with sound business practices. Without limiting the generality of the foregoing, the minute books of the Company ... contain accurate and complete records of all meetings held of, and corporate action taken by, ... the boards of directors ... of the Company.... At the Closing, all of those books and records will be in the possession of the Company.

The first sentence consists of a representation that Faxon's minute books "are complete" and a further representation that such minute books are "correct." Use of the present tense demonstrates that the representation was made at the time the parties signed the stock purchase agreement, October 4, 1994. Only the penultimate sentence of the section creates a representation "[a]t the Closing." Faxon's minute books therefore had to be both complete and correct as of October 4, 1994.

The first sentence also states, in the past tense, that the minute books "have been made available to" Dawson and "have been maintained in accordance with sound business practices." Accordingly, Faxon represented that, as of October 4, 1994, it had made the minute books available to Dawson and that such minute books had been maintained in accordance with sound business practices.

The second sentence does not, by its terms, effect or limit the representations in the first sentence. Rather, the second sentence creates additional representations which more specifically apply to the meetings reflected in the board minutes. Therein, plaintiffs represented or warranted that "the minute books" of Faxon [193] "contain accurate and complete records of all meetings held of,

and corporate action taken by, ... the boards of directors." Use of the present tense demonstrates that the representation was made as of October 4, 1994. Use of the words and punctuation, to wit, "all meetings held of, and corporate action taken by," does not restrict the representation to only those meetings wherein corporate action was taken. *See, e.g., Massachusetts Mutual Life Insurance Company v. Aritech Corporation,* 882 F.Supp. at 195. Accordingly, by virtue of the second sentence of section 2.5, there is a representation that the board minutes contain accurate records of meetings held by the board of directors.

Having defined the parameters of the representations in section 2 .5, this court turns to the factual issues of whether the minute books: (1) were complete on October 4, 1994; (2) were correct on October 4, 1994; (3) had been made available to Dawson prior to October 4, 1994; (4) were accurate on October 4, 1994, as to meetings held; and (5) had been maintained in accordance with sound business practices up to October 4, 1994. As discussed in greater detail in the factual discussion *supra,* there are material issues of fact with respect to the first three representations.

Viewing the record in plaintiffs' favor as the nonmovant to Dawson's motion with respect to the first three representations, Zuroff testified that Faxon had a practice of creating binders of financial materials for due diligence reviews which contained an exhaustive list of board minutes. There were also a number of copies of the June 30, 1994 board minute. The fact that there was one copy with the notation "Mark Z. said hold!" does not establish that another copy or an original was not placed in the Pendiflex minute book kept outside the President's office. Faxon had a practice of keeping the board minutes in this folder. Brewer does not

---

**192.** "Company" refers to Faxon domestic by virtue of the language in section 2.1 that, "As used in the remainder of this Section 2 (other than Sections 2.3, 2.4 and 2.5), the term 'Company' shall include each of the Subsidiaries of the Company."

**193.** Plaintiffs' contention that these representations do not apply to minutes or board meetings regarding subsidiaries, such as Nihon Faxon, is without merit. The representations apply to the minute books of Faxon and to the meetings held by Faxon's board of directors. The fact that the subject matter of such minutes and meetings involve Faxon subsidiaries does not eliminate the representations.

remember Zuroff's actual instructions. She did not know whether the instruction meant not to place the June 30, 1994 board minute into the Pendiflex folder or minute book. Although there is more persuasive testimony and evidence that the minute books were not complete or correct or made available to Dawson with respect to the June 30, 1994 minute, it is not the function of this court to weigh the evidence. Rather, there is sufficient countervailing evidence to create material issues of fact as to the aforementioned representations.

Likewise, viewing the record in Dawson's favor for purposes of plaintiffs' summary judgment motion, there are material issues of fact as to whether plaintiffs breached section 2.5's representation that the minute books were: (1) complete on October 4, 1994; (2) correct on October 4, 1994; and (3) had been made available to Dawson by October 4, 1994.

 Turning to the fourth and fifth representations, whether the June 30, 1994 minute was "maintained in accordance with sound business practices" and whether the minute books "contain accurate" records "of all meetings held" is more problematic. The board minute is dated June 30, 1994, and states that a special meeting of the board "was held ... on June 30, 1994 at 2:00 p.m." The board minute also states that the board voted to convert $6 million of Nihon Faxon's intercompany debt into "paid in capital" which would "be effective immediately."

The undisputed testimony, however, is that the minute was not prepared on June 30, 1994, and was, instead, back dated to June 30, 1994.[194] Whether Dawson also back dated minutes is immaterial to the issue of whether plaintiffs breached section 2.5 by back dating a board minute wherein action was "effective immediately." Similarly,

whether Zuroff discussed the subject matter of the June 30, 1994 board minute with Connolly prior to the closing is not only disputed[195] but also immaterial to whether plaintiffs breached the representation that the minute books were maintained in accordance with sound business practices.[196] Furthermore, under section 9.1, Dawson's knowledge of facts determinable from any investigation does not affect Dawson's right to a remedy based on plaintiffs' breach of a section 2.5 representation.

Finally, plaintiffs' argument that Dawson did not assert any counterclaim until nearly two years after the closing is unavailing. Dawson asserted the claim by letter dated October 11, 1996, which falls within the two year time period in section 9.1. Likewise, Dawson's motivations for alleging plaintiffs' breach of section 2.5 do not impact the finding that plaintiffs breached a representation in section 2.5.

In sum, section 2.5 unambiguously represents that Faxon's board minutes had been maintained in accordance with sound business practices. It is undisputed that the board minute was not prepared in June 1994. Rather, it was prepared in or around September 1994 and back dated to June 30, 1994. To this limited extent, therefore, Faxon's board minutes were not maintained in accordance with sound business practices as a matter of law and plaintiffs breached the section 2.5 representation that such minutes were maintained in accordance with sound business practices.

Section 2.5 also unambiguously represents that Faxon's minute books contain "accurate" records of all meetings held. There is no evidence, except for the minute itself, that the meeting took place on June 30, 1994. Rather, the evidence shows that the meeting took place in August or September 1994.

---

**194.** Indeed, plaintiffs acknowledge in their papers that the minute was prepared in September 1994. Plaintiffs' counsel similarly stated at oral argument that, "It's undisputed that [the June 30, 1994 board minute] was prepared in mid-September."

**195.** Zuroff did not know whether he told Connolly that the board, in fact, voted on the recapitalization of Nihon Faxon's intercompany debt.

Rather, he only remembers discussing recapitalization as one approach to retaining Tsukuba University as a Nihon Faxon client.

**196.** Whether such knowledge is material to Dawson's counterclaims of fraud and negligent misrepresentation is not the subject of Dawson's motion. Both Dawson's and plaintiffs' motions seek determination on the alleged breach of section 2.5.

Inasmuch as the minute states that a meeting took place on June 30, 1994, with a board vote to convert $6 million of Nihon Faxon intercompany debt into paid in capital "effective immediately," the minute was not accurate. In this limited respect, therefore, the minute was not an accurate record of the meeting as a matter of law and plaintiffs breached the section 2.5 representation that Faxon's minute books contain "accurate" records of all meetings held.[197]

Viewing the record in Dawson's favor for purposes of plaintiffs' summary judgment motion, the minute books did not contain an accurate record of the June 30, 1994 board meeting inasmuch as this meeting did not occur on June 30, 1994. Similarly, back dating the minute to state that the meeting was held on June 30, 1994, is not in accordance with sound business practices. To state the obvious, plaintiffs are not entitled to summary judgment with respect to the fourth and fifth representations.

In sum, with respect to the alleged section 2.5 breach, neither Dawson nor plaintiffs are entitled to summary judgment on the first three representations. Dawson, however, is entitled to partial summary judgment to the effect that plaintiffs breached the fourth and fifth representations in the aforementioned manner.

### 3. *Remaining Section 2 Breaches*

As previously noted, plaintiffs move for summary judgment on Counterclaim V which alleges that plaintiffs breached the stock purchase agreement and the Turner agreement. Dawson's answers to interrogatory numbers 24 and 38 identify the misrepresentations made by plaintiffs in violation of sections 2.4, 2.5, 2.8 and 2.11. Dawson's October 11, 1996, set off letter elaborates upon these alleged breaches on the part of plaintiffs and additionally claims that plaintiffs breached sections 2.10, 2.14, 2.17 and 2.25. In seeking summary judgment on Counterclaim V, plaintiffs track a number of the alleged

breaches identified by Dawson in interrogatory numbers 24 and 38 and in the October 11, 1996 set off letter. Plaintiffs submit that they did not breach the warranties and representations in sections 2.4, 2.5, 2.8, 2.11, 2.13, 2.17 and 2.25. Following the format of plaintiffs' brief and having already addressed the breaches of sections 2.4 and 2.5, this court turns the remaining alleged breaches *seriatim* by section. (Docket Entry # 318, pp. 103–137).

■ Plaintiffs are not entitled to summary judgment on Counterclaim V on their alleged breach of section 2.8. Viewing the record in Dawson's favor, at a minimum there is a material issue of fact as to whether plaintiffs delivered a complete and accurate accounts receivable schedule to Dawson at the Closing.

■ Plaintiffs next move for summary judgment on Counterclaim V on the basis that they did not breach section 2.11. Section 2.11 consists of a representation made by plaintiffs with respect to the payment of taxes in certain tax returns listed in Schedule 2.11. Under section 2.11, plaintiffs represented that:

> The Company [198] has paid, or made provision for the payment of, all Taxes that have or may have become due pursuant to those Tax Returns [199] or otherwise, or pursuant to any assessment received by Sellers or the Company, except such Taxes, if any, .... (ii) which, if not paid, would not have a material adverse effect on the business or financial condition of the Company.

As set forth in Dawson's counterclaim and its October 11, 1996 set off letter, Dawson seeks to set off various amounts relative to taxes owed to: (1) Japanese tax authorities for Nihon Faxon; (2) The Massachusetts Department of Revenue ("the DOR") in connection with Apogee Holdings, Inc. ("Apogee"),

---

**197.** For reasons explained *infra* in part C(3), plaintiffs' additional arguments with respect to the alleged section 2.5 breaches are unavailing.

**198.** By virtue of the definition of the term "Company" in the last sentence of section 2.1, the term

"Company" in section 2.11 refers to Faxon and its subsidiaries.

**199.** "[T]hose Tax Returns" refers to the tax returns listed in schedule 2.11.

a Delaware corporation; and (3) a Canadian tax authority for Faxon Canada.[200]

As to Nihon Faxon, plaintiffs assert that the Nihon Faxon tax liability was a settlement in the amount of $29,185, and therefore did not have a materially adverse effect on Faxon. The October 11, 1996 set off letter, which elaborates upon the nature of Nihon Faxon's tax liability, claims a set off in the amount of the Japanese tax settlement of $29,185. (A.614–616). In response to plaintiffs' argument, Dawson simply refers to deposition testimony of Connolly wherein Connolly identified the set off letter and acknowledged his signature on the last page. (S.A. 23; Docket Entry # 357, pp. 41–42).

Section 2.11 excepts from the reach of the warranty those taxes "which, if not paid, would not have a material adverse effect on" Faxon's business or financial condition. Dawson does not adequately address this argument in its papers or argue for an alternative interpretation of section 2.11. Given the size and worth of Faxon, defined to include its subsidiaries for purposes of section 2.11, plaintiffs are thus entitled to summary judgment on Counterclaim V with respect to their alleged breach of section 2.11 as to the Nihon Faxon tax settlement in the amount of $29,185.

As an alternative basis to allow summary judgment, plaintiffs contend that the Nihon Faxon settlement resolved issues relative to the 1994 and 1995 tax years which are not encompassed within the section 2.11 warranty, i.e., they involve tax years not listed in schedule 2.11. The most recent tax return for Nihon Faxon listed in schedule 2.11 is for the tax year ending March 31, 1993. Neczy-

por, a tax partner at Deloitte, testified that Faxon reached a settlement with respect to an income tax examination in Japan relative to Nihon Faxon. A March 6, 1996 memorandum from Neczypor memorializing that Faxon was under examination reflects a settlement with Japanese tax examiners for the fiscal tax years 1994 and 1995. (P. 26, vol. I, pp. 123–127; P. 239). On this alternative basis, therefore, which Dawson does not adequately address, plaintiffs are entitled to summary judgment on Counterclaim V with respect to their alleged breach of section 2.11 as to the Nihon Faxon taxes.

Turning to the DOR, Dawson asserts that the DOR undertook a tax audit of Faxon raising questions about the tax nexus of Apogee to Massachusetts. Dawson's October 11, 1996 set off letter alleges that Faxon "may have exposure approaching $1,000,000." [201] (A.618). Plaintiffs argue that Faxon settled its liability with the DOR relative to Apogee and incurred zero liability. Plaintiffs therefore maintain that the DOR taxes relative to Apogee did not have a materially adverse effect on Faxon's business or financial condition.

Plaintiffs support their argument with Neczypor's testimony that the potential liability to the DOR with respect to Apogee was, in fact, zero. (P. 26, p. 149, vol.I). Plaintiffs therefore met their summary judgment burden which Dawson fails to adequately refute. Accordingly, plaintiffs are entitled to summary judgment on Counterclaim V with respect to their alleged breach of section 2.11 as to the DOR taxes in connection with Apogee.

---

**200.** The October 11, 1996 set off letter states that plaintiffs also breached section 2.14 of the agreement due to Faxon's failure to comply with the above described tax obligations. Plaintiffs state, in a footnote, that Dawson "attempts to cloak its [section 2 .11] claim under Section 2.14 (Legal Requirements)." Plaintiffs also add that section 2.14 "does not apply to tax issues, which are specifically governed by Section 2.11." (Docket Entry # 318, n. 81).

The agreement, however, does not expressly confine liability for nonpayment of taxes to section 2.11. Plaintiffs fail to point to any contractual language or to any direct conflict between the operation of the two sections to support their

two sentence argument. Absent further augmentation, their argument does not entitle them to summary judgment on those section 2.14 claims which might overlap Dawson's section 2.11 claims.

**201.** The claim letter, however, when used by Dawson, is simply an allegation of a breach of contract by Connolly. In other words, if plaintiffs offer sufficient summary judgment evidence, Dawson cannot rely solely on the letter to establish the material issue of fact that the taxes, if paid, would have a materially adverse effect on Faxon's business or financial condition.

As to Faxon Canada, plaintiffs point out that Dawson asserts only a potential liability to the Canadian tax authority and, thus, does not have an actual claim under section 2.11. Counterclaim V alleges that if the Canadian tax authority determines that additional taxes must be paid by Faxon Canada, then plaintiffs will be liable to Dawson to the extent of such additional taxes. Dawson's October 11, 1996 set off letter advises plaintiffs of this potential liability.

Damages constitute an essential element to Dawson's breach of contract claim. *Guckenberger v. Boston University,* 974 F.Supp. at 150 (the "plaintiff must allege ... that the breach caused the plaintiff damage"); *Singarella v. City of Boston,* 342 Mass. 385, 173 N.E.2d 290, 291 (1961) ("essential" element in breach of contract is that "the plaintiffs have suffered damage"). Until Dawson suffers a loss or damages caused by plaintiffs' breach of section 2.11, plaintiffs are only potentially liable to Dawson. Plaintiffs thus pointed to the absence of evidence to support Dawson's breach of contract claim which Dawson failed to refute. *See Dow v. United Brotherhood of Carpenters,* 1 F.3d 56, 58 (1st Cir.1993); *see also McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir.1995). Plaintiffs are therefore entitled to summary judgment on Counterclaim V with respect to their alleged breach of section 2.11 as to the Canadian taxes.[202]

Plaintiffs next move for summary judgment on Counterclaim V insofar as they did not breach section 2.13 of the agreement. Under section 2.13, plaintiffs represented that, except for plans and agreements listed in schedule 2.13, Faxon had not "within the last five years maintained, ... adopted, ... or obligated itself ... to pay any benefits ... with respect to" any ERISA employee pension benefit plan, ERISA employee welfare benefit plan, "a collective bargaining agreement ..., employment agreements, ... or any other benefit, program, or contract, whether or not written...." Section 9.1 allowed for the survival of representations in section 2.13 until the applicable statute of

limitations with respect to employee benefit plans had elapsed.

By letter dated February 4, 1997, Dawson alleged that plaintiffs breached section 2.13 by not listing in schedule 2.13 life insurance policies for two former Faxon employees and retirement payments to one former Faxon employee. According to Dawson, in or around 1977 Albert H. Davis promised Faxon officers who reached retirement age that certain policies would be kept in force for the duration of the officers' lives. Dawson therefore asserted a claim under section 2.13 for reimbursement of the $72,817 in past payments and the $180,265 in estimated future payments for the aforementioned Faxon officers. (S.A. 52; P. 245).

Plaintiffs argue that: (1) they disclosed the life insurance premium payments by letter dated September 29, 1994; (2) section 2.13 did not encompass the payments because the 1977 agreement by Albert H. Davis was not an employee benefit plan maintained in the last five years; and (3) Dawson's claim was time barred because the exception to the two year limit in section 9.1 only applied to "Employee Benefit Plans" as opposed to the 1977 life insurance agreements.

As to the first argument, the language of the first sentence of section 2.13 makes clear that the representations and warranties in section 2.13 apply to plans and contracts not listed in schedule 2.13 which have been maintained by Faxon within the last five years as of October 1994. There are no facts indicating that the aforementioned policies are not listed in schedule 2.13. The September 29, 1994 facsimile consists of an incomplete draft of the proposed schedules to the agreement and includes a statement of premiums due for two of the former Faxon employees. Such parol evidence cannot contradict the absence of this invoice from the schedule 2.13 as it appears in the final agreement.

With respect to the second argument, plaintiffs' letter in reply to Dawson's February 4, 1997 set off letter further elucidates this argument. (P. 246). Therein, plaintiffs

**202.** This ruling does not effect Dawson's ability to raise this claim in the future if Faxon does incur taxes for Faxon Canada's tax return for the

year ending March 31, 1993, which have a materially adverse effect on Faxon's business or financial condition.

state that the life insurance policy agreement "was adopted in 1977–1978" and that section 2.13 does not apply to agreements "adopted more than five years before the closing." The language of the first sentence of section 2.13 belies plaintiffs' argument. Section 2.13 applies to contracts maintained in the last five years as well as to contracts adopted or sponsored in the last five years as of October 1994. Plaintiffs do not cite to any facts which indicate that Faxon did not maintain the aforementioned benefits within the last five years. Accordingly, they are not entitled to summary judgment on this basis.

Turning to plaintiffs' third argument, the two year limit in section 9.1 does not apply to representations made in section 2.13. Rather, such representations survive until the statute of limitations applicable to employee benefit plans has elapsed. The language of section 9.1 is as follows:

> **9.1 SURVIVAL.** All representations and warranties in this Agreement . . . will survive the Closing until the second anniversary of the Closing Date, except that the representations and warranties in **Sections 2.11 and 2.13** will survive until all applicable statutes of limitations with respect to the Tax Returns and the Employee Benefit Plans have elapsed. . . .

Plaintiffs misread the reference to employee benefit plans in section 9.1 as restricting the type of representation which survives the two year time limit. The reference to employee benefit plans simply defines the time period of survival and not the representations which survive the two year time limit. By its terms, section 9.1 states that the representations in section "2.13 will survive" and then simply sets the applicable time period for survival.

 Plaintiffs next seek summary judgment with regard to Counterclaim V for their liability for breach of section 2.17. Their sole argument is that the subject matter of the set off, Faxon's settlement for $29,680 in connection with Faxon's agreement to indemnify S.Y. Jun ("Jun") of Faxon Korea ("the Jun indemnification agreement"), was listed in schedule 2.17. Dawson's October 11, 1996 set off letter asserts a claim that plaintiffs breached section 2.17 by failing to deliver a complete and accurate list of "Applicable Contracts" which, by definition, included indemnity agreements. In the October 11, 1996 set off letter, Dawson additionally alleges that under the Jun indemnification agreement Faxon agreed to indemnify Jun for all costs associated with Jun's personal guarantees of performance bonds with Faxon clients. (A.619).

Under section 2.17 plaintiffs represented that, "*Schedule 2.17* contains a complete and accurate list . . . of all Applicable Contracts described in (i) through (xv) below. . . . ." Item (vii) in section 2.17 identified "each agreement providing for the Company to indemnify any Person" as falling within the definition of "Applicable Contracts." Plaintiffs' failure to list the Jun indemnification agreement in schedule 2.17 would therefore contravene the representation that the list was "complete and accurate."

Plaintiffs submit that item eight in schedule 2.17 includes the Jun indemnification agreement. Item eight in schedule 2.17 does not expressly refer to the Jun indemnification agreement or to indemnification agreements in general. Rather, item eight identifies "Performance Bonds for the benefit of customers in Korea, the aggregate amount of which is not more than $8,000,000."

Viewing the record in Dawson's favor as the nonmovant, Zuroff testified that Jun entered into guarantee[s] with a client personally guaranteeing performance of the client's contract and that Faxon agreed to indemnify Jun in the event of a default. (P. 21, pp. 136–138, vol. VII). Because Jun's agreement with the client was effectively a performance bond, Zuroff testified that "to some extent" the agreement was disclosed in item eight. He also testified, however, that he did not see a line item in schedule 2.17 identifying "an indemnification letter with Se–Yung."[203] Zuroff's testimony (P. 21, pp. 138–139, vol. VII) is equivocal and supports both Dawson's position that the indemnification agreement was not listed in schedule 2.17 as well as plaintiffs' position that the indemnification agreement was a performance bond listed in

---

**203.** Documents refer to Jun's full name as "Se-

Yung Jun" or "Jun Se Yung." (P. 191 & 240).

item eight of schedule 2.17. The documents cited by plaintiffs to support their position (P. 191, 240 & 242) do not establish that the Jun indemnification agreement was listed in item eight of schedule 2.17 as a matter of law. The language of item eight identifies "Performance Bonds" and schedule 2.17 does not expressly identify the Jun indemnification agreement. Plaintiffs are therefore not entitled to summary judgment that they did not breach section 2.17.

■ Plaintiffs also seek summary judgment to the extent that they did not breach section 2.25 of the agreement. Dawson's October 11, 1996 set off letter and paragraphs 76 and 77 of their counterclaim set forth the alleged section 2.25 breach.[204] Dawson submits that plaintiffs breached section 2.25(b), as well as section 2.25(a),[205] because they failed to reflect the financial condition of Nihon Faxon, including its inability to pay its intercompany debt to Faxon domestic.

Section 2.25(b) is an undeniably broad representation. Therein, plaintiffs represented that:

> There is no fact known to any Seller that has specific application to any Seller or the Company (other than general economic or industry conditions) and that materially adversely affects the assets, business, prospects, financial condition, or results of operations of the Company that has not been set forth in this Agreement or the Schedules attached hereto.

In seeking summary judgment, plaintiffs contend that they disclosed the material facts

pertaining to Nihon Faxon prior to the closing. They also argue that the representation did not extend to Faxon subsidiaries. As to the latter argument, section 2.1 defines the term "Company" as including the subsidiaries in section 2, except for sections 2.3, 2.4 and 2.5. The term "Company" in section 2.25 therefore includes Nihon Faxon.

As to the former argument, section 2.25(b) does not limit the representation to only those facts not known by Dawson. Instead, the language is that, "There is no fact known to any Seller." In other words, section 2.25(b) does not read that, "There is no fact known to any Seller [and unknown to Dawson]."

While not argued by plaintiffs, the heading of section 2.25 is entitled "Disclosure." The parties expressly agreed in section 11.8, however, that, "The headings of Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation."

The focus and the language of section 2.25(b) is upon facts known to plaintiffs which are not set forth or disclosed in the agreement or the attached schedules. Absent a more specific argument,[206] plaintiffs are not entitled to summary judgment on Dawson's contract claim that they breached section 2.25(b) of the agreement.[207]

Finally, plaintiffs seek a declaration that they are entitled to an acceleration of the installment payments due under the notes. (Docket Entry # 318, pp. 12 & 57–59). In

---

**204.** As a technical matter, the breach of contract counterclaim only incorporates paragraphs 1 through 69. (Docket Entry # 312, ¶ 104). The allegations concerning the alleged breaches of section 2.13 and 2.25 appear in paragraphs 73 through 77. Dawson should therefore seek leave to amend its amended counterclaim to incorporate these paragraphs into the breach of contract counterclaim.

**205.** Plaintiffs do not distinguish between section 2.25(a) and 2.25(b) in their supporting memorandum. The counterclaim refers to both section 2.25(a) and 2.25(b) and, thus, liability under either 2 .25(a) or 2.25(b) suffices as a reason to deny summary judgment.

**206.** Instead of developing this argument, plaintiffs simply note that Dawson's receipt of the

information and plaintiffs' disclosure of the material facts pertaining to Nihon Faxon "is set forth in more detail in the section addressing Dawson's fraud claims," which is 41 pages in length. Whereas knowledge might foreclose a fraud claim due to the absence of reasonable reliance, it does not necessarily foreclose a breach of contract claim where knowledge on the part of the promisee is not made an express part of the promise and the promisee and promisor are sophisticated business entities or individuals represented by attorneys.

**207.** Because there are material issues of fact concerning plaintiffs' breach of certain representations and warranties in the agreement, plaintiffs' additional argument that Dawson improperly set off legal fees (Docket Entry # 318, p. 137) is unavailing at this point in time.

light of the genuine issues of material fact surrounding the majority of Dawson's claimed accounts receivable and breach of warranty set offs, plaintiffs are not, at this stage in the proceedings, entitled to bring an action for breach of the total agreement. *See Restatement (Second) of Contracts* § 243(3) (1981) (where only remaining duties of breaching party are to pay money in unrelated installments, his breach of less than the whole, whether or not followed by repudiation, "does not give rise to a claim for damages for total breach"). For similar reasons, plaintiffs' request for attorneys fees and costs (Docket Entry # 318, pp. 156–157) is without merit.

### D. PLAINTIFFS' FRAUD AND CHAPTER 93A CLAIMS

Dawson next seeks partial summary judgment on plaintiffs' claims of fraud and violation of chapter 93A.[208] (Docket Entry # 296, p. 1). Plaintiffs' fraud claim appears in Count III and plaintiffs' chapter 93A claim appears in Count IV of the amended complaint. (Docket Entry # 241). The viability of each claim in the face of Dawson's summary judgment motion is discussed separately.

#### 1. *Plaintiffs' Fraud Claim*

Plaintiffs' amended complaint and its briefing papers set forth seven allegations of fraud.[209] The six allegations which plaintiffs outline in detail under separate headings in Count III of the amended complaint are as follows: (1) Dawson's change in the revenue recognition policy for Turner from the policy used in the Turner interim balance sheet to a different revenue recognition policy in the Turner closing balance sheet; (2) Dawson's misrepresentation that Baron voluntarily left Faxon's employ and that Faxon incurred a liability to pay him severance; (3) Dawson's misrepresentation in its December 23, 1994 set off letter that Deloitte had determined the adjusted closing net Worth; (4) Dawson's

misrepresentations that it had not received the July consolidating financials prior to the closing; (5) Dawson's misrepresentation that plaintiffs had not delivered the accounts receivable schedule as required under section 2.8 of the agreement; and (6) Dawson's misrepresentations of its intent to pay the purchase price. (Docket Entry # 241, ¶¶ 76–103).

In addition to the foregoing, Count III incorporates prior paragraphs in the amended complaint which refer to Dawson's shredding of due diligence material. Plaintiffs' memorandum in opposition to Dawson's summary judgment motion on plaintiffs' fraud and chapter 93A claims clarifies that plaintiffs also allege that Dawson's ongoing shredding of due diligence material was fraudulent. (Docket Entry # 332, pp. 26–29 & 52–55). Finally, plaintiffs' memorandum in opposition bases the entirety of their fraud claim on the premise, noted in item six above, that Dawson misrepresented its intention to pay the purchase price and intended "to make predetermined spurious claims for set offs based upon fraudulent and deceptive manipulations of the adjustment mechanisms in" the stock purchase agreement and in the Turner agreement. (Docket Entry # 332). Plaintiffs essentially allege that Dawson never intended to make the installment payments and instead intended to take improper set offs as a means to avoid its contractual obligation to pay the remainder of the purchase price.

In Massachusetts, the elements of a fraud claim include a false statement of material fact made with knowledge of its falsity, reliance on the statement and damages resulting therefrom. "A claim for misrepresentation requires that a plaintiff show a false statement of material fact made to induce the plaintiff to act and reliance on the false statement by the plaintiff to his detriment." *McEneaney v. Chestnut Hill Realty Corporation*, 38 Mass.App.Ct. 573, 650

---

**208.** Dawson's actual summary judgment motion simply seeks summary judgment on the issues raised in its memorandum in support of summary judgment on plaintiffs, fraud and chapter 93A claims. (Docket Entry # 257).

**209.** The amended complaint does not include a count for breach of the duty of good faith and fair dealing and it is not the function of this court to reconstruct plaintiffs' pleadings on plaintiffs' behalf.

N.E.2d 93, 96 (1995), *review denied,* 420 Mass. 1107, 652 N.E.2d 146 (1995); *accord Danca v. Taunton Savings Bank,* 385 Mass. 1, 429 N.E.2d 1129, 1133 (1982); *see Elias Brothers Restaurants, Inc. v. Acorn Enterprises, Inc.,* 831 F.Supp. 920, 922–923 (D.Mass.1993) (stating above elements as required for the defendant's fraudulent inducement counterclaim); *VMark Software, Inc. v. EMC Corporation,* 37 Mass.App.Ct. 610, 642 N.E.2d 587, 593 n. 9 (1994). Fraudulent misrepresentation or an action for deceit, as alleged by plaintiffs (Docket Entry # 241, ¶¶ 82, 89, 94 & 96), requires the showing that the defendant made the false representation of material fact with knowledge of its falsity. *Town & Country Fine Jewelry Group, Inc. v. Hirsch,* 875 F.Supp. 872, 876 (D.Mass.1994); *Bolen v. Paragon Plastics, Inc.,* 754 F.Supp. 221, 226 (D.Mass.1990). As noted above, it also requires proof of damages flowing from the misrepresentation. *Ravosa v. Zais,* 40 Mass.App.Ct. 47, 661 N.E.2d 111, 117 n. 12 (1996), *review denied,* 422 Mass. 1108, 664 N.E.2d 1198 (1996); *see Turner v. Johnson & Johnson,* 809 F.2d 90, 95 (1st Cir.1986) (recognizing that one of the elements of common law fraud is "the plaintiffs were injured as a result of their reliance").

■■■ It is also true that a false statement of material fact may encompass statements as to future conduct under certain circumstances. *See Logan Equipment Corporation v. Simon Aerials, Inc.,* 736 F.Supp. 1188, 1200 (D.Mass.1990) (setting forth exceptions to general rule that promissory statements of future events are not actionable). "[S]tatements of present intention as to future conduct," such as statements that a party would pay the installments due in the future as part of the purchase price in a contract, "may be the basis for a fraud action if ... the statements misrepresent the actual intention of the speaker and were relied upon by the recipient to his damage." [210] *McEvoy Travel Bureau, Inc. v. Norton Company,* 408 Mass. 704, 563 N.E.2d 188, 192 (1990); *accord Starr v. Fordham,* 420 Mass. 178, 648 N.E.2d 1261, 1267 (1995) (same); *Schinkel v. Maxi–Holding, Inc.,* 30 Mass.App.Ct. 41, 565

N.E.2d 1219, 1224 (1991), *review denied,* 409 Mass. 1104, 569 N.E.2d 832 (1991); *see, e.g., Compagnie De Reassurance v. New England Reinsurance,* 57 F.3d 56, 82–83 (1st Cir. 1995), *cert. denied,* 516 U.S. 1109, 116 S.Ct. 564, 133 L.Ed.2d 490 (1995). Innocent misrepresentations do not create such liability inasmuch as the plaintiff must show that " 'the defendant made a false representation of a material fact with knowledge of its falsity.' " *Compagnie De Reassurance v. New England Reinsurance,* 57 F.3d at 73 (citation omitted). In other words, the false statement of a present intent to do the future act must misrepresent the actual intent of the speaker. *See Schinkel v. Maxi–Holding, Inc.,* 565 N.E.2d at 1224; *Town & Country Fine Jewelry Group, Inc. v. Hirsch,* 875 F.Supp. 872, 876 (D.Mass.1994).

■■■ "[M]ere nondisclosure," absent a duty to speak such as with a misleading partial disclosure, "generally will not support any cause of action for misrepresentation." *Logan Equipment Corporation v. Simon Aerials, Inc.,* 736 F.Supp. at 1200; *accord Greenery Rehabilitation Group, Inc. v. Antaramian,* 36 Mass.App.Ct. 73, 628 N.E.2d 1291, 1294 & n. 5 (1994), *review denied,* 417 Mass. 1103, 634 N.E.2d 120 (1994). Fraudulent nondisclosure may nevertheless occur where, for example, the seller sold and designed a product to include a particular part, had actual knowledge that the part had not been installed in the product sold to the buyer and, knowing that the part was missing, knew that it was responsible for the product's malfunction. *Cambridge Plating Company, Inc. v. Napco, Inc.,* 85 F.3d 752, 757 & 764–765 (1st Cir.1996).

■■■ As noted above, a claim for misrepresentation requires a showing of reliance on the part of the plaintiff. Where the parties, represented by counsel, proceed to negotiate and agree to the terms of an integrated contract, however, a plaintiff with considerable business intelligence should not be able to claim reliance on a representation made during negotiations which directly conflicts with the terms of the integrated contract. *See Turner v. Johnson & Johnson,* 809 F.2d 90,

---

**210.** This theory forms the basis for plaintiffs' overriding fraud claim that Dawson never intended to pay the purchase price but instead intended to take spurious set off claims.

96 (1st Cir.1986) (contract clause stating no obligation to market product vitiated misrepresentation claim grounded on buyer's oral promise to promote product); *McEvoy Travel Bureau, Inc. v. Norton Company*, 408 Mass. 704, 563 N.E.2d 188, 193–194 (1990) (affirming jury's fraud finding that the defendant misrepresented its intentions to enter into longterm contract with the plaintiff); *see also Starr v. Fordham*, 420 Mass. 178, 648 N.E.2d 1261, 1268 (1995); *Elias Brothers Restaurants, Inc. v. Acorn Enterprises, Inc.*, 831 F.Supp. 920, 924–926 (D.Mass.1993); *Greenery Rehabilitation Group, Inc. v. Antaramian*, 36 Mass.App.Ct. 73, 628 N.E.2d 1291, 1293 (1994), *review denied*, 417 Mass. 1103, 634 N.E.2d 120 (1994) (citing *Turner*, denying fraud claim and noting that buyer urged that agreement provide for survival of representations beyond date of agreement while seller insisted the contrary and agreement had provisions indicative of compromise); *see, e.g., McCartin v. Westlake*, 36 Mass.App.Ct. 221, 630 N.E.2d 283, 289–290 (1994).

In *McEvoy*, the Massachusetts Supreme Judicial Court ("the SJC") distinguished *Turner* in two important respects. First, the alleged fraud in *Turner* took place during negotiations as opposed to immediately prior to the signing of the contract. *McEvoy Travel Bureau, Inc. v. Norton Company*, 563 N.E.2d at 193. Although liability more typically occurs when the misrepresentation is made at the time of the contract's execution, liability may still attach to an earlier misrepresentation if the "misrepresentation was still operative" at the time of the contract's execution.[211] *McEvoy Travel Bureau, Inc. v. Norton Company*, 563 N.E.2d at 194. Second, the SJC emphasized that *Turner* involved an integrated agreement whereas McEvoy and Norton had a longstanding oral arrangement, memorialized in written contracts in 1981, 1982 and 1983, and the jury could have found that the parties did not intend the written contract to represent their full and complete understanding. *McEvoy Travel Bureau, Inc. v. Norton Company*, 563 N.E.2d at 193–194 & n. 7; *accord Steinke v. Sungard Financial Systems, Inc.*, 121 F.3d 763, 771 n. 6 (1st Cir.1997).

▬▬ Finally, it is equally true that a party cannot be allowed to engage in fraud to induce the other party to agree to the terms of a contract. *McEvoy Travel Bureau, Inc. v. Norton Company*, 563 N.E.2d at 194 (noting that, " 'the law long ago abandoned the position that a contract must be held sacred regardless of the fraud of one of the parties in procuring it' "). Nor is the parol evidence rule a bar to alleged misrepresentations where "the complaining party alleges fraud in the inducement." *McEvoy Travel Bureau, Inc. v. Norton Company*, 563 N.E.2d at 193 n. 5; *accord Town & Country Fine Jewelry Group, Inc. v. Hirsch*, 875 F.Supp. 872, 876 (D.Mass.1994) ("fraud in inducement of a written contract may be proven by evidence external to the contract").

▬▬ With respect to the Turner allegation, Dawson initially argues that the rulings of the district judge foreclose consideration of the Turner claim. Dawson essentially asserts that the law of the case doctrine bars reconsideration of the Turner claim by this court. This court's previous discussion of this doctrine need not be repeated.

The issue decided by the district judge on July 8, 1996, involved the ten day delay of the Turner audit report in the context of a time of the essence clause under Massachusetts law. As explained in greater depth in the factual background, she denied reconsideration on procedural grounds and therefore did not by necessary implication decide plaintiffs' substantive arguments in plaintiffs' motion for reconsideration. *See DeWeerth v. Baldinger*, 38 F.3d 1266, 1277 (2nd Cir.), *cert. denied*, 513 U.S. 1001, 115 S.Ct. 512, 130 L.Ed.2d 419 (1994) (doctrine only " 'applies

**211.** In other words, plaintiffs' assertions of a misrepresentation based on statements that Dawson was available as a back stop with cash available or that its offer would be an all cash offer must be in effect at the time the parties executed the stock purchase agreement in order to succeed on this fraud claim. At the time of execution of the stock purchase agreement, however, these representations were no longer operative. Intervening events, including subsequent negotiations to pay the purchase price by installments, demonstrate that the misrepresentations were no longer viable.

to issues that have been decided either expressly or by necessary implication;'" citations omitted); *Royal Insurance Company of America v. Quinn–L Capital Corporation,* 3 F.3d 877, 880 (5th Cir.1993), *cert. denied,* 511 U.S. 1032, 114 S.Ct. 1541, 128 L.Ed.2d 193 (1994) (same); *see also* James Wm. Moore 18 *Moore's Federal Practice* ¶ 134.20[3] (1997) (doctrine does not extend to issues which the court did not address). Accordingly, the law of the case doctrine does not foreclose review of the substance of plaintiffs' fraud claim based on the Turner agreement.

■ With respect to the substance of the Turner/fraud claim, plaintiffs complain about Dawson's change in the Turner interim balance sheet's revenue recognition policy to the Turner closing balance sheet's revenue recognition policy. They allege that Dawson misrepresented that it had taken a set off in accordance with sections 1.5 and 1.6 of the Turner agreement and intended that plaintiffs rely on this misrepresentation. According to plaintiffs, Dawson took an improper set off because it had Deloitte change the revenue recognition policy from the recognition of revenue in the period in which Turner billed its customers to the recognition of revenue at the time in which the subscription begins. Dawson then concealed this change from plaintiffs as well as its engagement letter with Deloitte (P. 163) wherein Deloitte and Dawson agreed that the purpose of the audit was not to determine a purchase price adjustment but rather to evaluate the fairness of Turner's balance sheet as of September 30, 1994, in accordance with GAAP. Plaintiffs submit that this improper set off supports their fraud claim that Dawson never intended to pay the purchase price for Faxon.

With Dawson having pointed to the absence of evidence to support this fraud theory as well as to the deficiencies of the theory itself, plaintiffs fail to adequately support their claim. Furthermore, plaintiffs had more than ample opportunity to support their claim via two additional rounds of briefing after Dawson's supplemental reply and after argument on the summary judgment motion.

First, the evidence establishes that there was no change in revenue recognition policy between the Turner interim balance sheet and the audit of Turner as of September 30, 1994. Prior to the September 20, 1994 Turner sale, Turner was a wholly owned subsidiary of Faxon. (S.A.258). Consolidated financial statements for Faxon prior to the Turner sale demonstrate that Faxon recognized revenue in the period in which the subscription began. Likewise, the Turner closing balance sheet deferred revenue to the period in which the subscription began. The Faxon closing balance sheet as of October 2, 1994, reflects a change in Faxon's revenue recognition policy which post dates the Turner sale and is therefore irrelevant to the issue of whether Turner changed its revenue recognition policy. The change in revenue recognition between the unaudited interim balance sheet of Faxon and the closing balance sheet of Faxon also does not establish a factual issue that Turner used a policy to recognize revenue upon billing in the Turner interim balance sheet.

More importantly and in the alternative, any change in Turner's revenue recognition policy between the Turner interim balance sheet and the Turner audit is immaterial to the propriety of Dawson's Turner set off. Contrary to plaintiffs' assertion, the Turner agreement does not require adjustments to make the revenue recognition policy used in the Turner interim balance sheet consistent with the revenue recognition policy used in the Turner closing balance sheet. Notably, there are no adjustments required under section 1.5 of the Turner agreement. In contrast, the parties knew how to require such adjustments and expressly did so in subsections 1.5(a) through (g) of the Faxon stock purchase agreement.

Section 1.5 of the Turner agreement expressly and unambiguously allows Dawson to take a purchase price adjustment if the net worth figure of Turner as of September 30, 1994, as shown on the Turner closing balance sheet fell below $1,212,540. Dawson could then take a purchase price adjustment for every dollar that the net worth figure was below "$1,462,540, which is the Company's net worth as shown on the Interim Balance

Sheet." The parties agreed to the figures set forth in section 1.5 which are unambiguous.

Further, section 1.6 required Dawson to cause Deloitte to audit the closing balance sheet of Turner in accordance with GAAP as of September 30, 1994.[212] The reference to the interim balance sheet in section 1.5 did not require Deloitte to use the same revenue recognition policy as the one used in the interim balance sheet. Section 1.6 simply required Deloitte to conduct an audit of the closing balance sheet of Turner as of September 30, 1994, in accordance with GAAP. If the net worth figure therein fell below the figure in section 1.5, then Dawson could take an adjustment.[213]

In short, the change in revenue recognition policy, if any, has no bearing on the propriety of Dawson's purchase price adjustment under sections 1.5 and 1.6 of the Turner agreement. Hence, there is no showing that Dawson's purchase price adjustment was not in accordance with sections 1.5 and 1.6 of the Turner agreement. Simply put, there was no false misrepresentation of a material fact. Nor was there a concealment of a material fact under circumstances which would require a disclosure. Dawson's Turner purchase price adjustment therefore cannot and does not support plaintiffs' fraud theory that Dawson never intended to pay the purchase price. It also does not support an independent fraud claim.

■ Turning to plaintiffs' allegation of fraud in connection with Faxon's obligatory severance payment to Baron, plaintiffs theorize that Dawson again took an improper set off under the agreement. They contend that

Dawson concealed its efforts to orchestrate Baron's resignation in order to rehire him and to have plaintiffs compensate Baron under the severance agreement. Plaintiffs characterize the entire transaction as "a sham." (Docket Entry # 241, ¶ 87; Docket Entry # 332, pp. 25 & 55).

A so called "sham transaction," however, does not necessarily establish the elements of a fraud claim. Where, as here, Dawson pointed to the absence of evidence to support plaintiffs' claim that the severance charge was improper, plaintiffs had an obligation to set forth sufficient facts to avoid summary judgment.

Irrespective of whether plaintiffs waived this claim, there is no showing that Baron's resignation was not a "voluntary termination" within the meaning of schedule 9.2. The Plan allowed Baron, a named employee, to terminate his employment with Faxon "for any reason." It is undisputed that Baron sent Ingleby a resignation letter and that he claimed a right to severance pay. Faxon therefore incurred liability under the Plan within the meaning of schedule 9.2 thereby triggering plaintiffs' obligation to indemnify Dawson for the claim under section 9.2 of the agreement. The fact that Baron discussed an ongoing employment arrangement involving 40% of his time at the same time that he tendered his resignation letter does not, without more, establish a factual issue that he did not voluntarily terminate his employment with Faxon.[214] Nor does it evidence that Faxon did not incur a liability to pay Baron severance under the terms of the Plan which allowed Baron to terminate his em-

212. Whether Faxon's closing balance sheet was audited in accordance with GAAP is irrelevant to whether Turner's closing balance sheet was audited in accordance with GAAP. It is also irrelevant to whether Dawson took a proper purchase price adjustment in accordance with the Turner agreement. Plaintiffs fail to sufficiently support their argument that GAAP does not require deferral of revenue. Moreover, in oral argument, plaintiffs' counsel acknowledged that, "it may be that the revenue recognition policy they used was GAP (sic), but so is the one that was used in the interim balance sheet. *GAP (sic) is not the issue.* It's using a different policy...." (Docket Entry # 366; emphasis added).

Plaintiffs' assertion that Dawson should have disclosed the engagement letter also fails to support their fraud theory that Dawson never intended to pay the purchase price or that Dawson took an improper purchase price adjustment under the Turner agreement. In addition to other reasons, section 1.6 simply required Deloitte to conduct an audit in accordance with GAAP.

213. The Turner agreement, like the Faxon stock purchase agreement, contains an integration clause in section 7.5.

214. This court assumes that Baron performed similar tasks at Westwood in the course of his subsequent employment with Dawson.

ployment with Faxon "for any reason whatsoever." In short, there was no false representation of fact in the December 19, 1994 letter wherein Dawson states that Baron "voluntarily terminated" his "employment with Faxon" and that "Faxon has incurred a liability." There was no duty to disclose Dawson's subsequent employment arrangement with Baron involving duties related to Faxon. Inasmuch as the agreement allowed the set off, the set off was proper and does not support plaintiffs' contention that Dawson never intended to pay the purchase price but rather set about devising ways to claim spurious set offs.

▆▆▆ Plaintiffs also cite to Ingleby's shredding of Faxon due diligence material as supporting their fraud claim. (Docket Entry # 241, ¶¶ 46 & 75). They set forth the parameters of the claim in further detail in their opposition memorandum and at oral argument. In the memorandum, plaintiffs state that they "do not allege that the shredding of due diligence materials is in itself a misrepresentation of fact." Rather, they assert that Ingleby's shredding of documents "contradicts Dawson's representations as to plaintiffs' alleged failure to provide financial due diligence materials to Dawson before the acquisition." (Docket Entry # 332, p. 54). Similarly, at oral argument, plaintiffs' counsel stated that Dawson was "basing their set off and breach of warranty claims on the nondisclosure of information that they had previously shredded." Plaintiffs' counsel later reaffirmed "that the shredding of the information goes to the fact that . . . after you shred the documents, [you] specifically assert and take a multimillion dollar set off claim based on the nondisclosure of financial information when you have shredded the fi-

nancial files that would contain that documentation." [215] (Docket Entry # 366).

The primary nondisclosure about which plaintiffs complain in connection with their shredding argument is the July 1994 financials prepared on September 9. This fraud allegation is set forth in paragraphs 91 to 94 of the amended complaint. (Docket Entry # 241). By letter dated April 10, 1995, Dawson claimed a $6,641,404 set off for damages due to plaintiffs' alleged breach of representations and warranties in the agreement. Therein, Ferber notes that the interim balance sheet reflected losses of $5,347,000 whereas the actual number was $6,857,000 which was reflected in the undisclosed financial statements prepared on or about September 9, 1994. By letter dated May 9, 1994, Ferber wrote that, "Dawson categorically denies that" it "obtained copies of all regularly generated financial reports, including the July 31, 1994 statements prepared September 9." (P. 200 & 205).

Dawson therefore made a representation of fact that it had not received the July 1994 consolidated financials. There is more than enough evidence to show that this representation was false at the time it was made. As explained in greater detail in the factual background, these financials were faxed to Ferber on September 16, 1994, and in January 1997 Dawson acknowledged the likelihood that the July 1994 consolidated financials were in its possession prior to the closing.

As Dawson points out, however, plaintiffs did not rely on Dawson's representation. Rather, plaintiffs disputed and litigated Dawson's alleged nonreceipt of the July consolidated financials vigorously. As a result, in January 1997 Dawson formally acknowledged

---

**215.** In other words, plaintiffs correctly conceded that the shredding of documents is not a misrepresentation and does not, in and of itself, set forth an independent fraud claim. Dawson's motion, as it pertains to the alleged shredding, is therefore allowed in this limited respect.

The shredding is nevertheless relevant to plaintiffs' chapter 93A claim as well as to Dawson's fraud claim inasmuch as reliance might not be justified or reasonable if Dawson had documents showing the true financial condition of Nihon Faxon. Viewing the facts in plaintiffs' favor, Ingleby testified that he had a practice through-

out 1994 of discarding unwanted documents and that it was not until October 1995 that he retained materials relevant to Faxon. Plaintiffs are therefore not foreclosed from raising Ingleby's practice throughout 1994 of discarding unwanted material from his files at trial, unless precluded by the trial judge.

In the context of shredding and fraud, plaintiffs primarily cite to the representation that Dawson had not received the July consolidated financials (Docket Entry # 332, pp. 54–55) which this court, therefore, now addresses.

the likelihood that it had received the information in the July consolidated financials prior to the closing.

In addition to the absence of reliance, plaintiffs also fail to show damages, another essential element of a fraud claim.[216] In its October 11, 1996 claim letter, Dawson restated its April 10, 1995 breach of representations and warranties claim.[217] In no uncertain terms, Dawson states that it is the October 11, 1996 claim letter which defines the scope of its claim that plaintiffs breached the representations and warranties in the agreement. (Docket Entry # 296). The October 11, 1996 letter omits reference to the nondisclosure prior to the closing of the July consolidated financials prepared on September 9, 1994. In January 1997 Dawson states, in answer to an interrogatory, that it is likely that Dawson had the information from the July consolidated financials in its possession prior to the closing. Dawson also acknowledges that Zuroff faxed these financials to Ferber prior to the closing. Notwithstanding ample opportunity, plaintiffs neither adequately address nor identify the damages they suffered as a result of their reliance on the representation of the nonreceipt of the July consolidated financials. The misrepresentation by Dawson of its nonreceipt of the July consolidated financials therefore does not set forth an independent fraud claim and is therefore subject to summary judgment.

■■■ Plaintiffs also ground their fraud claim on the implicit representation in the December 23, 1994 claim letter that Deloitte had determined the adjusted closing net worth of Faxon. Even assuming that the December 23, 1994 letter makes a representation of fact that Deloitte had done the determination, Dawson points out, correctly, that plaintiffs did not rely on the representation. To the contrary, by letter dated March 30, 1995, Bronson informed Ferber that it had come to the sellers' attention that Deloitte had not determined the adjusted closing net worth as required under subsection

1.6(b) of the agreement. (P. 194). On April 10, 1995, Ferber acknowledged that Bronson was "correct that the Adjusted Closing Net Worth furnished to Sellers was not determined by Deloitte." (P. 201). Given the absence of reliance, Dawson is entitled to summary judgment with respect to the fraud claim based on the December 23, 1994 letter.

■■■ Next, plaintiffs allege that Dawson misrepresented that plaintiffs had not delivered the accounts receivable schedule as required under section 2.8 of the agreement. (Docket Entry # 241, ¶¶ 95–98). The amended complaint identifies the September 22, 1995 accounts receivable set off letter as setting forth the purported misrepresentation of fact. The letter, however, does not make a representation that plaintiffs did not deliver the accounts receivable schedule as required under section 2.8. (A. 601–602; P. 229). Rather, it is the October 11, 1996 claim letter which makes this statement. Therein, Dawson states that, "The Sellers breached Section 2.8 by failing to provide to Dawson at the Closing 'a complete and accurate schedule (the "Accounts Receivable Schedule") of all accounts receivable (individually on a gross basis) of the Company (the "Accounts Receivable") as of October 2, 1994.'" (P. 244).

Assuming *arguendo* that this statement is a representation of fact as opposed to the more reasonable view that it is an opinion that plaintiffs breached section 2.8, plaintiffs nevertheless fail to provide evidence concerning an essential element of this fraud claim, i.e., their reliance on the statement. Dawson points to the absence of such reliance, as well as harm (Docket Entry # 301), which plaintiffs fail to refute.

Plaintiffs primarily complain about Dawson's alleged concealment of the Safesite accounts receivable tape. Such evidence, which plaintiffs allegedly uncovered in 1997 after issuing an alleged subpoena, demonstrates the absence of reliance. Plaintiffs did not accept Dawson's representation that they

---

**216.** Dawson points to the absence of facts to support this essential element of plaintiffs' fraud claim based on the July consolidated financials.

**217.** Meanwhile, by letter dated September 22, 1995, Dawson asserted a set off of $4,533,283 due to uncollected receivables, an amount in excess of Dawson's $1,000,000 installment payment due in October 1995.

had not delivered the accounts receivable schedule. Rather, they litigated the issue and, through discovery, uncovered evidence that the statement was not true.

Alternatively, plaintiffs fail to show evidence of damages resulting from the alleged fraud. The amount of Dawson's claimed accounts receivable set off stems from its calculation of the accounts receivable, individually on a gross basis, as opposed to any damage resulting from plaintiffs' alleged failure to deliver the schedule.

The alleged misrepresentation concerning plaintiffs' nondelivery of the accounts receivable schedule therefore does not set forth an independent claim of fraud and, to this extent, Dawson is thus entitled to summary judgment.

■ Plaintiffs' final fraud claim and, indeed, the overarching allegation set forth in plaintiffs' opposition memorandum, is that prior to the closing Dawson never intended to pay the installment payments on the purchase price. (Docket Entry # 241, ¶¶ 99–103). Although the amended complaint does not expressly identify the alleged misrepresentations prior to the closing, plaintiffs' opposition memorandum (Docket Entry # 332) and plaintiffs' counsel at oral argument identify three statements made in August 1994 wherein Dawson allegedly misrepresented its intent to pay the purchase price. Viewing the record in plaintiffs' favor, Dawson did make the following three statements in August 1994:(1) "Dawson is available as a back stop with cash available;" (2) "[o]ur offer would be an all-cash offer for 100% of the stock of Faxon, Inc., including all remaining unsold subsidiaries;" and (3) Dawson intends "to proceed with this offer in its entirety, including the above [nonEuropean] subsidiaries, in the event that the proposed sale of same should fall through for whatever reason." (P. 66, 77 & 81).

The first representation, taken in context, was made on August 3, 1994, by Ingleby to Altman and is part of a one page, three sentence facsimile transmission. The entire sentence reads as follows: "In expressing my

hope that the present situation is resolved sooner rather than later, I should like to remind you that Dawson is available as a back stop with cash available and a willingness to negotiate a better price than we previously discussed." (P. 66).

Connolly made the second statement to Altman on August 23, 1994, in a one page facsimile transmission. (P. 77). Connolly made the third statement, again to Altman, on August 25, 1994, in a one page facsimile transmission. Connolly made the third statement in the context of discussing Dawson's proposed future bid in the range of $15 million for Faxon, Inc., without Faxon Canada, Turner and other nonEuropean subsidiaries. The relevant portions of the facsimile read:

> I wish to confirm that it is our intention to make a bid for 100% of the stock of Faxon, Inc. within the price range mentioned by you in our telephone conversation earlier today.
>
> We understand that at the present time this offer does not include Faxon Canada, Turner, Latin America or Asia Pacific.
>
> However, I can confirm that it is our intention to proceed with this offer in its entirety, including the above subsidiaries, in the event that the proposed sale of same should fall through for whatever reason.

(P. 81).

The difficulty with the first two representations is that they are not false.[218] On August 31, 1994, Dawson made an offer to purchase Faxon, Inc., albeit without the nonEuropean subsidiaries, for "$15 million cash." (P. 85). Arguably, there is evidence that the third representation, "to proceed with this offer in its entirety, including the above subsidiaries," when viewed as a reference to an all cash offer in the range of $15 million, was untrue inasmuch as in September the parties renegotiated the purchase price to be in the form of installment payments. Even assuming that plaintiffs provide sufficient evidence of the falsity of the third statement when made, however, plaintiffs fail to show facts that their reliance on

---

218. Throughout its papers and at oral argument, Dawson maintained that plaintiffs' fraud claim lacked the required elements of fraud under Massachusetts law.

the misrepresentation was reasonable and/or justifiable. The first and second statements are equally deficient in this regard because of the absence of reliance.

It is undisputed that, after a month of negotiating the terms of the agreement, the parties agreed to a contract which directly contradicted the representation of an all cash offer. The parties, with the assistance of counsel throughout the negotiations, agreed that Dawson could pay $11 million of the purchase price in seven annual installments. The agreement was fully integrated.

In the language of *McEvoy*, therefore, this case is "generally similar to *Turner*, where there can be no reasonable reliance on the alleged misrepresentation." *McEvoy Travel Bureau, Inc. v. Norton Company*, 563 N.E.2d at 194 (further noting that cases like *McEvoy* "are to be analyzed in light of the principles stated in *Bates*," referring to *Bates v. Southgate*, 308 Mass. 170, 31 N.E.2d 551 (1941)). Plaintiffs therefore cannot base their fraud claim on the alleged misrepresentations made in August 1994 that Dawson would proceed with a cash offer in the range of $15 million, or even $17 million. Reliance on statements that an offer, as opposed to an agreement, would be in cash when the fully integrated and negotiated agreement states that $11 million of the purchase price will be paid in installments fails as a matter of law. *See, e.g., Piantes v. Pepperidge Farm, Inc.*, 875 F.Supp. 929, 933–934 (D.Mass.1995); *see generally Town & Country Fine Jewelry Group, Inc. v. Hirsch*, 875 F.Supp. at 876. Dawson is therefore entitled to summary judgment on plaintiffs' allegations that Dawson made knowing misrepresentations in August 1994 as to its intent to pay.

In sum, Dawson is therefore entitled to summary judgment on plaintiffs' fraud claim in Count III of the amended complaint. This opinion, however, shall not foreclose plaintiffs from filing a motion seeking leave to amend their amended complaint to raise a fraud claim similar to their chapter 93A claim that Dawson, by executing the agreement, knowingly made a material representation at *that* time that it would comply with its terms. *See In re Lane*, 937 F.2d 694, 698 (1st Cir. 1991). These terms require Dawson to pay

the purchase price subject to the adjustments in sections 1.5, 1.6 and 8.2. On October 4, 1994, Dawson therefore knowingly represented that it would make the installment payments subject to the adjustments. To the extent Dawson lacked the present intent to make the future installment payments subject to the adjustments and plaintiffs relied on the representation in the agreement to their detriment, plaintiffs might state a claim of fraud under Massachusetts law. *See generally McEvoy Travel Bureau, Inc. v. Norton Company*, 563 N.E.2d at 192; *Starr v. Fordham*, 648 N.E.2d at 1267–1268; *Schinkel v. Maxi–Holding, Inc.*, 565 N.E.2d at 1224; *Piantes v. Pepperidge Farm, Inc.*, 875 F.Supp. at 933 (recognizing that misrepresentation claim based on present intent to act in future requires evidence that the promisor "intended to breach that promise at the time it was made").

### 2. *Plaintiffs' Chapter 93A Claim*

Dawson also seeks summary judgment on plaintiffs' chapter 93A claim. (Docket Entryè257, 296, 301 & 354). Plaintiffs' chapter 93A claim alleges a number of unfair and deceptive acts on the part of Dawson. These include the allegation that "Dawson attempted to pass off its December 23, 1994 Adjusted Closing Net Worth determination as the work product of Deloitte." Plaintiffs additionally assert that Dawson used its breach of warranty claim "as a wedge to force Sellers to waive Dawson's failure to preserve its rights under the exclusive purchase price adjustment procedure." (Docket Entry # 241, ¶ 108). Dawson's argument that plaintiffs did not plead their chapter 93A contention that Dawson used improper set offs as a means to coerce plaintiffs to accept less than the full amount due them under the agreement (Docket Entry # 301) is therefore misplaced. *See Connecticut General Life Insurance Company v. Universal Insurance Company*, 838 F.2d 612, 622 (1st Cir.1988).

Dawson also raises a threshold argument that plaintiffs' chapter 93A claim did not arise "primarily and substantially" in Massachusetts. (Docket Entryè301 & 354). Under section 11 of chapter 93A, the burden of proof is on Dawson "to show that [its]

misconduct occurred primarily and substantially outside Massachusetts." *Roche v. Royal Bank of Canada*, 109 F.3d 820, 829 (1st Cir.1997). As discussed in *Clinton Hospital Association v. Corson Group, Inc.*, 907 F.2d 1260 (1st Cir.1990), Massachusetts courts first look to the following three factors in determining whether the acts at issue occurred primarily and substantially within Massachusetts: (1) "where the defendant committed the deceptive or unfair acts or practices;" (2) "where the plaintiff received and acted upon the deceptive or unfair statements;" and (3) "the situs of [the] plaintiff's losses due to the unfair or deceptive acts or practices." *Clinton Hospital Association v. Corson Group, Inc.*, 907 F.2d at 1265–1266; *accord Arthur D. Little International, Inc. v. Dooyang Corporation*, 979 F.Supp. 919, 926 (D.Mass.1997).

The first factor "is the least weighty of the three factors." *Roche v. Royal Bank of Canada*, 109 F.3d at 829. Under this factor, as noted in *Clinton*, although the acts originated outside Massachusetts, "it was intended that their force and input influence the plaintiff's behavior in Massachusetts." *Clinton Hospital Association v. Corson Group, Inc.*, 907 F.2d at 1265.

Under the second factor, "the critical factor is the locus of the recipient of the deception at the time of reliance." *Clinton Hospital Association v. Corson Group, Inc.*, 907 F.2d at 1265–1266. "[T]he location of the dissembler at the time he makes a deceptive statement" is therefore "minimized." *Compagnie De Reassurance v. New England Reinsurance*, 57 F.3d at 90; *Clinton Hospital Association v. Corson Group, Inc.*, 907 F.2d at 1265. The location of Davis and FNB "is of special significance ... since 'the victim's ingestion of a deceptive statement and the subsequent effects from reliance on it are what give the deceptive statement its venomous sting.'" *Play Time, Inc. v. LDDS Metromedia Communications, Inc.*, 123 F.3d 23, 33 (1st Cir.1997) (quoting *Clinton*, 907 F.2d at 1266).

The fact that Davis maintains a legal residence in New Hampshire and that various claim letters were sent to Davis in New Hampshire does not defeat plaintiffs' chapter 93A claim. Nor do the facts that Dawson, Inc. is an Illinois corporation and Dawson PLC is based in England entitle Dawson to summary judgment on the basis that the deceptive conduct did not occur primarily and substantially in Massachusetts.

Viewing the facts in plaintiffs' favor, they establish that the December 23, 1994 claim letter was sent to Davis in New Hampshire but also to FNB in Massachusetts. (P. 179). At the time, Davis maintained an apartment in Cambridge, Massachusetts which she continued to maintain through 1996. She acted upon the deception in the December 23, 1994 letter in Massachusetts. (Docket Entry # 333, ¶ 7). Similarly, plaintiffs' counsel, located in Massachusetts, acted upon the concealment and deception by writing a letter to Ferber on March 30, 1995. (P. 194). Dawson's deception and concealment of Deloitte's nondetermination of the adjusted closing net worth of Faxon, a Massachusetts corporation located in Westwood, resulted in a claimed set off of the purchase price. Dawson was to make those payments to Davis by wiring them directly to bank accounts located in Massachusetts. (Docket Entry # 333, ¶ 8). Such facts create a genuine issue of material fact as to whether Dawson met its burden in showing that the acts occurred primarily and substantially outside Massachusetts.

Substantive liability under section 11 of chapter 93A for unfair and deceptive acts occurs when the objectionable conduct attains " 'a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.' " *Quaker State Oil Refining Corp. v. Garrity Oil Co., Inc.*, 884 F.2d 1510, 1513 (1st Cir.1989) (citation omitted); *accord Industrial General Corporation v. Sequoia Pacific Systems Corporation*, 44 F.3d 40, 43 (1st Cir.1995). A chapter 93A claimant must set forth conduct which falls " 'within at least a penumbra of some common law, statutory, or other established concept of unfairness,' or [was] 'immoral, unethical, oppressive or unscrupulous,' and resulted in 'substantial injury to competitors or other.' " *Logan Equipment Corp. v. Simon Aerials, Inc.*, 736 F.Supp. 1188, 1203–1204 (D.Mass.1990) (quoting *PMP Associates, Inc. v. Globe Newspaper Co.*, 366 Mass.

593, 321 N.E.2d 915, 917 (1975)); *accord General Electric Company v. Lyon*, 894 F.Supp. 544, 552 (D.Mass.1995). As noted by the First Circuit, however, such language is oftentimes " 'uninstructive.' " *NASCO, Inc. v. Public Storage, Inc.*, 127 F.3d 148, 152 (1st Cir.1997) (citation omitted). In evaluating the unfairness of the objectionable conduct, this court may "assess 'the equities between the parties,' including what both parties knew or should have known." *Ahern v. Scholz*, 85 F.3d 774, 798 (1st Cir.1996).

■■■■ As correctly argued by Dawson, a mere breach of contract, without more, will not create liability under the statute. *Pepsi–Cola Metropolitan Bottling Company, Inc. v. Checkers, Inc.*, 754 F.2d 10, 18 (1st Cir.1985). Furthermore, as recently noted by the First Circuit, even a knowing breach of contract "does not raise the breach to the level of a Chapter 93A violation." *Ahern v. Scholz*, 85 F.3d at 798. Rather, the question "is whether the level of 'rascality' " rises to the level of a chapter 93A violation by, for example, concealment of the nature of calculating the commercially unreasonable deductions under a contract. *Ahern v. Scholz*, 85 F.3d at 799. It is nevertheless equally true that the absence of a breach of contract does not automatically exonerate a party from liability under section 11 of chapter 93A. *NASCO, Inc. v. Public Storage, Inc.*, 127 F.3d at 152.

■■■■ Using a breach of contract "as a lever" in order "to obtain advantage for the party committing the breach in relation to the other party . . . has an extortionate quality that gives it the rancid element of unfairness" thereby creating liability under chapter 93A. *Atkinson v. Rosenthal*, 33 Mass.App.Ct. 219, 598 N.E.2d 666, 670 (1992) (limiting *Anthony's Pier Four v. HBC Associates*, 411 Mass. 451, 583 N.E.2d 806 (1991),[219] to breach of contract cases with this extortion-

ate quality); *see also Ahern v. Scholz*, 85 F.3d at 798–799 (declining to decide whether "*Atkinson* extends beyond its immediate context to limit award of Chapter 93A damages in breach of contract cases to cases with an 'extortionate quality' "); *NASCO, Inc. v. Public Storage, Inc.*, 29 F.3d 28, 34 (1st Cir.1994) (knowingly breaching contract "in order to obtain for itself unbargained-for benefits to the detriment of NASCO" would allow jury to find liability under chapter 93A); *Arthur D. Little International, Inc. v. Dooyang Corporation*, 979 F.Supp. 919, 925 (D.Mass.1997) (recognizing liability "where one party orders consulting services without an intent to pay for them" as well as where party follows "strategy of commercial extortion by failing to pay clear obligations . . . to force favorable price concessions through threat of expensive litigation").

■■■■ Viewing the facts and all reasonable inferences in plaintiffs' favor, by letter dated December 23, 1994, Dawson asserted a set off under sections 1.5 and 1.6 which it had no right to take because Deloitte had not determined Faxon's adjusted closing net worth.[220] At the same time, it concealed this fact from plaintiffs while claiming that it had the right to take the $3,961,723 set off.

By late March 1995 plaintiffs had discovered Deloitte's nondetermination. Shortly thereafter, on April 10, 1995, Dawson issued another set off letter claiming indemnification in the amount of $6,641,404. The April 10, 1995 breach of warranty set off letter included the false assertion that plaintiffs had not disclosed the July consolidated financials prepared on September 9, 1994, to Dawson. The letter also claimed a breach of section 2.8 because a "substantial part" of the $10.4 million intercompany receivable due

---

**219.** In *Anthony's Pier Four*, the SJC stated that, "conduct 'in disregard of known contractual arrangements' and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes." *Anthony's Pier Four v. HBC Associates*, 583 N.E.2d at 821 (quoting *Wang Laboratories, Inc. v. Business Incentives, Inc.*, 398 Mass. 854, 501 N.E.2d 1163, 1165 (1986), wherein the benefits were obtained "without cost").

**220.** Unlike the fraud claim based on the December 23, 1994 claim letter, proof of actual reliance is not required under section 11 of chapter 93A. *See International Fidelity Insurance Company v. Wilson*, 387 Mass. 841, 443 N.E.2d 1308, 1314 (1983).

from Nihon Faxon "could not be expected to be collected in full."[221]

In a separate letter, Dawson then used the April 10, 1995 set off as a lever to obtain unbargained for benefits, i.e., a purchase price reduction under sections 1.5 and 1.6. Therein, Dawson advised plaintiffs that if plaintiffs were unwilling to agree to one of two options to redetermine the adjusted closing net worth, then "Dawson plans to proceed in accordance with the Stock Purchase Agreement," i.e., either continue to assert the improper set off and/or proceed with an excessive accounts receivable set off. In a letter dated October 4, 1995, Dawson repeated the offer to "drop its indemnification claims" if plaintiffs agreed to proceed with one of two options concerning the purchase price adjustment claim. (P. 233). Minutes dated November 16, 1995, of an audit meeting of Dawson, Inc. reflect that the proposed $5 million downward adjustment of the purchase price "served a purpose from a litigation standpoint" although Connolly thought that the parties, through settlement or arbitration, would settle on an amount of "at least $4 million." (P. 236).

Such facts have the necessary unfair or deceptive quality to support liability under section 11 of chapter 93A. Dawson, however, makes a further argument that damages are essential to a chapter 93A claim and plaintiffs have not suffered any harm as a result of the deceptive conduct. Dawson's assertion of an improper set off in contravention of the terms of the agreement necessarily deprives plaintiffs of monies, or a lowered set off amount, under the notes. Dawson's continued assertion of a set off in violation of known contractual obligations also results in unnecessary expenses for plaintiffs in uncovering the deception. Viewing the record in plaintiffs' favor, there is a sufficient causal connection between Dawson's deception and

plaintiffs' loss to avoid summary judgment. *See International Fidelity Insurance Company v. Wilson,* 387 Mass. 841, 443 N.E.2d 1308, 1314 (1983); *Orkin Exterminating Company, Inc. v. Rathje, III,* 72 F.3d 206, 209–210 (1st Cir.1995); *Lane v. First National Bank of Boston,* 737 F.Supp. 118, 120 (D.Mass.1989).

In light of the foregoing, Dawson is not entitled to summary judgment on plaintiffs' chapter 93A claim.

### E. *DAWSON'S FRAUD AND CHAPTER 93A CLAIMS*

As a final matter, plaintiffs move for partial summary judgment on Dawson's claims of fraud and violation of chapter 93A. (Docket Entrye315 & 318). Dawson's counterclaim alleges that plaintiffs committed common law fraud (Count I), statutory fraud (Count II) and negligent misrepresentation (Count III). In addition to seeking summary judgment on the foregoing counts, plaintiffs move for summary judgment on Count IV of the counterclaim which alleges a chapter 93A violation. Dawson opposes summary judgment. (Docket Entry # 357).

In seeking partial summary judgment on Dawson's fraud and chapter 93A claims, plaintiffs make the following arguments. First, they contend that Dawson cannot base a fraud claim upon prior statements which are inconsistent with a fully integrated and negotiated agreement. Plaintiffs emphasize that the stock purchase agreement excluded the subsidiaries from any warranties as to their financial condition. Second, they submit that Dawson conducted an exhaustive due diligence review of Faxon and had actual knowledge about the financial condition of Faxon, including Nihon Faxon, which precludes any fraud claim due to the absence of reasonable reliance.[222] Plaintiffs point out

---

**221.** As previously noted, however, the term "Company" in section 2.8 included the subsidiaries thereby limiting the warranty under section 2.8 to the external receivables of Nihon Faxon.

**222.** Plaintiffs also argue that they are entitled to summary judgment on the fraud claims because of "the fundamental contradiction in Dawson's versions of the facts." (Docket Entry # 318). They point out that Dawson argues that it relied

on the adjustments in section 1.5 to cover any deficiency in the value of the foreign subsidiaries. Hence, according to plaintiffs, Dawson cannot simultaneously argue that the nondisclosures and misrepresentations as to Nihon Faxon induced Dawson to enter into the agreement.

Dawson's assertions are not mutually exclusive. Dawson could rely on both the purchase price adjustment in section 1.5 as well as representations made by Zuroff inasmuch as Zuroff's

that Dawson now admits that it received the July consolidated financials prepared on September 9, 1994. (Docket Entry # 318). As summarized by plaintiffs' counsel at oral argument, "the primary basis" for plaintiffs' summary judgment motion on the fraud and chapter 93A claims "is the exclusion of the subsidiaries in the agreement and the integration clause in the agreement." [223] (Docket Entry # 366).

 The fraud counts in Dawson's counterclaim revolve around the undisclosed or materially misrepresented statements concerning Nihon Faxon. Viewing the record in Dawson's favor, Zuroff assured Connolly that the Nihon Faxon intercompany receivable was supported by back-to-back receivables. He also advised Connolly that the addition of the foreign subsidiaries was a wash and that the added subsidiaries would not impact Faxon's net worth.[224]

Zuroff was also aware of the Tsukuba University problem but did not disclose the possible loss of this Nihon Faxon client to Connolly prior to the closing. Although Connolly remembers discussions about efforts to retain Nihon Faxon customers, Connolly testified that he was never informed of the projected loss of 50% of Nihon Faxon's sales volume.

The record is disputed as to the extent and content of Connolly's review of financial information both before and after the EBSCO withdrawal. Viewing the record in Dawson's favor, Connolly was given financial statements showing the pay down, at various times and in various amounts, of the Nihon Faxon intercompany debt. Zuroff did not advise Connolly that the statements were not realistic. Connolly was not focused on the financial condition of the subsidiaries prior to the EBSCO withdrawal. At a minimum, however, he reviewed the interim balance sheet and consolidated financials through June and possibly July. Ferber also received the July consolidated financials prepared on September 9, 1994. Viewing the record and inferences therefrom in Dawson's favor, Faxon did not, however, provide Dawson with copies of the June financials prior to the closing.

After the EBSCO sale Connolly was primarily occupied with arranging financing for the transaction, obtaining a line of credit and alleviating the concerns of Faxon's publishers and customers. Ingleby also lacked the necessary time to conduct an adequate due diligence review of Faxon.

Thus, viewing the record in Dawson's favor with respect to the scope of its knowledge of

statements are not in direct contradiction with the terms negotiated by the parties for reasons explained *infra*.

223. Plaintiffs' memorandum tailors most of its argument to Dawson's fraud claims and does not separately address Dawson's chapter 93A counterclaim.

A chapter 93A claim may "be premised on common law deceit." *Logan Equipment Corp. v. Simon Aerials, Inc.*, 736 F.Supp. 1188, 1204 (D.Mass.1990); *McEvoy Travel Bureau, Inc. v. Norton, Company*, 408 Mass. 704, 563 N.E.2d 188, 194–195 (1990) (no error in finding that chapter 93A claim was tenable due to viability of fraud claim and further noting that even experienced businessmen "should not be permitted to engage in fraud to induce the contract"); *Datacomm Interface, Inc. v. Computerworld*, 396 Mass. 760, 489 N.E.2d 185, 197 (1986) ("it is clear that common law actions for fraud and deceit are within the contemplation of an 'unfair act' under the statute"); *VMark Software, Inc. v. EMC Corporation*, 642 N.E.2d at 595 (" 'a misrepresentation in the common law sense would be the basis for a c. 93A claim' "); *see, e.g., Health Care Collection Services, Inc. v. Protocare, Inc.*, 1995 WL 96911 at *3 (D.Mass. Feb.24,

1995) (denying summary judgment on chapter 93A claim to the extent based on misrepresentation claims pending further discovery); *see also Sargent v. Koulisas*, 29 Mass.App.Ct. 956, 560 N.E.2d 569, 571 (1990). Absent an argument directly addressed to Dawson's chapter 93A claim, therefore, the arguments based on fraud, which do not mandate summary judgment, also do not mandate summary judgment on Dawson's chapter 93A claim.

224. Although plaintiffs point to facts which, as set forth in the factual background, conflict with Zuroff's alleged statements, this court is obligated to view the record in Dawson's favor. Accordingly, plaintiffs' contention that Zuroff never made these statements does not defeat Dawson's fraud claims.

Plaintiffs further assert that Zuroff's alleged misrepresentations were not actionable statements of fact capable of specific proof but were simply opinions. (Docket Entry # 318, p. 44). To the contrary, however, there is evidence in the record showing that the statements were susceptible of knowledge. There is also evidence that the statements were false at the time they were made.

Nihon Faxon and its receipt of financial statements prior to the closing, there are genuine issues of material fact as to whether Dawson's reliance was reasonable or justifiable. Given the summary judgment record, there are also genuine issues of material fact with respect to plaintiffs' nondisclosure of cash flow statements contradicting Zuroff's testimony that the Nihon Faxon intercompany receivable was supported by back-to-back receivables.

Plaintiffs' similar argument that Dawson intended to close Nihon Faxon after the transaction also does not establish that Dawson did not rely on the representations as to Nihon Faxon. First, the record does not establish that Dawson intended to close Nihon Faxon immediately after the transaction. Rather, there are facts which show that Dawson was considering closing or selling Nihon Faxon.[225] Consequently, misrepresentations about Nihon Faxon would materially impact the value of the entity acquired by Dawson and also negatively effect the proceeds from any future sale.

▬ Turning to plaintiffs' first argument, it is undeniable that the agreement was fully integrated.[226] In addition, section 2.4 excludes the subsidiaries, including Nihon Faxon, from the warranties and representations therein. Section 2.4 includes a representation by plaintiffs that certain financials statements "fairly present the financial condition and results of operation of the Company." Making a representation about financial statements of Faxon domestic, however, does

not directly contradict prior oral representations that adding subsidiaries to the transaction would not materially impact Faxon's net worth and that the addition of such subsidiaries was a wash.[227] Internal, undisclosed financial statements as well as the undisclosed June 30, 1994 board minute would serve to show that these representations were false at the time they were made.[228] Zuroff's statements do not directly contradict the terms agreed to by the parties during negotiations. Plaintiffs' argument based on *Turner* and its progeny therefore does not defeat Dawson's fraud in the inducement claims.

Furthermore, the agreement contemplates liability on the part of the sellers for fraud. Section 9.11 limits the sellers' liability to Dawson "[e]xcept in the case of fraud." The entire sentence reads as follows, "Except in the case of fraud by Sellers, Buyer's sole remedy for indemnification or reimbursement or money damages under this Agreement shall be limited to exercise of its rights under Sections 1.5, 1.6 and 8.2 and this entire Section 9 (excluding Section 9.3), as the case may be." [229]

In short, having considered all of plaintiffs' arguments, plaintiffs are not entitled to summary judgment on Dawson's fraud and chapter 93A claims.

## CONCLUSION

To the extent described in the body of this

225. The "admissions" and "undisputed" facts set forth in plaintiffs' memorandum are contrary to the facts when viewed in Dawson's favor and do not provide a basis to allow summary judgment in plaintiffs' favor on the fraud and chapter 93A counterclaims.

226. The relevant law has been set forth previously.

227. To state the obvious, the agreement does not read that the sellers do not warrant the financial condition of the subsidiaries. Rather, the agreement only excludes the subsidiaries from the term "Company" in sections 2.3, 2.4 and 2.5. Plaintiffs' argument that Dawson's reliance was unreasonable as a matter of law because the representations contradict the agreement is therefore unavailing.

228. This court does not read Dawson's fraud claims as alleging a fraudulent concealment claim based solely on the June 30, 1994 board minute. Rather, this court reads the counterclaim as alleging that plaintiffs breached section 2.5 due to the June 30, 1994 board minute. Moreover, section 2.5, wherein sellers represented that the board minutes were accurate and complete, would appear to bar a fraud claim based solely on the nondisclosure of the June 30, 1994 board minute.

This court also does not read paragraph 18 of Dawson's counterclaim as raising a fraud claim based on plaintiffs' representation as to the sale of foreign subsidiaries to EBSCO.

229. This reconstruction eliminates the bolding used in the agreement.

opinion, this court **RECOMMENDS**[230] that Dawson's motion for partial summary judgment (Docket Entry # 257) be **ALLOWED** as to plaintiffs' breach of section 2.5 to the limited extent set forth in this opinion and as to plaintiffs' fraud claim. It is further **RECOMMENDED**[231] that Dawson's motion (Docket Entry # 257) otherwise be **DENIED.**

This court also **RECOMMENDS**[232] that plaintiffs' motion for partial summary judgment (Docket Entryè313 & 315) be **ALLOWED** as to Dawson's purchase price adjustment claim under sections 1.5 and 1.6 of the agreement and as to Dawson's claim that plaintiffs breached section 2.11. It is additionally **RECOMMENDED**[233] that plaintiffs' motion (Docket Entryè313 & 315) otherwise be **DENIED.**

---

**230.** Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and Recommendation to which objection is made and the basis for such objection. Any party may respond to another party's objections within ten days after service of the objections. Failure to file objections within the specified time waives the right to appeal the district court's order. *United States v. Escoboza Vega*, 678 F.2d 376, 378–79 (1st Cir.1982); *United States v. Valencia–Copete*, 792 F.2d 4, 6 (1st Cir.1986).

**231.** See the previous footnote.

**232.** See footnote number 230.

**233.** See footnote number 230.